UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OLEG V. DERIPASKA,<br>64 Severnaya Street, Oktyabrsky,<br>Khutor, Ust-Labinsky District,<br>Krasnodar Territory, Russia, 352332,<br><br>                                    Plaintiff,<br><br>v.<br><br>THE ASSOCIATED PRESS,<br>200 Liberty Street,<br>New York, NY 10281,<br><br>                                    Defendant. | Civil Action No. _____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Oleg V. Deripaska brings this action under the laws of the District of Columbia. Plaintiff's allegations are made with knowledge of his own acts and acts taking place in his presence, and upon information and belief as to all other matters.

## NATURE OF THE CASE

1. This is an action for defamation by direct statements and by implication.

2. Mr. Deripaska, a private investor and industrialist, is the CEO of United Company RUSAL, one of the world's largest aluminum companies.

3. The Associated Press (hereinafter the "AP") is a news publishing agency with global reach. In its most recent annual report, the AP claimed that "[m]ore than half the world's population sees content from the AP every day via 15,000 news outlets worldwide."

4. On March 22, 2017, the AP, by and through its writers Jeff Horwitz and Chad Day, published an article (hereinafter the "Article") that falsely accused Mr. Deripaska of

1

involvement in criminal acts and other improprieties.  Mr. Horwitz and Mr. Day are writers at the AP's local news bureau in Washington, DC.

5.  The AP acted with actual malice in publishing the Article because prior to publication it knew that such statements were false, or at minimum entertained doubts about the truth of the defamatory statements contained in the article.  In addition to the Article's overtly false and defamatory statements, the Article is structured to imply falsely that Mr. Deripaska's commercial dealings from the period between 2005 and 2009 were somehow related to alleged criminal conduct and improprieties related to the campaign of then-presidential candidate Donald J. Trump and the 2016 U.S. Presidential election (hereinafter the "Trump Campaign Controversy").

6.  The AP admitted, through an online video featuring one of the Article's authors, that the Article's central representations regarding Mr. Deripaska were misleading (hereinafter the "Horwitz Video").  In the Horwitz Video, the AP admitted, *inter alia*, that "the relationship [Mr. Manafort had] with Deripaska would've been over by the time the [Trump] campaign began, long since then."  The AP also admitted:  "There isn't any sort of question at the moment as to whether Oleg Deripaska was involved in some way in the Trump Campaign."

7.  Although the Horwitz Video contradicts some of the Article's central, defamatory themes, it did not accompany the Article's initial distribution.  Readers of the Article and of its numerous republications by news outlets around the world have been left with the impression that Mr. Deripaska's private, commercial dealings were—and still may be—deeply intertwined with the Trump Campaign Controversy.

8.  On March 31, 2017, Mr. Deripaska, through his attorneys, asked that the AP issue a public correction and retraction.  The requested retraction would have clarified that the AP is

aware of no evidence, of any kind, to suggest that Mr. Deripaska and Mr. Manafort had a contractual relationship to advance the interests of the Russian government or Mr. Putin, and that the relationship between Mr. Deripaska and Mr. Manafort predated all of the alleged contacts between the Russian government and the Trump Campaign by many years.

9. The AP refused Mr. Deripaska's request for a public correction and retraction.

10. Since its publication, the Article has been republished or cited by numerous news outlets worldwide, including but not limited to both print and televised publications by The Independent (UK), Bloomberg News, CNN, and MSNBC.

## PARTIES

11. Plaintiff Oleg V. Deripaska is a citizen of the Russian Federation ("Russia"), with business interests in several countries.

12. Defendant The Associated Press is an unincorporated cooperative association organized under the laws of the statue of New York, with its principal place of business in New York, NY.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(a)(2). For purposes of that statute, Mr. Deripaska is a citizen of Russia, and the AP is a citizen of New York. Accordingly, the citizenship of the parties is diverse. The amount in controversy exceeds $75,000.

14. This Court has personal jurisdiction over Defendant, and venue is proper in this judicial district, under 28 U.S.C. § 1391 and the District of Columbia's long-arm statute, D.C. Code §§ 13-423(a)(1) and (a)(3). The AP regularly transacts business in this district. The AP,

through its agents, has caused harm in this district.  A substantial part of the events giving rise to Mr. Deripaska's claim occurred in this district.

## FACTUAL ALLEGATIONS

**Statement #1**

15.  In its opening line, the Article asserts:  "Before signing up with Donald Trump, former campaign manager Paul Manafort secretly worked for a Russian billionaire with a plan to 'greatly benefit the Putin Government,' The Associated Press has learned."  The Article continues:  "Manafort pitched the plans to aluminum magnate Oleg Deripaska, a close Putin ally with whom Manafort eventually signed a $10 million annual contract beginning in 2006."  According to the Article, these "plans" were set forth in a memo written by Mr. Manafort in 2005 (hereinafter the "2005 Manafort Memo").

16.  The Article links the purported plans set forth in the 2005 Manafort Memo to the "$10 million annual contract" purportedly entered into between Mr. Deripaska and Mr. Manafort.  The Article then quotes the 2005 Manafort Memo:  "'We are now of the belief that this model can greatly benefit the Putin Government if employed at the correct levels with the appropriate commitment to success.' Manafort wrote in the 2005 memo to Deripaska."

17.  The Article expresses certainty about the connection between the plans set forth in the 2005 Manafort Memo and funds paid by Mr. Deripaska to Mr. Manafort:  "Manafort's plans were laid out in detailed documents obtained by the AP that included strategy memoranda and records showing international wire transfers for millions of dollars."

18.  Taken together, these assertions constitute a false and defamatory statement (hereinafter "Statement #1").

19. Statement #1 is verifiably false in that it asserts in substance that Mr. Deripaska paid Mr. Manafort to execute the plans set forth in the 2005 Manafort Memo, in particular to "greatly benefit the Putin Government."

20. Contrary to Statement #1, Mr. Deripaska never had any arrangement, whether contractual or otherwise, with Mr. Manafort to advance the interests of the Russian government or to implement the purported proposal in the 2005 Manafort Memo.

21. On information and belief, the 2005 Manafort Memo constituted a pitch by Mr. Manafort's firm for services unrelated to the contractual arrangements between Mr. Deripaska and Mr. Manafort.

22. The AP knew that Statement #1was false when it published the Article. There is no contract pursuant to which Mr. Deripaska paid Mr. Manafort for work designed to "greatly benefit the Putin government." The AP knew that to be the case when it published the Article, because it claimed to be in possession of a contact between Mr. Deripaska and Mr. Manafort, yet it did not quote, paraphrase, or otherwise summarize its terms. On information and belief, the purported contract in the AP's possession relates to ordinarily commercial dealings and in no way supports any assertion that Mr. Manafort was engaged by Mr. Deripaska to perform work to "greatly benefit the Putin government."

23. In the alternative, but for the same reasons stated above, the AP published Statement #1 with reckless disregard as to whether it was false. The AP had the terms of the purported 2006 contract in its possession, and could have examined those terms and reported on them. The AP, however, did not report on the terms in the purported 2006 contract because doing so would have contradicted the AP's assertion that Mr. Deripaska's dealings with Mr. Manafort were somehow related to subject of the 2005 Manafort Memo.

24. Statement #1 is defamatory. As the Article notes, "Under the Foreign Agents Registration Act, people who lobby in the U.S. on behalf of foreign political leaders or political parties must provide detailed reports about their actions to the department" and "[w]illfully failing to register is a felony." By asserting in substance that Mr. Deripaska paid Mr. Manafort to act as an unregistered foreign agent, Statement #1 injured plaintiff in his trade, profession, and community standing by making him appear to have been engaged in criminal conduct.

25. Statement #1 is actionable as a matter of law, irrespective of special harm, because it asserts that Mr. Deripaska was involved in, or aided, criminal conduct by Mr. Manafort.

26. Statement #1 has caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

**Statement #2**

27. In an effort to lend authority to its dubious chimera of accusations, the Article quotes Senator Lindsey Graham of South Carolina: "Clearly if [Mr. Manafort]'s getting millions of dollars from [Mr. Deripaska,] a billionaire close to Putin, to basically undermine democratic movements, that's something I'd want to know about."

28. The quotation attributed to Senator Graham (the "Graham Quotation") uses the present participle form, thereby asserting that Mr. Manafort is *currently* "getting millions of dollars" from Mr. Deripaska. In addition, the Graham Quotation's reference to "basically undermin[ing] democratic movements" furthers the Article's false and defamatory themes and effectively confirms that the 2005 Manafort Memo's plans are nefarious in and of themselves.

29. The Article does not clarify that the hypothetical payment of "millions of dollars" described in the Graham Quotation would have taken place many years ago, if it had happened at

all.  Nor does the Article correct or clarify the Graham Quotation's suggestion that Mr. Deripaska's contracts with Mr. Manafort were intended "to basically undermine democratic movements."

30.     The AP had (and has) no basis for reporting that any contract between Mr. Deripaska and Mr. Manafort provided for the undermining of democratic movements.

31.     The next paragraph of the Article reads:  "Democrats on the House Intelligence committee said the new revelations will feature in their investigations."

32.     Taken together, these assertions constitute a false and defamatory statement (hereinafter "Statement #2").

33.     The AP intended for Statement #2 to have a false and defamatory inference beyond the reporting of true facts.  Even if true, the statement regarding the House Democrats' investigation—when paired with the Graham Quotation—strongly and falsely conveys that Mr. Deripaska's contracts with Mr. Manafort had criminal implications and merit a congressional investigation.  Again, Mr. Deripaska did not make any payments to Mr. Manafort to undermine democratic movements, and the Article cites no proof to substantiate that accusation.

34.     The AP knew that Statement #2 was false when it published the Article.  Specifically, the AP knew that Mr. Deripaska severed relations with Mr. Manafort many years ago.  In the Horwitz Video, the Associate Press admitted, *inter alia*, that "the relationship [Mr. Manafort had] with Deripaska would've been over by the time the [Trump] campaign began, long since then."

35.     Alternatively, by not placing the Graham Quotation in its proper temporal context, the AP acted with reckless disregard for whether or not Statement #2 conveyed a false inference.

36. Statement #2 is defamatory. By conveying that Mr. Deripaska paid Mr. Manafort to undermine democratic movements, and that Mr. Deripaska merited being the subject of a congressional investigation, Statement #2 injured plaintiff in his trade, profession, and community standing by making him appear infamous or odious.

37. Statement #2 is actionable as a matter of law, irrespective of special harm, because it conveys that Mr. Deripaska was involved in, or aided, criminal conduct by Mr. Manafort—including conduct in violation of the Foreign Agents Registration Act, and that he merited being the subject of a congressional investigation.

38. Statement #2 has caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

**Statement #3**

39. The Article claims: "Deripaska became one of Russia's wealthiest men under Putin, buying assets abroad in ways widely perceived to benefit the Kremlin's interests."

40. The next paragraph returns to a discussion of the Trump Campaign Controversy. In that paragraph, the Article repeats that Mr. Manafort had worked as President Trump's campaign chairman during the 2016 Presidential election—a fact already set forth in the very first paragraph.

41. In the next paragraph, the Article claims: "The newly obtained business records link Manafort more directly to Putin's interest in the region. According to those records and people with direct knowledge of Manafort's work for Deripaska, Manafort made plans to open an office in Moscow, and at least some of his work in Ukraine was directed by Deripaska, not local political interests there."

42. In the next paragraph, the Article claims: "Meanwhile, federal criminal prosecutors became interested in Manafort's activities years ago as part of a broad investigation to recover stolen Ukraine assets after the ouster of pro-Russian President Viktor Yanukovych there in early 2014."

43. Taken together, these assertions constitute a false and defamatory statement (hereinafter "Statement #3").

44. The AP intended for Statement #3 to have a defamatory inference beyond the mere reporting of true facts. Even if each element of Statement #3 were true or a matter of opinion, the Article's juxtaposition of these assertions reasonably conveys that Mr. Deripaska stole Ukrainian assets in 2014, and that he is implicated in federal prosecutors' investigation of that theft. Moreover, the strange insertion of a paragraph regarding the Trump Campaign Controversy in the middle of Statement #3 conveys that the alleged theft of assets from Ukraine is somehow tied to the Trump Campaign Controversy.

45. Statement #3 is verifiably false. Mr. Deripaska has never stolen assets from Ukraine or elsewhere, and did not aid Mr. Manafort in doing so. Moreover, Mr. Deripaska has never had any involvement in the Trump Campaign Controversy.

46. The AP knew that what Statement #3 implied was false when it published the Article. The AP knew that by 2014 Mr. Deripaska had not worked with Mr. Manafort for several years. Indeed, the AP knew that by 2014, Mr. Deripaska and Mr. Manafort were already engaged in litigation over their prior contracts.

47. Alternatively, the AP published Statement #3 with reckless disregard as to whether or not it conveyed a false implication. At a minimum, a review of the public litigation between Mr. Deripaska and Mr. Manafort would have revealed the striking improbability that

they would have engaged in any work together in 2014, let alone that they embarked on a criminal conspiracy to steal assets from Ukraine.

48. Statement #3 is defamatory. By conveying that Mr. Deripaska was involved in the theft of assets from Ukraine and that he might be the subject of a federal criminal investigation, Statement #3 injured plaintiff in his trade, profession, and community standing by making him appear odious or infamous.

49. Statement #3 is actionable as a matter of law, irrespective of special harm, because it reasonably conveys that Mr. Deripaska was involved in, or aided, criminal conduct, and that he might be the subject of a federal criminal investigation.

50. Statement #3 has caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

## COUNT I:
## DEFAMATION — LIBEL

51. Plaintiff incorporates and adopts by reference the allegations contained in each and every preceding and subsequent paragraph of this Complaint.

52. The AP published the Article without authorization or privileged and it was subsequently viewed by third parties throughout the world.

53. Statements #1, 2, and 3 are each false.

54. The Article as a whole creates a false overall implication.

55. The AP published Statements #1, 2, and 3 with knowledge that each was false.

56. Alternatively, the AP published Statements #1, 2, and 3 with reckless disregard as to whether they were false.

57. The AP published the Article as a whole with knowledge that its overall implication was false.

58. Alternatively, the AP published the Article as a whole with reckless disregard as to whether its overall implication was false.

59. Statements #1, 2, and 3 are defamatory in that each one injured Mr. Deripaska in his trade, profession, and community standing, and made him appear odious and infamous.

60. The Article as a whole is defamatory in that it injured Mr. Deripaska in his trade, profession, and community standing, and made him appear odious and infamous.

61. Statements #1, 2, and 3 are each actionable as a matter of law without regard to special harm because each one implies that Mr. Deripaska engaged in criminal conduct or that he aided criminal conduct by Mr. Manafort.

62. The Article as a whole is actionable as a matter of law without regard to special harm because it implies that Mr. Deripaska engaged in criminal conduct or that he aided criminal conduct by Mr. Manafort.

63. Statements #1, 2, and 3 have caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

64. The Article as a whole has caused Mr. Deripaska special harm, because his business interests have suffered a loss of good will value and other pecuniary loss.

## REQUEST FOR RELIEF

65. Plaintiff incorporates and adopts by reference the allegations contained in each and every preceding and subsequent paragraph of this Complaint.

66. Mr. Deripaska request that this Court render the following relief:

    a. Award him an appropriate amount in monetary damages as determined at trial, including pre- and post-judgment interest;

    b. Award exemplary damages against Defendant in an appropriate amount to

be determined at trial; and

c.     Grant him such other relief as is just and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

Respectfully submitted,

Dated: May 15, 2017                    **BOIES SCHILLER FLEXNER LLP**

   */s/ Jonathan D. Schiller*
Jonathan D. Schiller (DC Bar No. 185496)
jschiller@bsfllp.com
575 Lexington Ave., 7th Fl.
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

Jonathan Sherman (DC Bar No. 468539)
jsherman@bsfllp.com
1401 New York Ave., NW
Washington, DC 20005
Telephone:     (202) 237-2727
Facsimile:     (202) 237-6131

*Attorneys for Plaintiff*