**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| OLEG V. DERIPASKA, <br><br>        Plaintiff, <br><br> v. <br><br> THE ASSOCIATED PRESS, <br><br>        Defendant. | Case No. 1:17-cv-00913-ESH |

**MOTION TO DISMISS
OF DEFENDANT ASSOCIATED PRESS**

Defendant Associated Press ("AP"), by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 12(b), hereby moves for dismissal with prejudice in its favor and against plaintiff Oleg V. Deripaska ("Deripaska"), on his claim for defamation asserted in the Complaint. In support of its motion, AP relies on the Memorandum of Points and Authorities, the supporting declaration of David A. Schulz and exhibits cited therein.

As demonstrated in AP's Memorandum, dismissal is warranted because the Complaint fails to plausibly allege any facts entitling plaintiff to relief as a matter of law. Fed. R. Civ. P. 12(b). Deripaska alleges only strained implications not reasonably conveyed by the challenged AP news report. Moreover, many of the purported implications he challenges are non-actionable opinion, privileged, or not about Deripaska at all. Moreover, the Complaint fails on the separate basis that Deripaska is a public figure within the meaning of defamation law who is required, but failed, adequately to plead actual malice. Because the allegations cannot support a claim for defamation, as a matter of law, the Complaint must be dismissed.

**REQUEST FOR HEARING**

AP respectfully requests a hearing on its motion to dismiss.

Dated:  July 3, 2017

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

/s/ David A. Schulz

*Of Counsel*:

Karen Kaiser
Brian Barrett
The Associated Press
200 Liberty Street
New York, NY  10281
Telephone: (212) 621-7547
Fax: (212) 506-6131
kkaiser@ap.org
bbarrett@ap.org

David A. Schulz (D.C. Bar No. 459197)
Chad R. Bowman (D.C. Bar No. 484150)
Mara J. Gassmann (D.C. Bar No. 1014532)
Maxwell S. Mishkin (D.C. Bar No. 1031356)

1899 L Street, N.W., Suite 200
Washington, D.C.  20036
Telephone: (202) 508-1136
Fax: (202) 861-9888
dschulz@lskslaw.com
cbowman@lskslaw.com
mgassmann@lskslaw.com
mmishkin@lskslaw.com

*Counsel for Defendant The Associated Press*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

OLEG V. DERIPASKA,

              Plaintiff,

v.

THE ASSOCIATED PRESS,

              Defendant.

Case No. 1:17-cv-00913-ESH

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

LEVINE SULLIVAN KOCH & SCHULZ, LLP

*Of Counsel:*

Karen Kaiser
Brian Barrett
The Associated Press
200 Liberty Street
New York, NY 10281
Telephone: (212) 621-7547
Fax: (212) 506-6131
kkaiser@ap.org
bbarrett@ap.org

David A. Schulz (D.C. Bar No. 459197)
Chad R. Bowman (D.C. Bar No. 484150)
Mara J. Gassmann (D.C. Bar No. 1014532)
Maxwell S. Mishkin (D.C. Bar No. 1031356)

1899 L Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 508-1136
Fax: (202) 861-9888
dschulz@lskslaw.com
cbowman@lskslaw.com
mgassmann@lskslaw.com
mmishkin@lskslaw.com

*Counsel for Defendant The Associated Press*

Date: July 3, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .............................................................................1

FACTUAL BACKGROUND ...................................................................................2

    A.    The Plaintiff ..........................................................................................2

    B.    Deripaska's Prominent International Role Advancing Russian Interests ...............4

    C.    The Challenged News Report ..............................................................10

    D.    Deripaska's Complaint Against The Associated Press .........................12

ARGUMENT ........................................................................................................14

I.    NONE OF THE ALLEGEDLY DEFAMATORY
    IMPLICATIONS IS ACTIONABLE AS A MATTER OF LAW ....................15

    A.    "Statement #1" Is Not Capable Of Defamatory Meaning And
        Not "Of-And-Concerning" Deripaska ..................................................16

    B.    "Statement #2" Is A Nonactionable Matter Of
        Opinion That Is Also Privileged, And Does Not
        Reasonably Convey Ongoing Involvement With Manafort .................18

        1.    Nonactionable opinion and privileged ......................................19

        2.    No reasonable defamatory implication is conveyed .................23

    C.    "Statement #3" Does Not Reasonably Convey The Defamatory
        Implication Alleged, Nor Does The Report Affirmatively Suggest
        That AP Intended Or Endorsed That Implication ..................................24

    D.    The Article Is Not Defamatory "As A Whole"....................................26

II.    THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT
    AP PUBLISHED WITH THE REQUISITE DEGREE OF FAULT ...............28

    A.    Deripaska Is A Limited Public Figure For
        Purposes Of His Libel Claim Against AP............................................28

        1.    The pre-existing public controversy surrounding the role of
            Russian oligarchs as emissaries of the Russian government ...................30

        2.    Deripaska played a significant role in that controversy............................34

       3.       The AP Report is germane to the public controversy ...............................37

B.     To State A Claim For Defamation, Deripaska Must
       Sufficiently Plead Publication With "Actual Malice" ...........................................38

C.     Deripaska Fails To Plausibly Allege Publication With "Actual
       Malice"...........................................................................................................40

CONCLUSION ....................................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Group, LLC,*
    783 F.3d 1328 (D.C. Cir. 2015) ..................................................................16

*Abbas v. Foreign Policy Group, LLC,*
    975 F. Supp. 2d 1 (D.D.C. 2013) ...........................................................17, 20

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................14, 38, 39

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................38

*Besen v. Parents & Friends of Ex-Gays, Inc.,*
    2012 WL 1440183 (E.D. Va. Apr. 25, 2012) ..........................................29

*\*Biro v. Conde Nast,*
    807 F.3d 541 (2d Cir. 2015) ....................................................................39

*Biro v. Conde Nast,*
    883 F. Supp. 2d 441 (S.D.N.Y. 2012) .....................................................15

*Biro v. Conde Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) ...........................................29, 39, 43

*Boley v. Atlantic Monthly Group,*
    950 F. Supp. 2d 249 (D.D.C. 2013) .............................................29, 34, 40, 41

*Bose Corp. v. Consumers Union of United States, Inc.,*
    466 U.S. 485 (1984) ..................................................................................42

*Caudle v. Thomason,*
    942 F. Supp. 635 (D.D.C. 1996) ..............................................................27

*Chapin v. Knight-Ridder, Inc.,*
    993 F.2d 1087 (4th Cir. 1993) ......................................................16, 25, 42

*Clyburn v. News World Communications, Inc.,*
    903 F.2d 29 (D.C. Cir. 1990) ....................................................................36

*\*Coles v. Washington Free Weekly, Inc.,*
    881 F. Supp. 26 (D.D.C. 1995) .....................................................14, 15, 17

*Competitive Enterprise Institute v. Mann*,
  150 A.3d 1213 (D.C. 2016) ....................................................................21

*Compuware Corp. v. Moody's Investors Services, Inc.*,
  499 F.3d 520 (6th Cir. 2007) ................................................................41

*Dodds v. ABC*,
  145 F.3d 1053 (9th Cir. 1998) ..............................................18, 41, 42

*Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*,
  2015 WL 1163787 (M.D. Pa. Mar. 13, 2015)........................................39

*Edwards v. National Audubon Society, Inc.*,
  556 F.2d 113 (2d Cir. 1977)...................................................................23

*Egiazaryan v. Zalmayev*,
  2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) .........................................40

*Farah v. Esquire Magazine*,
  736 F.3d 528 (D.C. Cir. 2013) .......................................3, 10, 15, 19, 22

*Foretich v. Chung*,
  1994 WL 716606 (D.D.C. Oct. 3, 1994) ...............................................26

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)..........................................................................29, 30

*Gliklad v. Deripaska*,
  2017 WL 1482164 (N.Y. Sup. Ct. Apr. 25, 2017)...............................4, 9

*Gray v. St. Martin's Press, Inc.*,
  221 F.3d 243 (1st Cir. 2000)...........................................................34, 42

*Guilford Transportation Industries, Inc. v. Wilner*,
  760 A.2d 580 (D.C. 2000) .............................19, 20, 22, 23, 25, 26, 44

*Haynes v. Alfred A. Knopf, Inc.*,
  8 F.3d 1222 (7th Cir. 1993) ..................................................................22

*Herbert v. Lando*,
  781 F.2d 298 (2d Cir. 1986)..................................................................27

*Hourani v. Psybersolutions LLC*,
  2017 WL 2350275 (D.C. Cir. Mar. 3, 2017) .............................3, 29, 36

*Howard v. Antilla*,
  294 F.3d 244 (1st Cir. 2002)..................................................................41

*Hustler Magazine, Inc. v. Falwell,*
485 U.S. 46 (1988)..............................................................................................21

*\*Jankovic v. International Crisis Group,*
822 F.3d 576 (D.C. Cir. 2016) ............................................28, 34, 35, 36, 37, 38

*Kahl v. Bureau of National Affairs, Inc.,*
856 F.3d 106 (D.C. Cir. 2017) .....................................................................15, 38

*Kavanagh v. Zwilling,*
997 F. Supp. 2d 241 (S.D.N.Y. 2014)...........................................................24, 44

*Kowal v. MCI Communications Corp.,*
16 F.3d 1271 (D.C. Cir. 1994) ............................................................................14

*Leo Winter Associates, Inc. v. Department of Health & Human Services,*
497 F. Supp. 429 (D.D.C. 1980) .........................................................................27

*Liberty Lobby, Inc. v. Dow Jones & Co.,*
638 F. Supp. 1149 (D.D.C. 1986) .......................................................................44

*Lohrenz v. Donnelly,*
350 F.3d 1272 (D.C. Cir. 2003) ..........................................................................28

*Mar-Jac Poultry, Inc. v. Katz,*
773 F. Supp. 2d 103 (D.D.C. 2011) .....................................................................15

*Mayfield v. NASCAR,*
674 F.3d 369 (4th Cir. 2012) ........................................................................39, 41

*McBride v. Merrell Dow & Pharmaceuticals, Inc.,*
717 F.2d 1460 (D.C. Cir. 1983) ..........................................................................15

*McCaskill v. Gallaudet University,*
36 F. Supp. 3d 145 (D.D.C. 2014) ......................................................................20

*McFarlane v. Esquire Magazine,*
74 F.3d 1296 (D.C. Cir. 1996) ............................................................................23

*Michel v. NYP Holdings, Inc.,*
816 F.3d 686 (11th Cir. 2016) ......................................................................39, 40

*Milkovich v. Lorain Journal Co.,*
497 U.S. 1 (1990)...........................................................................................19, 20

*Miller v. Transamerican Press, Inc.,*
621 F.2d 721 (5th Cir. 1980) ..............................................................................29

*Moldea v. New York Times Co.*,
   15 F.3d 1137 (D.C. Cir. 1994) ...................................................................27, 42

*Montgomery Ward & Co. v. McGraw-Hill Publishing Co.*,
   146 F.2d 171 (7th Cir. 1944) ...............................................................................20

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................................18, 29

*Newton v. NBC*,
   930 F.2d 662 (9th Cir. 1990) ...............................................................................41

*Nurriddin v. Bolden*,
   818 F.3d 751 (D.C. Cir. 2016) .............................................................................14

*O'Toole v. Northrop Grumman Corp.*,
   499 F.3d 1218 (10th Cir. 2007) .............................................................................3

*OAO Alfa Bank v. Center for Public Integrity*,
   387 F. Supp. 2d 20 (D.D.C. 2005) ..............................................30, 34, 35, 36, 38

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984) .........................................................19, 20, 21, 22

*Oparaugo v. Watts*,
   884 A.2d 63 (D.C. 2005) .....................................................................................17

*Pearson v. District of Columbia*,
   644 F. Supp. 2d 23 (D.D.C. 2009) .........................................................................3

*Pippen v. NBCUniversal Media, LLC*,
   734 F.3d 610 (7th Cir. 2013) ...............................................................................39

*Q International Courier, Inc. v. Seagraves*,
   1999 WL 1027034 (D.D.C. Feb. 26, 1999) .........................................................20

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) .....................................................................16

*Saenz v. Playboy Enterprises, Inc.*,
   841 F.2d 1309 (7th Cir. 1988) .............................................................................42

*Schatz v. Republican State Leadership Committee*,
   669 F.3d 50 (1st Cir. 2012) ............................................................................39, 44

*Secord v. Cockburn*, 747 F. Supp. 779 (D.D.C. 1990) ..............................................16

*Service Employees International Union National Industry Pension Fund v.
   Liberty House Nursing Home of Jersey City, Inc.*,
   2017 WL 521506 (D.D.C. Feb. 8, 2017) ...............................................................3

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)..................................................................................................39

*Stovell v. James*,
  810 F. Supp. 2d 237 (D.D.C. 2011)..........................................................................27

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987)........................................18, 19, 23, 29, 30, 34, 38, 39, 42, 44

*Thomas v. News World Communications*,
  681 F. Supp. 55 (D.D.C. 1988)..............................................................................20, 41

*ToDay's Housing v. Times Shamrock Communications, Inc.*,
  21 A.3d 1209 (Pa. Super. Ct. 2011).......................................................................24, 44

*In re United Press International*,
  106 B.R. 323 (D.D.C. 1989) ......................................................................................23

*Waldbaum v. Fairchild Publications, Inc.*,
  627 F.2d 1287 (D.C. Cir. 1980)...............................................................29, 30, 31, 34, 37

*Weyrich v. New Republic, Inc.*,
  235 F.3d 617 (D.C. Cir. 2001) ...............................................................................18, 21

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990)..............................................19, 20, 21, 23, 25, 42

*Woods v. Evansville Press Co.*,
  791 F.2d 480 (7th Cir. 1986) ...................................................................................42

*Zimmerman v. Al Jazeera America, LLC*,
  2017 WL 1207416 (D.D.C. Mar. 31, 2017)..........................................................10, 40

**Other Authorities**

1 Robert D. Sack, *Sack on Defamation* §§ 2.9, 5.5.1 (5th ed. 2017)......................................16, 42

2 Robert D. Sack, *Sack on Defamation* § 16.2.1 (5th ed. 2017).....................................................15

## PRELIMINARY STATEMENT

This is a lawsuit for libel by implication, challenging an important piece of investigative journalism about former Trump campaign chairman Paul Manafort.  The plaintiff in this case, Oleg Deripaska, is one of Russia's wealthiest oligarchs and a longtime ally of Russian President Vladimir Putin.  Deripaska objects to inferences he reads into an Associated Press ("AP") news report disclosing previously unknown work Manafort performed for him that had been intended to "greatly benefit the Putin Government."

The March 2017 AP report revealed a confidential strategy for Eastern Europe that Manafort proposed to Deripaska in June 2005 to support pro-Russian political parties, bolster the legitimacy of governments friendly to Putin, and undercut anti-Russian figures, through political campaigns, nonprofit front organizations, and media operations.  The report made clear that AP did not know how much work was done to further Manafort's strategy, but reported that a contract with Deripaska to implement the strategy was signed by Manafort in 2006, and bank records revealed millions of dollars transferred to Manafort in a business relationship with Deripaska that continued at least through 2009.  In the context of current investigations into connections between Russia and the 2016 Trump campaign that Manafort had led, the AP report revealed a past link between Manafort and Putin that had not previously been known.

In attacking the AP report, Deripaska does not deny the strategy proposed to him by Manafort in 2005, the tens of millions of dollars he paid to Manafort, or the breakdown of the relationship ending in litigation against Manafort by 2014, all as reported by AP.  Rather, Deripaska disputes that he hired Manafort to advance Russian interests and contends that the report's description of his dealings with Manafort conveys several false and defamatory implications.  Among other claims, Deripaska alleges that the report implied that he "aided" criminal conduct by paying Manafort for lobbying services when Manafort was not registered as

1

a foreign lobbyist, participated in the theft of Ukrainian assets after 2014, and "is somehow tied to the Trump campaign controversy" today, even though the report makes clear that Deripaska's relationship with Manafort ended years ago and they were in litigation with each other long before the 2016 campaign began.

Deripaska's effort to punish AP for reporting on Paul Manafort's past lucrative connection to him should be dismissed at the outset. The strained implications he alleges are not reasonably conveyed by the AP report, some plainly constitute non-actionable opinion or are otherwise privileged, and one is not even "of and concerning" Deripaska. None of the alleged implications can support a claim for defamation, as a matter of law.

Moreover, Deripaska has no claim for libel by implication for the further reason that he is a limited public figure. As such he must both demonstrate that the report on its face indicates an intent by AP to convey the asserted implications, and allege the existence of facts that could plausibly establish that AP published with knowledge that those implications were false or while seriously doubting their truth. He does not do so. For this reason, too, Deripaska's effort to pursue intrusive, expensive, and chilling litigation against AP should be rejected at the outset. His complaint states no claim of defamation.

## FACTUAL BACKGROUND[1]

A.    **The Plaintiff**

Deripaska is a Russian industrialist and CEO of United Company RUSAL, "one of the world's largest aluminum companies." Complaint ("Compl.") ¶ 1, May 15, 2017, ECF No. 1. The aluminum business is just one part of Deripaska's sprawling business empire that operates

---

[1] Allegations in the Complaint are accepted as true solely for purposes of this motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"in several countries" around the globe.  *Id.* ¶ 11.  In 2008, Forbes identified Deripaska as the wealthiest person in Russia, and the ninth-richest in the world.[2]

Like other winners of the "oligarch wars" who amassed incredible wealth and power in Russia's transition from communism, Deripaska has long been a subject of international fascination and attention.  A 2003 PBS Frontline report identified Deripaska as the "Aluminum King," who "accumulated a business empire through a series of ruthless and elaborate, though technically legal, takeover raids."[3]  A 2006 *The New York Times* report likewise noted that, by age 32, Deripaska "had already wrested control of the Russian aluminum industry from a netherworld of organized crime figures, mercenary local officials and ambitious tycoons like himself," an achievement which Deripaska credited to Putin's leadership.[4]  As a "young tycoon," Deripaska "assiduously forged ties with the new regime and, in 2001, cemented his links to the political elite" through marriage into the inner circle of the President Boris Yeltsin, eventually becoming Yeltsin's step-grandson, by marriage.[5]

---

[2] *The World's Billionaires: #9 Oleg Deripaska*, Forbes (Mar. 5, 2008, 6:00 PM ET), https://www.forbes.com/lists/2008/10/billionaires08_Oleg-Deripaska_UCP9.html.  The Court may take judicial notice of publicly available news articles, *see, e.g.*, *Hourani v. Psybersolutions LLC*, 2017 WL 2350275, at *2 (D.C. Cir. Mar. 3, 2017), *aff'g* 164 F. Supp. 3d 128, 131 & n.1, 136 (D.D.C. 2016); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013), and of websites whose authenticity is not in question, *see, e.g.*, *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).  Judicial notice may likewise be taken of public documents, such as court records, without converting the motion to dismiss into a motion for summary judgment."  *Pearson v. Dist. of Columbia*, 644 F. Supp. 2d 23, 45 n.19 (D.D.C. 2009), *aff'd*, 377 F. App'x 34 (D.C. Cir. 2010); *accord Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Liberty House Nursing Home of Jersey City, Inc.*, 2017 WL 521506, at *6-7 & n.4 (D.D.C. Feb. 8, 2017).

[3] *How to Make a Billion Dollars: Oleg Deripaska, Aluminum King*, Frontline World (Oct. 2003), http://www.pbs.org/frontlineworld/stories/moscow/deripaska.html.

[4] Andrew Kramer, *Out of Siberia, a Russian Way to Wealth*, N.Y. Times (Aug. 20, 2006), at C-1, http://www.nytimes.com/2006/08/20/business/yourmoney/20oligarch.html.

[5] Catherine Belton, *Faces of the Crisis: Oleg Deripaska*, Fin. Times (Dec. 29, 2008), https://www.ft.com/content/3ca3a236-d5b0-11dd-a9cc-000077b07658?mhq5j=e2.

In the late 1990's, Deripaska was identified as a "Young Leader of Tomorrow" by the World Economic Forum in Davos.[6]  As his website touts, Deripaska was awarded the Russian Federation's Order of Friendship in 1999, an honor he shares with former UN Secretary General Ban Ki-moon, current U.S. Secretary of State Rex Tillerson, and a Romanov prince.[7]  Deripaska has also received the Order of Alexander Nevsky, typically given to those with at least 20 years of meritorious civil service to the Russian Federation.[8]  Today, Deripaska is widely known as "Putin's oligarch," and has boasted to reporters: "'I don't separate myself from the state.'"[9]

**B.    Deripaska's Prominent International Role Advancing Russian Interests**

A survey of the world's newspapers and Deripaska's own website readily reveals his role as an outspoken international representative of the Russian Federation.  Deripaska has regularly and publicly promoted his—and Russia's—economic and political vision abroad.  For example, Deripaska has participated in G8, G20, United Nations, and Asian business summits.[10]  Deripaska's website touts his active involvement in many other global conferences, including the

---

[6] *See, e.g.*, Jeanne Whalen, *A Russian Tycoon Turns to Image-Making; After 1990s Asset Grabs, Financial Standards Come Into Fashion*, Wall St. J. (August 28, 2001), at A8.

[7] Oleg Deripaska, *About Oleg Deripaska: Achievements*, http://www.deripaska.com/about/achieve/ (last visited June 28, 2017).

[8] *Id.*

[9] *E.g.*, Anton Troianovski, *Kremlin-Friendly Tycoon Poised to Buy Energy Company*, Wash. Post (July 31, 2007), at A15, http://www.washingtonpost.com/wp-dyn/content/article/2007/07/30/AR2007073001612.html; *Saving the Oligarchs*, The Economist (Dec. 3, 2009), http://www.economist.com/node/15022616; *see also* Tom Winter et al., *Donald Trump Aide Paul Manafort Scrutinized for Russian Business Ties*, NBC News (Aug. 18, 2016), http://www.nbcnews.com/news/us-news/donald-trump-aide-paul-manafort-scrutinized-russian-business-ties-n631241 ("Deripaska . . . is considered by U.S. officials to be among Putin's inner circle of billionaire businessmen.").

[10] *See, e.g.*, Oleg Deripaska, *Initiatives*, http://www.deripaska.com/initiative/ (last visited June 28, 2017); Second O. Deripaska Decl. ¶ 5, *Gliklad v. Deripaska*, Index No. 652641/2015 (June 9, 2016), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=ptd/vvefkaXtIRK0Id321Q==&system=prod.

annual World Economic Forum in Davos, which in 2010 elected him to its Management Council.[11]  At these events and others, Deripaska regularly promotes Russian interests.[12]  Even his webpage appeals to Russian patriotism:  "Want to take part in development of Russia? – JOIN US!"[13]

Deripaska has also courted foreign leaders.  During the 2008 U.S. presidential campaign, for example, *The Washington Post* reported that a senior advisor to U.S. Senator John McCain's presidential campaign, Manafort partner Rick Davis, helped set up an encounter between McCain and Deripaska in Switzerland.[14]  According to the report, Deripaska subsequently wrote to Davis and Manafort "to thank them for arranging the meeting" and mentioned "a business deal that Deripaska and the consultants had apparently been talking about."[15]  The report noted that

---

[11] Oleg Deripaska, *Initiatives: World Economic Forum*, http://www.deripaska.com/initiative/ (last visited June 28, 2017).

[12] *See, e.g.*, Olivia Lang, *Davos 2011: Day 2 as it happened*, BBC News (Jan. 27, 2011), http://news.bbc.co.uk/2/hi/business/davos/9377609.stm ("One of the world's richest men, Russian aluminum king Oleg Deripaska, has been defending his country against claims that investors are put off by politicians meddling in business."); *CNN - Interview with Oleg Deripaska in Davos*, YouTube (Feb. 10, 2011), https://www.youtube.com/watch?v=Te2PATfJLqU; *Oleg Deripaska interviewed by Erin Burnett CNBC*, YouTube (Feb. 22, 2011), https://www.youtube.com/watch?v=-OqBMOlEFSI; Interview with Daniel Sandford, *Russian billionaire Oleg Deripaska: Why I funded Sochi*, BBC News (Feb. 10, 2014), http://www.bbc.com/news/av/business-26117153/russian-billionaire-oleg-deripaska-why-i-funded-sochi; *see also* Oleg Deripaska, *About Oleg Deripaska: Video Gallery*, http://www.deripaska.com/about/video/ (last visited June 29, 2017) (collecting television interviews with CCTV, Bloomberg, and others).

[13] Oleg Deripaska, *Contacts*, http://www.deripaska.com/contacts/ (last visited June 28, 2017).

[14] Jeffrey H. Birnbaum, et al., *Aide Helped Controversial Russian Meet McCain*, Wash. Post (Jan. 25, 2005), at A1, http://www.washingtonpost.com/wp-dyn/content/article/2008/01/24/AR2008012403383.html.

[15] *Id.*

Deripaska and McCain had been present at an earlier "social gathering" in August 2006, in
Montenegro, where Davis and Manafort were then working.[16]

Long before last year's Trump campaign, the connections between Russian interests and
Washington had become controversial.  A decade ago, *The Wall Street Journal* described how
Russian lobbying had become big business in the U.S. capital.  The *Journal's* front-page story
named Deripaska and others with "close ties to the Kremlin" who had hired Washington
lobbyists, observing that "the source, amount and purpose of the fees they pay" can be "murky"
and that required federal filings "often offer only a vague sense of the work being done."[17]

Nor was Deripaska's effort to exercise influence limited to the United States.  As a
wealthy and powerful emissary of his country, he was known to hobnob with world leaders,
frequently entertaining them on his yacht or his private plane.[18]  Deripaska's notoriety is such
that he became a key figure in a 2012 British libel suit against a London newspaper, in which the
scandalous accusation that a British politician had been entertained by Deripaska was found to be
substantially true.[19]  The episode became known in British media as the "Deripaska affair."[20]

---

[16] *Id.*

[17] Glenn R. Simpson, et al., *How Lobbyists Help Ex-Soviets Woo Washington --- Scrubbed
Images Open Doors, Assure Investors*, Wall St. J. (Apr. 17, 2007), at A1,
https://www.wsj.com/articles/SB117674837248471543.

[18] *See, e.g.*, Approved Judgment, *Rothschild v. Associated Newspapers Ltd.*, [2012] EWHC
177 (QB) (Eng.), https://www.judiciary.gov.uk/wp-
content/uploads/JCO/Documents/Judgments/rothschild-v-associated-newspapers-ltd-
judgment.pdf (detailing trip aboard Deripaska's plane with prominent British government and
European Union official and entering judgment for newspaper defendant), *aff'd*, [2013] EWCA
Civ. 197 (Eng.), http://www.bailii.org/ew/cases/EWCA/Civ/2013/197.html.

[19] *Id.*

[20] *See, e.g.*, Luke Baker, *Russian billionaire yacht affair shakes UK politics*, Reuters (Oct. 28,
2008), http://www.reuters.com/article/us-britain-politics-scandal-idUSTRE49L2XG20081022.

Deripaska's international efforts to promote Russia – and to cultivate friends in high office – have been widely acknowledged.  Ernst & Young credited "key energy and metals magnate[]" Deripaska by name as a Russian economic driver in its 2013 "attractiveness survey" on Russia.[21]  And just last year, Deripaska was honored by Putin for his "charitable and public activities" on behalf of Russia.[22]

While drawing accolades at home and abroad, Deripaska has faced sharp international criticism for his business methods.[23]  Organizers of the World Economic Forum, for example, pulled his invitation to Davos in or around 2000, despite having named him a "Young Leader of Tomorrow" just two years earlier.[24]  Shortly thereafter, Western banks "temporarily froze loan talks" out of concern over allegations of organized crime connections that had been made against Deripaska in many venues.[25]  The United States government ultimately denied him a travel visa, reportedly because it had found those accusations to have merit.[26]

---

[21] Ernst & Young, *Shaping Russia's Future (2012)*, http://www.ey.com/Publication/vwLUAssets/2013-Russia-attractiveness-survey-Eng/$FILE/2013-Russia-attractiveness-survey-Eng.pdf.

[22] Oleg Deripaska, *About Oleg Deripaska: Achievements*, http://www.deripaska.com/about/achieve/ (last visited June 28, 2017).

[23] *See, e.g.,* Kramer, *Out of Siberia, a Russian Way to Wealth*, N.Y. Times (Aug. 20, 2006), at C-1 http://www.nytimes.com/2006/08/20/business/yourmoney/20oligarch.html; Glenn Simpson et al., *Russia's Deripaska Faces Western Investigations—U.S., U.K. Probes of Industrialist Focus on Transfer of Funds*, Wall St. J. (Oct. 10, 2008), at A10, https://www.wsj.com/articles/SB122359420472121077.

[24] *See, e.g.,* Jeanne Whalen, *A Russian Tycoon Turns to Image-Making; After 1990s Asset Grabs, Financial Standards Come Into Fashion*, Wall St. J. (August 28, 2001), at A8.

[25] *Id.*

[26] *See, e.g.,* Misha Glenny, et al., *US refused oligarch visa over alleged criminal associations*, The Guardian (Oct. 30, 2008), https://www.theguardian.com/world/2008/oct/31/oleg-deripaska-us-visa-rusal; Kramer, *supra* note 23.

Deripaska hotly disputed any criminal connection,[27] and "mounted a high-level lobbying effort in Washington" to have the travel restriction lifted.[28]  To "improve his image," Deripaska employed former Republican presidential candidate Bob Dole specifically "to lobby the state department and other agencies on his behalf."[29]  Senator Dole's effort was temporarily successful, and Deripaska was briefly permitted into this country to give lectures at the Carnegie Endowment for International Peace and at Harvard University.[30]  Apparently, however, the ban on Deripaska's entry into the United States was reinstated.[31]

In 2008, Deripaska enlisted the aid of additional Washington lobbyists to address his visa and business issues[32]—and this time he received support from no less than Putin himself.  Putin "repeatedly" raised Deripaska's visa problems "in private talks with U.S. officials" before allowing "his frustration [to] also bubble[] into the public."[33]

---

[27] *See, e.g.*, Gregory L. White, *Rusal Holder Puts U.S. Last on Investing List*, Wall St. J. (Apr. 28, 2008), at B4, https://www.wsj.com/articles/SB120931030450547755.

[28] Kramer, *supra* note 23.

[29] Glenny, *supra* note 26.

[30] *Id.*

[31] *See, e.g., id.*

[32] For example, Deripaska hired the lobbying firm Endeavor Group to "engage with the U.S. government regarding the status of the foreign principal's [Deripaska] visa application; interact with the United States Trade Representative office to encourage U.S. participation in the intra-governmental global aluminum discussions; and engage with the Department of Treasury's Auto Task Force regarding the prospective acquisition of General Motor's European operations."  *See* Ex. A to Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, U.S. Dept. of Justice (May 8, 2009), https://www.fara.gov/docs/5934-Exhibit-AB-20090508-1.pdf; *see also* Mark Ames & Ari Berman, *McCain's Kremlin Ties*, The Nation (Oct. 1, 2008), https://www.thenation.com/article/mccains-kremlin-ties/ (reporting on Deripaska's hiring of U.S. lobbyists and an intelligence firm).

[33] *Deripaska Accused U.S. of Blackmail*, Wall St. J. (Oct. 30, 2009), https://www.wsj.com/articles/SB125687000832717809 (Putin: "I have asked my American colleagues, why don't you give [Deripaska] a visa? . . . They are not giving any explanations. But they deny him entry.  He is not a friend or relative of mine.  He is a representative of Russian big business.").

Then, in 2010, one of Deripaska's lobbyists registered on behalf of Russian Federation Foreign Minister Sergey Lavrov, who personally wrote to the U.S. government on Deripaska's behalf.[34]  The letter from Lavrov stated:

> Mr. Deripaska is one of our country's prominent business leaders who controls or directly manages a significant number of enterprises, which employ hundreds of thousands of people in Russia and globally and serve as an engine for the domestic and international economy. . . .  A persistent state of limbo regarding Mr. Deripaska's ability to travel freely between our two countries has become an impediment to the promotion of mutually advantageous contacts between the business communities of the two countries.

> As a matter of context and background, I would like to mention that the Russian side has raised this issue with various U.S. officials on numerous occasions, including in the course of bilateral discussions with both the White House and the State Department at different levels.[35]

Court documents reflect that the Russian government finally resolved the issue by granting Deripaska status as a diplomat, making official a role that he had long played.  In a sworn declaration filed in New York state court, Deripaska last year said he now possesses "a diplomatic passport from Russia, and on occasion I have represented the government in countries outside Russia . . . ."[36]  Deripaska explained that he had served as a "public representative of Russia in certain diplomatic and trade organizations" throughout the world, including the G8 and G20 summits,[37] and "meetings of the United Nations General Assembly."[38]

---

[34] Ex. A to Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, U.S. Dept. of Justice (Oct. 6, 2010), https://www.fara.gov/docs/5934-Exhibit-AB-20101006-3.pdf.

[35] *Id.*

[36] Second Decl. of O. Deripaska ¶ 5(j), *Gliklad v. Deripaska*, Index No. 652641/2015 (June 9, 2016), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=ptd/vvefkaXtIRK0Id321Q==&system=prod.  The court quoted extensively from this portion of his declaration in its published decision holding that it did not have jurisdiction over Deripaska in part because his visits to the forum were of a diplomatic, rather than personal, nature.  *See Gliklad v. Deripaska*, 2017 WL 1482164, at *3  (N.Y. Sup. Ct. Apr. 25, 2017).

[37] Second O. Deripaska Decl. ¶ 5(i), *supra* note 36.

### C.  The Challenged News Report

Deripaska challenges a news report published by AP on March 22, 2017 under the headline, "AP Exclusive: Before Trump job, Manafort worked to aid Putin" (the "Report"). (A true and correct a copy of the Report is attached as Exhibit A to the Declaration of David A. Schulz ("Schulz Decl.")).[39]  The Report was written by Jeff Horwitz and Chad Day, with contributions from nine additional AP reporters in Washington, New York, Moscow, and Kiev. As noted in the Complaint, AP also published a video featuring commentary on the Report from Horwitz.  Compl. ¶ 6.  (For the Court's convenience, a certified transcript of the video is attached as Exhibit B to the Schulz Declaration.)[40]

The Report described past connections between former Trump campaign manager Paul Manafort and Russia that had not previously been disclosed.  It described a "confidential strategy plan" that Manafort proposed to Deripaska in June 2005 to "influence politics, business dealings and news coverage inside the United States, Europe and former Soviet republics to benefit [Russian] President Vladimir Putin's government . . . ."  Report at 1.  The Report describes Deripaska as "a close Putin ally" who "became one of Russia's wealthiest men under Putin, buying assets abroad in ways widely perceived to benefit the Kremlin's interests."  *Id.* at 2-3.

The Report details how "Manafort proposed extending his existing work in eastern Europe to [former Soviet nations], where he pledged to bolster the legitimacy of governments

---

[38] First Decl. O. Deripaska ¶ 7, *Gliklad v. Chernoi*, Index No. 602335/2009 (Dec. 19, 2014) (Exhibit 2 to the Second O. Deripaska Decl., *supra* note 36).

[39] In determining whether a complaint states a claim, "the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice."  *Farah*, 736 F.3d at 534 (citations omitted).

[40] The transcript of the video is also properly considered on this motion to dismiss.  *See, e.g., Zimmerman v. Al Jazeera Am., LLC*, 2017 WL 1207416, at *2 n.5 (D.D.C. Mar. 31, 2017) (considering transcript of video attached as exhibit to motion to dismiss where that video was incorporated into complaint).

friendly to Putin and undercut anti-Russian figures through political campaigns, nonprofit front groups and media operations." *Id.* at 4. It notes that "Manafort eventually signed a $10 million annual contract [with Deripaska] beginning in 2006," and that their business relationship lasted until at least 2009. *Id.* at 2. The Report notes that "[h]ow much work Manafort performed under the contract was unclear," *id.*, as was the total amount Manafort had been paid by Deripaska, although "people familiar with the relationship said money transfers to Manafort amounted to tens of millions of dollars . . . ." *Id.* at 4.

Placing in context the many questions about Manafort raised by the revelation of this work a decade earlier, the Report explains that "people who lobby in the U.S. on behalf of foreign political leaders or political parties must provide detailed reports about their actions to the [D]epartment [of Justice]." *Id.* Manafort did not do so "during the period the contract [with Deripaska] was in place." *Id.*

The Report further explained that well before the 2016 presidential election, Manafort and Deripaska "had a falling out" that was "laid bare in 2014 in a Cayman Islands bankruptcy court." *Id.* at 5. According to legal filings in that case reviewed by AP, Deripaska had given Manafort "nearly $19 million to invest in a Ukrainian TV company called Black Sea Cable," and then "after taking the money, Manafort and his associates stopped responding to Deripaska's queries about how the funds had been used." *Id.* As the Report points out, before the start of the 2016 presidential race, "Deripaska's representatives [had] openly accused Manafort of fraud and pledged to recover the money from him." *Id.*

The Report includes comments from the parties involved and various U.S. government officials. It quotes a statement from Manafort conceding "that he had worked for Deripaska but den[ying] his work had been pro-Russian in nature." *Id.* at 2. Deripaska's representative

likewise would confirm only the existence of the Black Sea Cable agreement, "an agreement . . . to provide investment consulting services," noting that it "is a subject to legal claims."  *Id.* Senator McCain "called the disclosures 'serious stuff' and more evidence that an independent congressional committee should investigate the Trump administration," and U.S. Senator Lindsey Graham stated that "if [Manafort]'s getting millions of dollars from a billionaire close to Putin, to basically undermine democratic movements, that's something I'd want to know about," adding, "I don't know if [Manafort] violated [FARA], . . . but it's something I think we all need to know more about."  *Id.* at 3-4.[41]

**D.      Deripaska's Complaint Against The Associated Press**

The Complaint advances a single claim of defamation based on several allegedly false implications that Deripaska contends are conveyed by three composite "statements" identified in the Complaint, and by the Report "as a whole."  Specifically, the Complaint alleges that:

(1)      References in the Report to work done by Manafort for Deripaska several years

ago to "benefit the Putin government" (collectively labeled "Statement #1")

convey the false implication that **"Deripaska paid Mr. Manafort to act as an**

**unregistered foreign agent," and thereby "was involved in, or aided,"**

**criminal conduct by Manafort.**  *See* Compl. ¶¶ 15-25.

(2)      A quote from Senator Graham expressing concern over Manafort's possibly

"getting millions of dollars" from Deripaska "to basically undermine democratic

---

[41] Deripaska has remained in the headlines since the AP Report was published.  On May 26, 2017, *The New York Times* reported that Deripaska had "offered to cooperate with congressional intelligence committees in exchange for a grant of full immunity," but that "the Senate and House panels turned him down because of concerns that immunity agreements create complications for federal criminal investigators . . . ."  *See* Barry Meier & Jesse Drucker, *Russian Once Tied to Trump Aide Seeks Immunity to Cooperate With Congress*, N.Y. Times (May 26, 2017),  https://www.nytimes.com/2017/05/26/us/politics/oleg-deripaska-paul-manafort.html.

movements," and a reference to Democrats on the House Intelligence committee saying "the new revelations will feature in their investigations" (collectively labeled "Statement #2"), convey the false implications that **Deripaska's payments to Manafort are ongoing and that his involvement with Manafort was "nefarious" and warranted congressional investigation.**  *See id.* ¶¶ 27-36.

(3)     Statements juxtaposed in the Report that (a) Deripaska became wealthy buying assets in ways that benefited the Putin government, (b) Manafort made plans to open an office in Moscow in connection with work for Deripaska, including work directed by Deripaska in Ukraine, and (c) federal investigators seeking to recover assets stolen from Ukraine "in early 2014" are interested in Manafort's activities there (collectively labeled "Statement #3"), convey the false implication that **Deripaska "stole Ukrainian assets in 2014," is implicated in a federal investigation of that theft, and "is somehow tied to the Trump Campaign Controversy."**  *See id.* ¶¶ 39-48.

(4)     The Report "as a whole" conveys the false implications that **Deripaska "engaged in criminal conduct" or "aided criminal conduct" by Manafort,** and that **his private, commercial dealings were "deeply intertwined with the Trump Campaign Controversy."**  *See id.* ¶¶ 7, 54-62.

Based on these allegedly false implications, Deripaska seeks compensatory damages for alleged injury to his "trade, profession, and community standing" and for "loss of good will value and other pecuniary loss" to his "business interests," as well as punitive damages.  *See id.* ¶¶ 59-66.

Deripaska's Complaint fails to state a claim and should be dismissed for multiple reasons, as will now be demonstrated.

**ARGUMENT**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *cert. denied*, 2017 WL 2216960 (U.S. May 22, 2017). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 679. In conducting this review, the Court should not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin*, 818 F.3d at 756 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Nor should the Court "accept legal conclusions couched as factual allegations." *Id.* (citing *Iqbal*, 556 U.S. at 678).

In the District of Columbia, to survive a motion to dismiss a defamation complaint must plausibly allege that the statements at issue are: (1) defamatory, (2) "of and concerning" the plaintiff; (3) capable of being proven true or false; (4) false; and (5) made with the requisite degree of fault. *See Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996). Deripaska's Complaint does not do so.

The task of evaluating the legal sufficiency of plaintiff's defamation claim at this preliminary stage is one of constitutional importance:

> The First Amendment guarantees freedom of speech and freedom of the press. Costly and time-consuming defamation litigation can threaten those essential freedoms. To preserve First Amendment freedoms and give reporters . . . the breathing room they need to pursue the truth, the Supreme Court has [therefore] directed courts to expeditiously weed out unmeritorious defamation suits.

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (citations omitted). Indeed, because freedom of the press can be seriously chilled by the burdens of litigation "even if a defendant ultimately prevails," courts in this district and elsewhere repeatedly have

underscored that they should "properly dispose of defamation cases against the news media through summary procedures when and as soon as possible." *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 111 (D.D.C. 2011) (citing *Coles*, 881 F. Supp. at 30, and *McBride v. Merrell Dow & Pharms., Inc.*, 717 F.2d 1460, 1466 (D.C. Cir. 1983)); *see also Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2015 (2016). This frequently means dismissal on a motion to dismiss because,

> unlike in most litigation, in a libel suit the central event – the communication about which suit has been brought – is ordinarily before the judge at the pleading stage. He or she may assess it upon a motion to dismiss, firsthand and in context. . . . Thus, courts routinely consider, on motions to dismiss . . . issues such as whether the statement at bar is capable of bearing a defamatory meaning [and]. . . whether it is "of and concerning" the plaintiff, . . . and they frequently grant motions on these grounds and others.

2 Robert D. Sack, *Sack on Defamation* § 16.2.1 (5th ed. 2017). These concerns are only heightened where, as here, the defamation allegedly was made by implication, and where the plaintiff is one of the world's wealthiest and most powerful men, who is suing a news organization over public-spirited journalism.

## I.      NONE OF THE ALLEGEDLY DEFAMATORY IMPLICATIONS IS ACTIONABLE AS A MATTER OF LAW

The First Amendment requires this Court to make three "threshold inquiries" as a matter of law in assessing the sufficiency of Deripaska's Complaint. The Court must determine in the first instance whether the challenged statements (1) can reasonably be interpreted as stating facts about the plaintiff, (2) are not "so imprecise or subjective" that they are incapable of being proven true or false, and (3) are "reasonably capable" of conveying the defamatory meaning alleged. *Farah*, 736 F.3d at 534-35 (citation omitted). None of the passages in the Report challenged by Deripaska can survive this analysis.

**A.      "Statement #1" Is Not Capable Of Defamatory
Meaning And Not "Of-And-Concerning" Deripaska**

Deripaska stitches together various statements throughout the Report and labels them

collectively as "Statement #1."  It consists of the following points in the Report:

- Manafort worked for Deripaska pursuant to a 2005 strategy plan that was to
  "greatly benefit the Putin Government," *see* Compl. ¶ 19;

- The federal Foreign Agents Registration Act requires that "people who lobby in
  the U.S. on behalf of foreign political leaders or political parties must provide
  detailed reports about their actions to the department," and "[w]illfully failing to
  register [under FARA] is a felony," *see id.* ¶ 24; and

- "Manafort did not disclose details about the lobbying work to the Justice
  Department during the period the contract was in place," *see* Report at 4.

Deripaska claims that this discussion in the Report conveys the false implication that he paid

Manafort "to act as an unregistered foreign agent," and thereby "was involved in, or aided,"

criminal conduct by Manafort.  *See* Compl. ¶¶ 15-25.  This claim is doubly infirm.  First, the

Report expressly raises questions – rather than asserting conclusions – about whether Manafort

was required to register.  *See* Report at 4 ("'I don't know if he violated the Foreign Agent

Registration Act,' Sen. Graham said, 'but it's something I think we all need to know more

about.'").[42]  "[I]t is generally settled as a matter of defamation law . . . that a question, 'however

embarrassing or unpleasant to its subject, is not accusation.'"  *Abbas v. Foreign Policy Grp.,*

*LLC*, 783 F.3d 1328, 1338-39 (D.C. Cir. 2015) (citation omitted); *see also, e.g.*, *Chapin v.*

*Knight-Ridder, Inc.*, 993 F.2d 1087, 1098 (4th Cir. 1993) (finding "a story constructed around

questions, not conclusions" non-defamatory as a matter of law).

---

[42] On June 27, 2017, Manafort did belatedly register as a foreign agent for Ukraine-related
work between 2012 and 2014.  *See* Tom Hamburger & Rosalind S. Helderman, *Former Trump
campaign chairman Paul Manafort files as foreign agent for Ukraine work*, Wash. Post (June 27,
2017), https://www.washingtonpost.com/politics/former-trump-campaign-chairman-paul-
manafort-files-as-foreign-agent-for-ukraine-work/2017/06/27/8322b6ac-5b7b-11e7-9fc6-
c7ef4bc58d13_story.html?utm_term=.32c38990aeb6.

Second, and more to the point, *even if* Statement #1 could somehow be construed as a potentially defamatory accusation that Manafort violated FARA, Deripaska's claim still fails as a matter of law because these passages do not reasonably convey anything "false and defamatory . . . *concerning him.*"  *See Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (emphasis added). An essential requirement of any libel claim is that the challenged statements be made "of and concerning" the party that is bringing suit.  *Secord v. Cockburn*, 747 F. Supp. 779, 783 (D.D.C. 1990); 1 Robert D. Sack, *Sack on Defamation* § 2.9 (5th ed. 2017); *see also Rosenblatt v. Baer*, 383 U.S. 75, 82 (1966).  Stating that an independent contractor failed to fulfill a personal reporting obligation does not reasonably convey an accusation of illegal conduct by his employer.

The application of this "of and concerning" requirement is clearly demonstrated by *Coles v. Washington Free Weekly*.  There, plaintiff was an attorney hired by a group of D.C. taxi drivers, including one Ata Farahpour, to represent them in legal proceedings against a taxicab company, and defendant published an article describing those legal battles.  881 F. Supp. at 28. The attorney claimed that statements in the article describing extensive legal research performed by Farahpour defamed him by implying that he failed to do his own research and instead relied on his client.  *Id.* at 33.  The court dismissed the claim, holding that the challenged statements were "not of and concerning" the attorney.  Rather, they "describe Farahpour's activities and behavior, not [plaintiff]'s activities and behavior."  *Id.* (internal marks omitted); *see also Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 19 (D.D.C. 2013) (holding that statements concerning the alleged "ill-gotten gains" of plaintiff's father "cannot be the basis of any libel claim brought by [plaintiff], because they are not of and concerning him"), *aff'd in part on other grounds*, 783 F.3d 1328 (D.C. Cir. 2015).

17

So also here.  The passages at issue in "Statement #1" are not reasonably capable of any defamatory meaning, and certainly not *about plaintiff*.  Nothing in the Report can be fairly read to state or imply that Deripaska knew anything about – let alone suborned – *Manafort's* failure to register under FARA.  *See Tavoulareas v. Piro*, 817 F.2d 762, 781 (D.C. Cir. 1987) (en banc).  The Report simply informs readers that Deripaska retained Manafort and notes that Manafort may have failed to comply with all of the regulatory requirements triggered by that arrangement.  *See* Report at 4 ("'I don't know if [Manafort] violated the Foreign Agent Registration Act,' Sen. Graham said, 'but it's something I think we all need to know more about.'").

Even if this could be construed as potentially defamatory to Manafort – which, for the reasons articulated, it is not – that reporting certainly does not create any actionable defamatory meaning *about Deripaska* – that is, a meaning that would make Deripaska, rather than Manafort, appear "odious, infamous or ridiculous."  *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (citation omitted); *see also Dodds v. ABC*, 145 F.3d 1053, 1064-66 (9th Cir. 1998) (holding that "the implication cannot reasonably be drawn that [plaintiff] was involved in any criminal activity" simply from plaintiff's being included "in the same segment" as those "whose actual or alleged conduct was criminal").

The alleged implication of criminality is not "of an concerning" Deripaska.  This common law "of and concerning" limitation on claims of defamation also has constitutional underpinnings, *New York Times Co. v. Sullivan*, 376 U.S. 254, 288-89 (1964), and it is fully applicable here.  Deripaska has no claim for the implication allegedly arising from Statement #1.

**B.      "Statement #2" Is A Nonactionable Matter Of Opinion That Is Also Privileged, And Does Not <u>Reasonably Convey Ongoing Involvement With Manafort</u>**

Deripaska again combines multiple statements from the Report under the heading of "Statement #2," consisting of the following points:

- "Republican Sen. Lindsey Graham of South Carolina, a frequent Trump critic, said of Manafort: 'Clearly, if he's getting millions of dollars from a billionaire close to Putin, to basically undermine democratic movements, that's something I'd want to know about,'" *see* Report at 3; Compl. ¶¶ 27-29; and

- "Democrats on the House intelligence committee said the new revelations will feature in their investigations," *see* Report at 3; Compl. ¶¶ 31-32.

Deripaska asserts that these comments convey the false implication that his involvement with Manafort was "nefarious" and warranted congressional investigation, and that his payments to Manafort are ongoing.  *See* Compl. ¶¶ 27-36.  The purported implication that his conduct warranted investigation is not actionable because it is a matter of opinion so "subjective" that it is "not capable of being proved true or false."  *Farah*, 736 F.3d at 534-35.  The alleged implication of ongoing involvement with Manafort is expressly contradicted by the actual text of the Report, and "[n]othing in law or common sense supports saddling a libel defendant with civil liability for a defamatory implication nowhere to be found in the published article itself."  *Tavoulareas*, 817 F.2d at 781; *see also Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 601 (D.C. 2000) (adopting *Tavoulareas* analysis).

### 1.    Nonactionable opinion and privileged

A statement on a matter of public concern "must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved."  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *see also White v. Fraternal Order of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990) ("a statement of opinion having no provably false factual connotation is entitled to full constitutional protection").

Following *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) (en banc), courts in this Circuit consider four factors in determining whether a statement amounts to such a nonactionable opinion: (1) "the common usage or meaning of the specific language of the challenged statement itself," (2) whether "the statement [is] capable of being objectively characterized as true or

19

false," (3) "the full context of the statement," and (4) "the broader context or setting in which the statement appears." *Id.* at 979; *accord McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 159 (D.D.C. 2014) (citing *Ollman*, 750 F.2d at 979); *Abbas*, 975 F. Supp. 2d at 16 (same); *Q Int'l Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *6 (D.D.C. Feb. 26, 1999) (same). Neither Senator Graham's characterization of Manafort's actions as "basically undermin[ing] democratic movements" nor the House Democrats' view that Manafort's involvement with Deripaska would factor into Congress's investigations is actionable under *Ollman*.

First, as to Senator Graham's quote, the phrase "basically undermine democratic movements" is not verifiable. The D.C. Court of Appeals has explained:

> To say that one is unfair to labor is not a statement of a fact, but of an opinion. Likewise to say of one: you are reactionary, *you are undemocratic*, you are a nationalist, you are an isolationist, you are a New Dealer, you are a Union Leaguer, you are opposed to labor, you are a coddler of labor, is similarly to express an opinion.

*Guilford*, 760 A.2d at 598 (quoting *Montgomery Ward & Co. v. McGraw-Hill Publ'g Co.*, 146 F.2d 171, 176 (7th Cir. 1944)) (emphasis added); *see also Thomas v. News World Commc'ns*, 681 F. Supp. 55, 63 (D.D.C. 1988) ("A charge that plaintiffs' signs are 'unAmerican,' for example, is not objectively capable of proof or disproof."). Furthermore, the suggestion that one political consultant could be "undermin[ing] democratic movements" reflects the type of "rhetorical hyperbole" that the Supreme Court has held to be protected. *Milkovich*, 497 U.S. at 20 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)); *see also Ollman*, 750 F.2d at 987 (finding unverifiable "a loosely definable, variously interpretable statement of opinion made inextricably in the contest of political, social or philosophical debate") (internal marks and citation omitted); *White*, 909 F.2d at 522 (noting that the *Milkovich* test "is intended to protect the use of 'loose, figurative or hyperbolic language' which would preclude an impression that the author was seriously maintaining a provable fact"); *Weyrich*, 235 F.3d at 620-21

(statement that conservative political figure suffered "bouts of . . . paranoia" not reasonably

understood as a "verifiably false, and, therefore potentially actionable, assertion[] of mental

derangement").

Both the narrower and broader contexts of Senator Graham's quote confirm that it is

nonactionable.  The Report provides readers with specific descriptions of the conduct in which

Manafort was engaged, and Senator Graham's quote is presented after a statement by Senator

McCain and before one from Representative Jackie Speier, illustrating that it is only one of

several subjective reactions to AP's reporting from politicians of both parties.  *See* Report at 3.

And "the broader social context into which the statement fits," *Ollman*, 750 F.2d at 983, includes

the fact (noted in the Report) that Senator Graham is "a frequent Trump critic," and he is

criticizing the work of the former chairman of a presidential campaign that had not long before

defeated his own presidential ambitions.  As the D.C. Court of Appeals recently explained:

> The First Amendment protects those engaged in a debate of such
> public concern in the expression of their ideas on the subject, even
> with pointed language, free of the chilling effect of potential civil
> liability.  As a matter of constitutional principle, when the issue is
> whether liability may be imposed for speech expressing scientific
> or policy views, the question is not who is right; the First
> Amendment protects the expression of all ideas, good and bad.

*Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1242 (D.C. 2016).  Thus, in its choice of

words, its subjectivity, and its full context, the quote from Senator Graham conveys

nonactionable opinion.

The comment from "Democrats on the House intelligence committee" that they intend to

investigate Manafort's past work for Deripaska is equally nonactionable.  Again, the specific

language of the statement – that "the new revelations will feature in their investigations" – is

highly subjective and value-neutral on its face.  It does not state that the information will be

inculpatory, let alone dispositively so.  Furthermore, Deripaska's strained interpretation of the

statement – that Manafort's activities "merited" investigation – is highly subjective and not capable of being proven true or false.  *See* Compl. ¶ 36.  Rather, it is yet another "interpretable statement of opinion made inextricably in the contest of political, social or philosophical debate" that "is obviously unverifiable."  *Ollman*, 750 F.2d at 987 (internal marks and citation omitted).  Under the First Amendment, "if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."  *Guilford*, 760 A.2d at 597 (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).

The context of the House Democrats' statement in the Report further underscores that it is not actionable.  For one, the Report clarifies that congressional investigations were already underway.  *See* Report at 3.  In context, House Democrats were expressing their opinion that the information about Manafort would "feature" in those investigations – not that the information warranted a new investigation.  And the broader context is one in which Democratic members of Congress were expressing their opinion about how new information concerning a senior Republican political operative will impact contentious, ongoing congressional investigations.  Thus, even if the statement could fairly be read to imply that Manafort's conduct "merited" investigation, that statement, "in practical impact, is more like an expression of opinion than it is like an assertion of fact.  It is the kind of hyperbole that must be accepted in the rough and tumble of political argument."  *Ollman*, 750 F.2d at 998 (Bork, J., concurring).  The comments from Senator Graham and Democratic House members, on their face and in context, are "not actionable in defamation."  *Farah*, 736 F.3d at 534-35.

Further still, even if the comments from Senator Graham or the Democratic members of Congress could reasonably be interpreted as making an actionable allegation of wrongdoing,

AP's neutral reporting of those allegations is itself protected from liability under the First

Amendment.  *See Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977)

("[W]hen a responsible, prominent organization . . . makes serious charges against a public

figure, the First Amendment protects the accurate and disinterested reporting of those charges,

regardless of the reporter's private views regarding their validity.").  The D.C. Circuit has not yet

formally recognized this "neutral reportage" privilege.  *See White*, 909 F.2d at 528; *McFarlane v.*

*Esquire Magazine*, 74 F.3d 1296, 1307 (D.C. Cir. 1996).  But one court in this Circuit has

observed that "the logic of the doctrine, coupled with the weight of federal precedent, favor

adoption of a neutral reportage doctrine in this circuit," and held that the challenged reports were

"absolutely protected under the neutral reportage doctrine" because those reports presented a

"fair, accurate and neutral reiteration" of the allegations in question.  *In re United Press*

*International*, 106 B.R. 323, 329-31 (D.D.C. 1989).  Here, AP neither adopts nor puts any spin

on the comments offered by these members of Congress from both parties.  AP's neutral

reporting of those comments is privileged as a matter of law.

## 2. No reasonable defamatory implication is conveyed

Deripaska fares no better in alleging that the quote from Senator Graham implies some

ongoing support of Manafort's activities by Deripaska.  Compl. ¶¶ 28-29.  The Report cannot

reasonably be read to convey this implication, because the supposed *implication* is directly

contradicted by *statements* in the Report itself.  *Tavoulareas*, 817 F.2d at 781; *Guilford*, 760

A.2d at 601; *see also Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 255 (S.D.N.Y. 2014) (rejecting

claim for an alleged implication explicitly contradicted by statements in the report), *aff'd*, 578 F.

App'x 24 (2d Cir. 2014); *ToDay's Hous. v. Times Shamrock Commc'ns, Inc.*, 21 A.3d 1209,

1216 (Pa. Super. Ct. 2011) (rejecting defamation by implication claim where a challenged

publication "explicitly refuted any such implication").  The Report described the business

relationship as continuing at least through 2009 and explains the two were fighting in court in

2014.  *See* Report at 2, 5.  It expressly refutes an implication of ongoing business activities.

C.   **"Statement #3" Does Not Reasonably Convey The**
**Defamatory Implication Alleged, Nor Does The Report**
<u>**Affirmatively Suggest That AP Intended Or Endorsed That Implication**</u>

As before, Deripaska lumps together a set of disparate passages from the Report into

what he calls "Statement #3," which is made up of the following statements:

- "Deripaska became one of Russia's wealthiest men under Putin, buying assets abroad in ways widely perceived to benefit the Kremlin's interests," *see* Compl. ¶ 39;

- "Manafort worked as Trump's unpaid campaign chairman last year from March until August, a period that included the Republican National Convention that nominated Trump in July," *id.* ¶ 40; Report at 3;

- "The newly obtained business records link Manafort more directly to Putin's interests in the region. According to those records and people with direct knowledge of Manafort's work for Deripaska, Manafort made plans to open an office in Moscow, and at least some of his work in Ukraine was directed by Deripaska, not local political interests there," Compl. ¶ 41; and

- "[F]ederal criminal prosecutors became interested in Manafort's activities years ago as part of a broad investigation to recover stolen Ukraine assets after the ouster of pro-Russian President Viktor Yanukovych there in early 2014," *id.* ¶ 42.

Deripaska claims that, taken together, these passages convey that he "stole Ukrainian assets in

2014," is implicated in a federal investigation of that theft, and "is somehow tied to the Trump

Campaign Controversy."  *See id.* ¶¶ 39-48.  Once again, the alleged implication is not reasonably

conveyed by the text of the Report.  Moreover, Deripaska does not allege that the reported facts

comprising "Statement #3" are themselves false, objecting instead to the manner and order in

which they are presented in the Report.  Compl. ¶ 44.  To state a claim for defamation by

implication arising out of truthful statements, Deripaska "must make an especially rigorous

showing" both that the language can "be reasonably read to impart the false innuendo," and that

the Report on its face "affirmatively suggest[s] that the author intends or endorses the inference." *Guilford*, 760 A.2d at 596 (quoting *Chapin*, 993 F.2d at 1092-93).   He cannot do so.

The D.C. Circuit applied this principle in *White v. Fraternal Order of Police*, where plaintiff, a police officer, claimed that he had been defamed by implications conveyed in certain letters and news reports describing irregularities in the handling of a drug test he had taken in securing a promotion.   909 F.2d at 514-16.   The D.C. Circuit noted that defamation by implication is "an area fraught with subtle complexities," *id.* at 518, and cautioned that "[i]n entertaining claims of defamation by implication, courts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning." *Id.* at 519.   The court then held that plaintiff could not maintain defamation claims against the two media defendants, finding that the news reports in question were not reasonably capable of conveying the alleged defamatory meaning. *Id.* at 525-27.

The same is true here.   As this Court can properly determine on a motion to dismiss, the Report does not reasonably convey any connection between Deripaska in the theft of Ukrainian assets in 2014, let alone any implication that Deripaska is under federal investigation in that regard.   To the contrary, the Report makes clear that by 2014, Deripaska and Manafort were no longer working together and were in litigation with each other.   It also notes expressly that Deripaska made his fortune by "*buying* assets abroad," *see* Compl. ¶ 39 (emphasis added), and that "[n]o one mentioned Deripaska" at a House intelligence committee hearing that included testimony from the director of the Federal Bureau of Investigation, *see* Report at 3.

As noted above, pp. 23-24, the Report likewise cannot reasonably be read to suggest any involvement by Deripaska in alleged wrongdoing related to the Trump campaign, given that the Report – including in its headline – makes clear that the business relationship between Deripaska

and Manafort ended well before that campaign began.  *See* Report at 1 ("AP Exclusive: *Before Trump job*, Manafort worked to aid Putin) (emphasis added); *id.* at 5 ("Manafort's work with Deripaska continued for years, though *they had a falling out laid bare in 2014* in a Cayman Islands bankruptcy court.") (emphasis added).

For the same reasons, nothing in the Report affirmatively suggests to a reasonable reader that AP intended to convey the alleged implications, either.  *See Foretich v. Chung*, 1994 WL 716606, at *3 (D.D.C. Oct. 3, 1994) ("even if the defendants intended to defame the plaintiff, if their broadcast cannot reasonably be interpreted as being defamatory, there is no viable defamation claim").  The implications that Deripaska stole assets from Ukraine and is under investigation are directly undercut by the Report itself.  They are precisely the type of "imagined slights" that the D.C. Court of Appeals has cautioned must not be allowed to "become the basis for costly litigation" and thereby chill protected speech.  *Guilford*, 760 A.2d at 596.  "Statement #3" is not actionable as a matter of law.

### D.    The Article Is Not Defamatory "As A Whole"

Deripaska finally claims that the Report "as a whole" conveys the false implications that he "engaged in criminal conduct" or "aided criminal conduct" by Manafort, and that his private, commercial dealings were "deeply intertwined with the Trump Campaign Controversy."  *See* Compl. ¶¶ 7, 54-62.

As an initial matter, this claim runs aground on the requirement that a plaintiff "plead the defamatory statements with particularity," which includes "alleg[ing] specific defamatory comments."  *See Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996) (citing *Leo Winter Assocs., Inc. v. Dep't of Health & Human Servs.*, 497 F. Supp. 429, 432 (D.D.C. 1980)); *see also Stovell v. James*, 810 F. Supp. 2d 237, 248 (D.D.C. 2011) (plaintiff "fail[s] to adequately plead his defamation claim" where he "fail[s] to identify any of the specific statements [that are

allegedly defamatory] or the circumstances in which they were made"), *aff'd*, 526 F. App'x 1 (D.C. Cir. 2013) (per curiam).  Nor can Deripaska rest a claim on any opinions that readers might draw from the accurate or unchallenged facts of the Report.  *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144-45 (D.C. Cir. 1994) (an opinion based on facts disclosed to the reader, who "is free to draw his or her own conclusions based upon those facts, . . . is not actionable in defamation"), *modified*, 22 F.3d 310 (D.C. Cir. 1994).

But *even if* a defamation plaintiff could in the abstract sustain a free-floating defamation claim based on a publication as a whole, rather than on the specific factual statements it makes, Deripaska cannot do so here.  He contends only that the Report in total conveys the same purported implications that are already allegedly drawn from the statements discussed above.  This does not state an independent claim.  *See Herbert v. Lando*, 781 F.2d 298, 307-08 (2d Cir. 1986) (holding that the "overall impact" of the challenged publications "does not in itself constitute a cause of action" because the allegedly "defamatory implications of the specific statements and the overall impact of the publications are identical").

The argument that the article as a whole implies a connection between Deripaska and possible criminality by Manafort fails for the same reason as does Deripaska's claim regarding "Statement #1"—it is not defamatory *of Deripaska* to question whether Manafort may have failed an obligation to register under FARA.  And the allegation that the overall article implies a connection to what Deripaska styles the "Trump Campaign Controversy" fails for the same reason as implications alleged to flow from "Statement #2" and "Statement #3"—the implication of an ongoing relationship in 2016 is explicitly contradicted by the discussion of the termination of their relationship before 2014.  *See* Compl. ¶ 5.

In short, Deripaska does not get to rescue his otherwise legally insufficient claims by restyling his objection as one with the "overall" Report rather than anything specific he can point to.  His challenge to the Report "as a whole" is also insufficient as a matter of law and should be dismissed.

## II.   THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT AP PUBLISHED WITH THE REQUISITE DEGREE OF FAULT

As a separate and independent basis for dismissing the Complaint, Deripaska fails to allege facts that, if proven, could plausibly establish that AP published any of the alleged implications with "actual malice," the standard of fault Deripaska must meet if he is deemed a public figure.  The Complaint contains only conclusory allegations of "actual malice," with no specific facts tethered to the alleged implications at issue.

### A.   Deripaska Is A Limited Public Figure For Purposes Of His Libel Claim Against AP

For purposes of defamation, the First Amendment differentiates truly private figures, who are entitled greater protection from reputational harm, from public figures– *i.e.*, those individuals "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention," assume a place on the public stage and thereby both "run[] the risk of closer public scrutiny" and achieve "access to the channels of effective communication" to correct alleged falsehoods published about them.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-44 (1974).  In light of this country's "'profound national commitment'" to the debate of public issues, *Jankovic*, 822 F.3d at 585 (quoting *Sullivan*, 376 U.S. at 270), those who have chosen to engage in public endeavors or participate in public debate accept a greater risk of critical public comment and scrutiny, *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003).  Thus, to prevail on a claim for defamation, those who qualify as public figures must plead, and ultimately prove, by clear and convincing evidence, "actual malice" fault – a term of

art requiring proof that a challenged statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279-80.

A defamation plaintiff's status as a public figure "is a question of law for the court to resolve." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1293 n.12 (D.C. Cir. 1980). This question of a libel plaintiff's status "is pervasive, and it should be answered as soon as possible." *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir. 1980). Courts therefore regularly resolve the issue on preliminary motions on the basis of the pleadings and documents subject to judicial notice. *See, e.g.*, *Hourani*, 164 F. Supp. 3d at 128 (holding Kazakhstani businessman to be a limited purpose public figure on a motion to dismiss); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 260-62 (D.D.C. 2013) (finding plaintiff described as "Liberian warlord" who attempted to influence the Liberian Civil War to be a limited purpose public figure); *see also, e.g.*, *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013), *cert. denied*, 136 S. Ct. 2015 (2016) (granting pre-discovery motion to declare controversial art authenticator a limited purpose public figure); *Besen v. Parents & Friends of Ex-Gays, Inc.*, 2012 WL 1440183, at *4-5 (E.D. Va. Apr. 25, 2012) (holding spokesman for non-profit advocacy group to be a limited purpose public figure on a motion to dismiss).

The "touchstone" of the public figure analysis "remains whether an individual has 'assumed [a] role[ ] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment.'" *Tavoulareas,* 817 F.2d at 773 (quoting *Gertz*, 418 U.S. at 345). Here, Deripaska is a public figure, as his Complaint essentially concedes. *See* Compl. ¶¶ 22-23, 33-35, 44-47, 55-58 (alleging actual malice as the standard governing AP's conduct in publishing the Report).

The U.S. Supreme Court has identified two categories of "public figures" – "general purpose" and "limited purpose." *Tavoulareas*, 817 F.2d at 772.  Deripaska is at least a limited purpose public figure, who has thrust himself into a particular controversy.[43]  In this Circuit, a plaintiff qualifies as a limited purpose public figure if (1) there is a pre-existing public controversy, (2) the plaintiff has played a significant role in the controversy, and (3) the alleged defamatory statements are germane to the plaintiff's participation in the controversy.  *Waldbaum*, 627 F.2d at 1296-98.  Under this analysis, Deripaska is plainly a public figure.

Deripaska is the paradigmatic example of a limited public figure who has fairly exposed himself to public discussion through his activities.  Deripaska has voluntarily and openly assumed a leading role as an agent of the Russian Federation abroad, and in the controversy over the role of oligarchs as the ambassadors of Russian interests.  Through his purposeful and prominent representation of Russia around the world, he has achieved significant influence over that controversy, and is thereby a public figure for purposes of AP's Report touching on his activities in furtherance of Russian interests.

## 1.   The pre-existing public controversy surrounding the role of Russian oligarchs as emissaries of the Russian government

A public controversy is "a real dispute" that "has received public attention" because it "affects the general public or some segment of it in an appreciable way."  *Waldbaum*, 627 F.2d at 1296.  A public controversy exists, for example, when the "press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."  *Id.* at 1297; *see also OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 46-47 (D.D.C. 2005) ("To qualify as a public controversy, the law requires only that the issue be discussed publicly, and that the resolution of the issue affect others besides the immediate

---

[43] Given his formal status as a Russian Federation diplomat, *see supra* at 9, Deripaska may also qualify as a public official.

participants in the debate."). It may be broadly or narrowly drawn, and a broad controversy will

often generate other "sub[-]controvers[ies]." *Waldbaum*, 627 F.2d at 1297 n.27.

In the instant case, the issue long debated in capitals around the world directly affected

Russian-U.S. relations: Russian oligarchs were acting as *de facto* emissaries for the Russian

government and seeking to expand Russia's, and inextricably their own, influence, while western

powers remained skeptical of these individuals, whose extreme and allegedly ill-gotten wealth

and "symbiotic relationship . . . [with] Putin" simultaneously made them powerhouses and

pariahs.[44]

For years news reports have noted the "growing number of former Soviet officials and

industrialists seeking assistance in the U.S. capital."[45] Among them are Russian tycoons who

play "an increasingly important role in the global economy" and "have become politically

powerful" at home, making them "key players in Western efforts to promote regional stability."[46]

Concerns about the influence of such businessmen are long-standing and were expressed in no

less a forum than the 2008 Republican presidential nominee's convention speech, during which

Senator McCain "lashed out at Putin and the Russian oligarchs, who, 'rich with oil wealth and

corrupt with power . . . [are] reassembling the old Russian Empire.'"[47]

---

[44] *See, e.g.*, Gregory L. White & Alexander Kolyandr, *New Détente: Putin, Tycoons Rescue Each Other in Crisis*, Wall St. J. (Jan. 6, 2010), at A1, https://www.wsj.com/articles/SB126271582575516729; Hunter Walker, *Here Are The American Executives Who Are Working On Behalf Of Putin*, Business Insider (Mar. 5, 2014), http://www.businessinsider.com/american-executives-working-for-putin-2014-3.

[45] Glenn R. Simpson, et al., *How Lobbyists Help Ex-Soviets Woo Washington --- Scrubbed Images Open Doors, Assure Investors*, Wall St. J. (Apr. 17, 2007), at A1, https://www.wsj.com/articles/SB117674837248471543.

[46] *Id.* (reporting on Russian oligarchs and their U.S. lobbyists seeking to exert influence with American public officials).

[47] Ames, *supra* note 32.

According to observers, that old empire is being assembled in part due to "an unwritten understanding between Putin and the oligarchs: as long as they support the Kremlin, they can operate with impunity."[48]   Accordingly, they support the Kremlin at home and abroad and take on projects important to Putin.  In Deripaska's case, one example was buying an aluminum plant in a "key ex-Soviet republic," reportedly "to help Putin reassert control" there.[49]  Deripaska himself even boasts that "'I don't separate myself from the state.  I have no other interests.'"[50]

The Kremlin's desired sphere of influence indisputably extends to Washington.[51]  Well before AP ever published the Report, publications around the globe have reported that "behind the scenes," key advisors to top U.S. politicians "have cultivated deep ties with Russia's oligarchy–indeed, they have promoted the Kremlin's geopolitical and economic interests, as well as some of its most unsavory business figures . . . ."[52]  As *The Economist* put it, in reporting on a scandal involving senior British leaders connected to Deripaska, it is an open secret that Russian tycoons are engaged in "efforts to launder their reputations" and "politicians of all stripes [are] collud[ing] with them."[53]  Much attention has been paid to the expansion of Deripaska's

---

[48] *Id.*; *see also, e.g.*, Dana Cimilluca, et al., *Russia Tosses Life Preserver to One of Its Richest Men*, Wall St. J. (Oct. 29, 2008), at A1.

[49] Ames, *supra* note 32.

[50] *Saving the Oligarchs*, The Economist (Dec. 5, 2009), http://www.economist.com/node/15022616; *see also* Ames, *supra* note 32 ("Deripaska openly admits that his RusAl holdings are subservient to the Kremlin's wishes, telling the Financial Times last year, 'If the state says we need to give it up, we'll give it up.'").

[51] *See, e.g.*, Evan Osnos, David Remnick, et al., *Trump, Putin, and the New Cold War*, The New Yorker (Mar. 6, 2017),  http://www.newyorker.com/magazine/2017/03/06/trump-putin-and-the-new-cold-war; *Russia's Resurgence*, The Irish Times (Feb. 17, 2007), at 1.

[52] Ames, *supra* note 32.

[53] *The King of Corfu*, The Economist (Oct. 23, 2008), http://www.economist.com/node/12470493; *see also* Ken Silverstein, *Oleg Deripaska and the Buying of Washington*, Harper's Magazine (Oct. 24, 2008),https://harpers.org/blog/2008/10/oleg-deripaska-and-the-buying-of-washington-controversial-oligarch-funds-local-think-tanks/ (Deripaska, "woo[ing]

"American holdings over the past 10 years,"[54] including bids to acquire Chrysler and General

Motors subsidiaries, which were reportedly stymied by the controversy surrounding him.[55]

That the oligarchs are perceived to operate at the pleasure of the Kremlin in these global

activities is beyond dispute.  Putin regularly travels to world meetings with a set of oligarchs,

Deripaska among them.[56]  When the U.S. seeks to punish the Kremlin for aggressive conduct,

such as its annexation of Crimea, it does so in part through "sanctions and asset freezes" directed

to "Putin's billionaire cronies, targeted because of their closeness to" the Kremlin; after all, it is

"widely believed in Washington that their assets are Putin's . . . ."[57]  Indeed, Deripaska's own

U.S. visa troubles illustrate the critical role that oligarchs play in Putin's international efforts.  As

one publication described it, the U.S.'s withholding of a visa was "a serious obstacle to

[Deripaska's] business ambitions, hampering his duties as a Putin surrogate."[58]  Simply put, the

existence of a public controversy over the role of Russian oligarchs as emissaries for their

---

Washington," "has spread plenty of money around the United States, especially in Washington, D.C., to try to win himself friends and influence.").

[54] Barry Meier & Jesse Drucker, *Russian Once Tied to Trump Aide Seeks Immunity to Cooperate With Congress*, N.Y. Times (May 26, 2017), https://www.nytimes.com/2017/05/26/us/politics/oleg-deripaska-paul-manafort.html

[55] *See* Andrew Osborn, *Rusal Founder Keeps Low Profile – Main Owner Avoids Focus on Past as Russian Aluminum Giant Readies IPO*, Wall St. J.(July 30, 2007), at A9; Marty Jerome, *Chrysler Sale Threatened by Ties to Russian Mob*, Wired.com (May 11, 2007), https://www.wired.com/2007/05/chrysler_sale_t/; Justin Rood, *Controversial Oligarch Makes Play for GM's Hummer*, ABC News (Aug. 12, 2008), http://abcnews.go.com/Blotter/story?id=5564699&page=1.

[56] Gregory L. White & Alexander Kolyandr, *The Big Read: How Russian tycoon worked to preserve sprawling empire--Oleg Deripaska received bailouts from the Kremlin and breaks from foreign lenders; a strangely symbiotic relationship*, Wall St. J. (Europe) (Jan. 6, 2010), at 14.

[57] Luke Harding, *The new special relationship: what does Putin want from Trump?*, The Guardian (Nov. 20, 2016), https://www.theguardian.com/us-news/2016/nov/20/new-special-relationship-what-does-putin-want-from-trump-kgb.

[58] Ames, *supra* note 32.

government and advocates of Russian interests, a feature of the long-running controversy over

Russia's international influence and advocacy, is beyond reasonable dispute.

There can be no question that "persons actually were discussing" the "specific question"

over the role of oligarchs as *de facto* emissaries of Putin. *Jankovic*, 822 F.3d at 585 (quoting

*Waldbaum*, 627 F.2d at 1297).  Courts have consistently held that wide-ranging debates of just

this sort meet the test for public controversies.  Recently in *Jankovic*, the D.C. Circuit held that

the *Gertz* test for public controversies was satisfied by "'the progress of political and economic

reform in Serbia and the integration of Serbia into international institutions' in the post-

Milosevic Serbian government."  822 F.3d at 585 (citation omitted).  Similarly, the *Tavoulareas*

court identified a "national controversy over the state of the oil industry" and "the manner in

which the United States should respond to the rise of OPEC and the ensuing energy crisis."  817

F.2d at 767, 772-74.  In *Boley*, the court identified a "controversy concerning the Liberian Civil

War."  950 F. Supp. 2d at 261.  And, in *OAO Alfa Bank*, the court held that the *Gertz* test was

met by the controversy over the "rise of the oligarchs and the decline of the Russian economy

into what one observer described as a 'criminal-syndicalist state.'"  387 F. Supp. 2d at 43 (citing,

*inter alia*, *Gray v. St. Martin's Press, Inc.,* 221 F.3d 243, 251 (1st Cir. 2000) (identifying public

controversy as "the methods and influence of lobbyists in Washington")).  The debate over the

role of Russian oligarchs, and their ambitions and influence in furtherance of Russian priorities,

clearly falls within the ambit of a public controversy contemplated in *Waldbaum* and its progeny.

### 2.      Deripaska played a significant role in that controversy

There can similarly be no serious dispute that, as a Russian oligarch and self-described

representative of the Russian Federation, the holder of a diplomatic passport, and a "Kremlin

loyalist" who has declared "I do not separate myself from the state,"[59] Deripaska has voluntarily injected himself into this controversy.  His prominence has allowed him access to the media, which he used both to defend himself and Russia and promote his vision for his country.[60]  His wealth allowed him to fund public relations and direct lobbying efforts to the United States, and his stature also made him the beneficiary of similar efforts secured directly by the Russian government.  As a frequent "public representative" of the Russian government,[61] and a key "'representative of Russian big business'" according to the Russian president,[62] Deripaska has been on the front lines of advancing Russian interests around the world.

The plaintiffs in *OAO Alfa Bank*, also Russian oligarchs who became involved in the post-Soviet political economy and who had access to the press to voice their opinions on the events of the time, were held to be public figures.  The parallels to this case are clear:  Deripaska is a Russian tycoon, frequently discussed in the media alongside the plaintiffs in *OAO Alfa Bank*, whose money, diplomacy, and business dealings, inside and outside Russia, created wealth and prestige for his home country and whose fortunes were directly linked to those of the Russian power structure.  By their actions, such men accept a place in the dialogue of the day.  *See, e.g.*, *OAO Alfa Bank*, 387 F. Supp. 2d at 44-45.  Similarly, in *Jankovic*, a Serbian businessman whose

---

[59] *E.g.*, Anton Troianovski, *Kremlin-Friendly Tycoon Poised to Buy Energy Company*, Wash. Post (July 31, 2007), at A7.

[60] *See, e.g.*, *'Sanctions war' has nothing to do with Ukraine: it's just a pretext – Oleg Deripaska*, Basic Element (Sept. 22, 2014), https://www.basel.ru/en/highlights/sanctions-war-has-nothing-to-do-with-ukraine-it-s-just-a-pretext-oleg-deripaska/ (in TV interview, calling sanctions against Russia over Ukraine a "pre-text" by the West and, when asked if people across the globe are more anti-Russia than ever, Deripaska answered that "it's not people, it's [about] various lobbying groups and various interests"); *see also supra* note 12.

[61] Second O. Deripaska Decl. ¶ 5(i), *Gliklad v. Deripaska*, Index No. 652641/2015 (June 9, 2016), *supra* note 36.

[62] *Deripaska Accused U.S. of Blackmail*, Wall St. J. (Oct. 30, 2009), https://www.wsj.com/articles/SB125687000832717809.

money and advice were sought by his prime minister, who funded a Washington lobbyist, who enjoyed access to the media to voice his view on current events, and whose business investments in his native country provoked questions of favoritism and insider dealing also earned the public figure mantle for questions related to his country's political and economic figure.  822 F.3d at 584-86.  And, in *Hourani*, a "libel case [that] shows how small the world has become," a Kazakhstani businessman whose family owned "billions of dollars worth of important businesses" in his home land, who had connections to the country's president following Kazakhstan's declaration of independence from the Soviet Union, and who utilized his private property to the benefit of a member of the Kazakhstani ruling family was a limited purpose public figure for purposes of a controversy relating to the family.  *Hourani*, 164 F. Supp. 3d 132-33, 142-44 (citing *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990)).

Just as there was a debate in Russia as to whether corruption could be rooted out or if "crony capitalists" would rule the politicians (*Alfa Bank*), and as there was a debate in Serbia as to whether the elected leaders, even the self-described reformers, could break free of an "old guard" who were seen as obstacles to progressivism (*Jankovic*), so too there is an ongoing controversy now about Russia's foreign advocacy for its national interests and the means by which it accomplishes its goals.  Once Deripaska began advocating on behalf of the Russian government, including President Putin himself, he properly became a subject of public discussion – and, under the First Amendment, a public figure.

Deripaska recognizes this himself.  He openly accused the United States of public and private "blackmail" against him to "betray" his country in exchange for visa concessions, not a typical statement from the average businessman with no special relationship to his country's

leadership.[63]  In an open letter published in *The Washington Post* in response to the AP Report, Deripaska acknowledged that he, "and by extension [his] country Russia," has been the subject of critical reporting in the U.S. "[f]or years."[64]  And in sworn affidavits filed in U.S. courts and on his personal website, he has touted himself as a surrogate of the Russian Federation.[65]  It is perhaps no surprise then that his Complaint concedes that Deripaska is a public figure by attempting (and failing) to plead that AP acted with actual malice.  Compl. ¶¶ 22-23, 33-35, 44-47, 55-58.

### 3.    The AP Report is germane to the public controversy

The germaneness prong "'ensure[s] that the allegedly defamatory statement – whether true or not – is related to the plaintiff's role in the relevant public controversy." *Kahl*, 856 F.3d at 115 (quoting *Jankovic*, 822 F.3d at 589).  The inquiry is whether the challenged statement was "wholly unrelated" to this broader debate identified as the public controversy.  *Jankovic*, 822 F.3d at 589 (quoting *Waldbaum*, 627 F.2d at 1298).  Accordingly, it prevents publishers from "us[ing] an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life." *Id.*

The challenged Report is plainly germane to the public controversy.  As detailed above, there was an ongoing public debate over the Russian oligarchs' representation of Russian Federation interests around the world and as part of that, their employment of Washington

---

[63] Evan Perez, et al., *FBI Lets Barred Tycoon Visit U.S. The Wall Street Journal*, Wall St. J. (Oct. 30, 2009), at A1, https://www.wsj.com/articles/SB125685557890331 7087 ("There are 'Russian interests that I would never' betray, he said"); *Deripaska Accused U.S. of Blackmail*, *supra* note 62.

[64] Oleg Deripaska - *Initiatives: Open Letter Published in The Washington Post* (Mar. 31, 2017), http://www.deripaska.com/initiative/news/detail.php?ELEMENT_ID=9923#.WVOBU3KGP70.

[65] *See supra* notes 36-38; Oleg Deripaska, *About Oleg Deripaska: Photo Gallery*, http://www.deripaska.com/about/photo/.

lobbyists.  This is precisely the issue that AP reported in depth.  This is also precisely what the allegedly defamatory implications were about – that Deripaska had engaged a lobbyist for the benefit of Russia was part and parcel of the debate regarding Russia's aggressive political and economic policies.

At a minimum, the relationship between the challenged statements and the public controversy was certainly not "wholly unrelated" to this broader debate.  *E.g.*, *Jankovic*, 822 F.3d at 589 (germane where allegations about plaintiff's relationship with deposed dictator are not "'wholly unrelated' to the controversy" over current national reform effort) (citation omitted); *Tavoulareas*, 817 F.2d at 773-74 (statement germane where "alleged nepotism by [plaintiff] was not 'wholly unrelated' to a public controversy"); *OAO Alfa Bank*, 387 F. Supp. 2d at 44 (germane where corruption allegations against Russian oligarchs "are not 'wholly unrelated' to this broader debate" over Russian economic reform) (citation omitted).

Deripaska is a public figure for purposes of this litigation.

**B.    To State A Claim For Defamation, Deripaska
      Must Sufficiently Plead Publication With "Actual Malice"**

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court held that to satisfy Rule 8 a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly,* 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal,* 556 U.S. at 678.  But "naked assertions" or "conclusory statements" are not enough.  *Id.* (citations omitted).

As a public figure, Deripaska must plead, and ultimately prove, actual malice – that is, publication with actual knowledge that the statements were false or serious doubts as to their

truth.  *See, e.g., St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Tavoulareas*, 817 F.2d at

775-76.  Since *Iqbal* and *Twombly*, every Circuit to have considered the issue has held that the

requisite pleading of actual malice is subject to the same Rule 8 plausibility standard announced

in those cases.[66]  Deripaska must thus allege "enough facts from which malice might reasonably

be inferred."  *Schatz*, 669 F.3d at 58 (citing *Iqbal*, 556 U.S. at 686-87).  A libel complaint "using

actual-malice buzzwords" that are not "backed by well-pled facts" cannot survive a motion to

dismiss.  *Id.* at 56; *see also, e.g.*, *Earley v. Gatehouse Media Pa. Holdings, Inc.*, 2015 WL

1163787, at *1, 3 (M.D. Pa. Mar. 13, 2015) (dismissing libel by implication complaint failing to

plead adequate facts and explaining that "labels" or a "formulaic recitation" of the legal

requirements of an action are insufficient) (citations omitted); *Biro*, 963 F. Supp. 2d at 279-80

(pleading "actual-malice buzzwords" is simply not enough to nudge a case into discovery)

(citation omitted); *Egiazaryan v. Zalmayev*, 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011)

(dismissing where plaintiff's "repeated assertion" that defendant had published with actual

malice was inadequate "legal conclusion" not supported by relevant facts).

　　　　For example, in *Schatz*, the First Circuit dismissed as insufficient a complaint that alleged

in conclusory terms that the defendant "had 'knowledge' that its statements were 'false' or had

'serious doubts' about their truth and a 'reckless disregard' for whether they were false," but

failed to allege facts that would plausibly support these conclusions. 669 F.3d at 56, 58.

Similarly, in *Mayfield*, the Fourth Circuit dismissed a complaint alleging that defendants'

statements "were known by [them] to be false at the time they were made . . . or were made with

---

[66] *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *Biro v. Conde Nast*, 807 F.3d 541, 544–45 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2015 (2016); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. NASCAR*, 674 F.3d 369, 377-78 (4th Cir. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012).

reckless disregard as to their veracity" as "conclusory," observing that plaintiff's "entirely insufficient" allegations "simply do not suggest" facts from which the court could infer that defendants "knew their statements were false or . . . were reckless with respect to their veracity."  674 F.3d at 377-78.  Simply put, public figures, like other litigants, are not entitled to proceed to discovery to determine whether they might have a claim; they must first allege facts that plausibly support the existence of a claim.  *Michel*, 816 F.3d at 702.

Although the D.C. Circuit has not yet expressly recognized that the *Iqbal/Twombly* pleading requirements apply to actual malice fault, courts in this district repeatedly have done so. *E.g.*, *Zimmerman*, 2017 WL 1207416, at *17 (recognizing standard but finding specific allegations sufficient); *Boley*, 950 F. Supp. 2d at 263 (finding actual malice allegations insufficient and dismissing where plaintiff had "adduced no *facts* indicating that the [challenged] statements were false or made with actual malice, offering only broad and conclusory denials") (emphasis in original).  Indeed courts in this Circuit scrutinized fault allegations in public figure defamation cases even before *Iqbal/Twombly*.  *See, e.g.*, *Thomas*, 681 F. Supp. at 65 (granting motion to dismiss where "[t]he complaint lacks any colorable claim that *The Washington Times* published the challenged statements with actual malice").

A public figure like Deripaska must allege facts – and not simply conclusions – that if proven would plausibly establish publication by AP with "actual malice" in order to state a claim.  He has not done so.

**C.   Deripaska Fails To Plausibly Allege Publication With "Actual Malice"**

The allegations of actual malice in the Complaint are entirely conclusory.  Deripaska alleges, for example, that AP "intended . . . a false and defamatory inference beyond the

reporting of true facts." Compl. ¶ 33; *see also id.* ¶ 44 (same).[67] Such conclusory allegations would be insufficient on their own, even if the challenged statements were alleged to be expressly defamatory. *See, e.g.*, *Boley*, 950 F. Supp. 2d at 263; *Mayfield*, 674 F.3d at 377-78. Where, as here, a libel plaintiff seeks to pursue claims based on alleged *implications*, the First Amendment demands more.

Even if the alleged defamatory implications could reasonably be read from a challenged report – which, as described in Section I, *supra*, they cannot – a public figure must demonstrate that defendant *intended* to convey that false implication. *See Dodds*, 145 F.3d at 1064 (plaintiff must show by clear and convincing evidence that alleged defamatory implication was both reasonable and was intended by defendants (citing *Newton v. NBC*, 930 F.2d 662, 682 (9th Cir. 1990)); *Howard v. Antilla*, 294 F.3d 244, 255 (1st Cir. 2002) (same); *Compuware Corp. v. Moody's Inv'rs Servs., Inc.*, 499 F.3d 520, 528-29 (6th Cir. 2007) ("where the plaintiff is claiming defamation by innuendo, he . . . must show with clear and convincing evidence that the defendant [ ] intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material") (quoting *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988)); *Woods v. Evansville Press Co.*, 791 F.2d 480, 487-88 (7th Cir. 1986) ("A publisher . . . cannot be charged with the intolerable burden of guessing what inferences a jury might draw from an article and ruling out all possible false and defamatory innuendoes . . . .").

The reason is obvious: There can be no constitutional "knowledge of falsity" in implications that were never intended to be conveyed by the author in the first place. *See generally* 1 Robert D. Sack, *Sack on Defamation* § 5.5.1 (5th ed. 2017) ("implications perceived

---

[67] The Complaint also alleges that AP mischaracterized a contract between Deripaska and Manafort as including work on behalf of Russian interests, Compl. ¶ 22, but the Complaint does not allege that this statement is defamatory – only challenging the alleged implication that Manafort violated the law by failing to register as a foreign lobbyist.

in a statement but not intended by the speaker ordinarily are not actionable in public official or public figure cases") (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984) and *Dodds*, 145 F.3d at 1063-64).[68]

Deripaska makes no effort to satisfy this standard. *See Tavoulareas*, 817 F.2d at 794 ("defamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement"). Instead, he makes three general assertions, unconnected to AP's actual reporting, or even the defamatory implications he contends were conveyed. This is entirely insufficient.

First, the Complaint asserts that the terms of a contract entered into in 2006 between Deripaska and Manafort somehow establish that (a) Deripaska did not pay Manafort to do "work designed to 'greatly benefit the Putin government,'" and (b) AP knew this. Compl. ¶¶ 22-23. Deripaska does not, and cannot, explain how this is a well-pled fact that plausibly supports a finding of actual malice vis-à-vis any of the defamatory implications allegedly conveyed. *See Gray*, 221 F.3d at 252 ("Even assuming [author] was careless and reached a mistaken conclusion, that is not enough for actual malice."); *see also Moldea*, 22 F.3d at 315 ("[W]hen a writer is evaluating or giving an account of inherently ambiguous materials or subject matter, the First Amendment requires that the courts allow latitude for interpretation.") (citing *Bose Corp.*, 466 U.S. at 488).

---

[68] This rule protects speakers from liability based on innocent misunderstanding and is grounded in similar reasoning as the principle that admittedly true statements are not defamatory, absent specific evidence on the face of the report that a defamatory meaning was "intend[ed] or endorse[d]." *See, e.g.*, *White*, 909 F.2d at 520 (holding report based on true facts not impliedly defamatory because "the particular manner or language" of the report at issue did not "suppl[y] *additional*, *affirmative* evidence suggesting that the defendant *intend*[*ed*] or *endorse*[*d*] the defamatory inference") (first emphasis added); *Chapin*, 993 F.2d at 1093 (same).

Deripaska next alleges that AP's knowledge of the souring of his and Manafort's business relationship – that it had dissolved in litigation by the time the Trump presidential campaign began – is evidence that AP published with actual malice a Report allegedly implying a Deripaska connection to theft from Ukraine in 2014 and an ongoing connection with Manafort at the Trump campaign in 2016.  Compl. ¶¶ 34, 46-47 (alleging the purported timing of the end of the Manafort/Deripaska relationship and the 2014 litigation between them as a basis for actual malice in publishing second and third challenged statements).  The claim is nonsensical.  AP *reported* the fact of the end of the business relationship, referencing the "falling out laid bare in [a] 2014" lawsuit filed in the Cayman Islands.  *See* Report at 5.  The publication of this fact could hardly constitute plausible evidence that AP purposefully implied the contrary.  Accurately reporting facts is the antithesis of publishing with actual malice.  *See, e.g.*, *Biro*, 963 F. Supp. 2d at 285-88.

Indeed, for this reason, statements consistent with the Report after publication cited by the Complaint are a complete red herring.  Compl. ¶ 34.  A co-author of the Report, during a March 22, 2017 video, stated:

> I should emphasize that what we've reported is historical.  So the relationship with Deripaska would have been over by the time the campaign began, long since then.  I mean, Deripaska was suing him, in fact, at that point.  So you know, there isn't any sort of question at the moment as to whether Oleg Deripaska was, you know, in some way involved in the Trump campaign.

> But what it does demonstrate is that Paul Manafort had the contacts, connections, and willingness to work for a Russian oligarch who was seeking to influence world events.

Schulz Decl. Ex. B at 3:10-21.  Nothing in this separate statement, which accurately describes what is already in the Report, demonstrates any knowledge of falsity or intent to convey a statement that Deripaska *was involved with the Trump campaign*.  To the contrary, it demonstrates the *absence* of actual malice – an intent to convey precisely what the Report

actually stated.  *See Liberty Lobby, Inc. v. Dow Jones & Co.*, 638 F. Supp. 1149, 1152 (D.D.C. 1986) (judgement for publisher where "affirmative evidence" suggested defendants "published the article in good faith and without 'actual malice'"), *aff'd*, 838 F.2d 1287 (D.C. Cir. 1988).

Finally, Deripaska complains, in the alternative, that actual malice is shown by a purported failure by AP to "plac[e] the [Senator] Graham Quotation in its proper temporal context." Compl. ¶ 35.  Such criticisms of word choice and story structure do not amount to actual malice.  *See, e.g.*, *Schatz*, 669 F.3d at 57-58 (affirming dismissal where plaintiff alleged merely the "juxtaposing" of quotes to convey a misimpression and inaccurate "timing" of underlying events).  That is especially true where the article elsewhere – and in its headline – makes the "temporal context" clear.  *Tavoulareas*, 817 F.2d at 780-81; *Guilford*, 760 A.2d at 601; *Kavanagh*, 997 F. Supp. 2d at 255; *ToDay's Hous.*, 21 A.3d at 1215-16.

Because nothing in the Complaint plausibly alleges facts establishing that AP intended to convey the implications alleged by Deripaska, much less that those implications were knowingly false, he cannot state a viable claim for this reason as well.

## CONCLUSION

For each and all the foregoing reasons, AP respectfully requests this Court to enter an order dismissing the Complaint, with prejudice, and enter such other and further relief as the Court deems just and proper.

Dated:  July 3, 2017

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

*/s/ David A. Schulz*

*Of Counsel*:                              David A. Schulz (D.C. Bar No. 459197)
                                         Chad R. Bowman (D.C. Bar No. 484150)
Karen Kaiser                             Mara J. Gassmann (D.C. Bar No. 1014532)
Brian Barrett                            Maxwell S. Mishkin (D.C. Bar No. 1031356)
The Associated Press
200 Liberty Street                       1899 L Street, N.W., Suite 200
New York, NY 10281                       Washington, D.C. 20036
Telephone: (212) 621-7547                Telephone: (202) 508-1136
Fax: (212) 506-6131                      Fax: (202) 861-9888
kkaiser@ap.org                           dschulz@lskslaw.com
bbarrett@ap.org                          cbowman@lskslaw.com
                                         mgassmann@lskslaw.com
                                         mmishkin@lskslaw.com

*Counsel for Defendant The Associated Press*

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I caused defendant Associated Press' Motion to Dismiss, supporting Memorandum, and accompanying Declaration and Exhibits, to be filed and served electronically via the Court's ECF System upon counsel of record.


Dated:  July 3, 2017                     /s/ *David A. Schulz*
                                         David A. Schulz