**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

OLEG V. DERIPASKA,
        Plaintiff,

v.

THE ASSOCIATED PRESS,
        Defendant.

Case No. 1:17-cv-00913-ESH

---

**DEFENDANT'S SPECIAL MOTION TO DISMISS THE COMPLAINT**
**PURSUANT TO THE D.C. ANTI-SLAPP ACT**

Pursuant to the District of Columbia Anti-SLAPP Act of 2010, D.C. Code § 16-5502(a) ("the Anti-SLAPP Act" or "the Act"), Defendant Associated Press ("AP"), by and through its undersigned counsel, respectfully moves for an order dismissing the Complaint with prejudice. AP reserves the right to file a motion seeking an award of the costs of litigation hereof, including attorneys' fees, as provided by D.C. Code § 16-5504(a), within fourteen days after the entry of judgment, following a grant of its anti-SLAPP motion.  Fed. R. Civ. P. 54(d)(2).

For the reasons set forth more fully in the accompanying Memorandum of Points and Authorities, the declaration of Chad R. Bowman, and the exhibits attached thereto, AP's publication is protected by the Anti-SLAPP Act, as it constitutes an "[a]ct in furtherance of the right of advocacy on issues of public interest," D.C. Code § 16-5502(a), and Plaintiff Oleg Deripaska is unable to discharge the heavy burden the Act imposes on him to demonstrate that he is "likely to succeed on the merits" of his defamation claims. D.C. Code § 16-5502(b). Accordingly, AP respectfully requests that the Court grant its special motion to dismiss and enter judgment in its favor dismissing the Complaint with prejudice.

**REQUEST FOR HEARING**

AP respectfully requests a hearing on its motion to dismiss.

Dated:  July 3, 2017

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

/s/ David A. Schulz

*Of Counsel*:

David A. Schulz (D.C. Bar No. 459197)
Chad R. Bowman (D.C. Bar No. 484150)
Karen Kaiser
Mara J. Gassmann (D.C. Bar No. 1014532)
Brian Barrett
Maxwell S. Mishkin (D.C. Bar No. 1031356)
The Associated Press
200 Liberty Street
1899 L Street, N.W., Suite 200
New York, NY  10281
Washington, D.C.  20036
Telephone: (212) 621-7547
Telephone: (202) 508-1136
Fax: (212) 506-6131
Fax: (202) 861-9888
kkaiser@ap.org
dschulz@lskslaw.com
bbarrett@ap.org
cbowman@lskslaw.com
mgassmann@lskslaw.com
mmishkin@lskslaw.com

*Counsel for Defendant The Associated Press*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

OLEG V. DERIPASKA,

        Plaintiff,

v.

THE ASSOCIATED PRESS,

        Defendant.

Case No. 1:17-cv-00913-ESH

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S**
**SPECIAL MOTION TO DISMISS UNDER THE D.C. ANTI-SLAPP ACT**

LEVINE SULLIVAN KOCH & SCHULZ, LLP

*Of Counsel:*

Karen Kaiser
Brian Barrett
The Associated Press
200 Liberty Street
New York, NY 10281
Telephone: (212) 621-7547
Fax: (212) 506-6131
kkaiser@ap.org
bbarrett@ap.org

David A. Schulz (D.C. Bar No. 459197)
Chad R. Bowman (D.C. Bar No. 484150)
Mara J. Gassmann (D.C. Bar No. 1014532)
Maxwell S. Mishkin (D.C. Bar No. 1031356)

1899 L Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 508-1136
Fax: (202) 861-9888
dschulz@lskslaw.com
cbowman@lskslaw.com
mgassmann@lskslaw.com
mmishkin@lskslaw.com

*Counsel for Defendant The Associated Press*

Dated:  July 3, 2017

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 5

ARGUMENT ........................................................................................................... 5

I.      THIS COURT CAN ONCE AGAIN APPLY
        D.C.'S ANTI-SLAPP ACT IN DIVERSITY CASES ........................................ 6

II.     DERIPASKA'S COMPLAINT SHOULD BE
        DISMISSED UNDER THE D.C. ANTI-SLAPP ACT ..................................... 11

        A.      Deripaska's Complaint Triggers
                The D.C. Anti-SLAPP Act's Protections ............................................ 11

                1.      The Report is protected under Section 16-5501(1)(A)(i) ......... 12

                2.      The Report is protected under Section 16-5501(1)(A)(ii) ....... 13

                        (a)      Deripaska is a public figure ......................................... 15

                        (b)      Manafort is a public figure .......................................... 15

                3.      The Report is protected under Section 16-5501(1)(B) ........... 22

        B.      Deripaska Cannot Show That His
                Claim Is Likely To Succeed On The Merits ...................................... 23

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Boulter*,
  842 F. Supp. 2d 85 (D.D.C. 2012) ..................................................................2, 6

*\*Abbas v. Foreign Policy Group, LLC*,
  783 F.3d 1328 (D.C. Cir. 2015) ...................................................................2, 6, 7

*Abbas v. Foreign Policy Group, LLC*,
  975 F. Supp. 2d 1 (D.D.C. 2013) ...............................................................2, 6, 14

*Abex Corp. v. Maryland Casualty Co.*,
  790 F.2d 119 (D.C. Cir. 1986) ..........................................................................9

*Boley v. Atlantic Monthly Group*,
  950 F. Supp. 2d 249 (D.D.C. 2013) ....................................................2, 6, 13, 14

*Burke v. Air Serv International, Inc.*,
  685 F.3d 1102 (D.C. Cir. 2012) ....................................................................6, 10

*Chandok v. Klessig*,
  632 F.3d 803 (2d Cir. 2011) ...............................................................................2

*Coles v. Washington Free Weekly, Inc.*,
  881 F. Supp. 26 (D.D.C. 1995) ........................................................................23

*\*Competitive Enterprise Institute v. Mann*,
  150 A.3d 1213 (D.C. 2016) ..............................................................2, 3, 7, 8, 11, 14

*Diwan v. EMP Global LLC*,
  841 F. Supp. 2d 246 (D.D.C. 2012) ...............................................................2, 6

*Doe No. 1 v. Burke*,
  91 A.3d 1031 (D.C. 2014) ................................................................................14

*\*Easaw v. Newport*,
  2017 WL 2062851 (D.D.C. May 12, 2017) .................................................3, 8, 9

*Erie Railroad Co. v. Tompkins*,
  304 U.S. 64 (1938) ...............................................................................................6

*Farah v. Esquire Magazine, Inc.*,
  863 F. Supp. 2d 29 (D.D.C. 2012) ..........................................................2, 6, 9, 14

*Forras v. Rauf,*
  39 F. Supp. 3d 45 (D.D.C. 2014) ......................................................................................2, 6, 9

*Gardner v. Martino,*
  563 F.3d 981 (9th Cir. 2009) ...........................................................................................2

*Godin v. Schencks,*
  629 F.3d 79 (1st Cir. 2010).........................................................................................2, 10

*Guilford Transportation Industries, Inc. v. Wilner,*
  760 A.2d 580 (D.C. 2000) ..............................................................................................24

*Hanna v. Plumer,*
  380 U.S. 460 (1965)........................................................................................................10

*Henry v. Lake Charles American Press, LLC,*
  566 F.3d 164 (5th Cir. 2009) ...........................................................................................2

*Hicks-Bey v. United States,*
  649 A.2d 569 (D.C. 1994) ................................................................................................8

*Hilton v. Hallmark Cards,*
  599 F.3d 894 (9th Cir. 2010) ...........................................................................................2

*Jankovic v. International Crisis Group,*
  822 F.3d 576 (D.C. Cir. 2016).............................................................................15, 22, 25

*Kahl v. Bureau of National Affairs, Inc.,*
  856 F.3d 106 (D.C. Cir. 2017).........................................................................................15

*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.,*
  44 Cal. Rptr. 2d 46 (Cal. Ct. App. 1995) ........................................................................13

*Lee v. Flintkote Co.,*
  593 F.2d 1275 (D.C. Cir. 1979) .......................................................................................9

*Liberty Synergistics Inc. v. Microflo LTD,*
  718 F.3d 138 (2d Cir. 2013)..............................................................................................2

*Moss v. Stockard,*
  580 A.2d 1011 (D.C. 1990) ............................................................................................15

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964).........................................................................................................4

*National Treasury Employees Union v. FLRA,*
  30 F.3d 1510 (D.C. Cir. 1994) .........................................................................................9

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.,*
    190 F.3d 963 (9th Cir. 1999) ............................................................................. 10

*Northon v. Rule,*
    637 F.3d 937 (9th Cir. 2011) ............................................................................. 10

*Ollman v. Evans,*
    750 F.2d 970 (D.C. Cir. 1984) ........................................................................... 24

*Price v. Stossel,*
    620 F.3d 992 (9th Cir. 2010) ............................................................................... 2

*Royalty Network, Inc. v. Harris,*
    756 F.3d 1351 (11th Cir. 2014) ........................................................................... 2

*Salve Regina College v. Russell,*
    499 U.S. 225 (1991) ............................................................................................. 8

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.,*
    559 U.S. 393 (2010) ............................................................................................. 6

*Sherrod v. Breitbart,*
    843 F. Supp. 2d 83 (D.D.C. 2012) ............................................................. 2, 6, 10

*Smith v. People of State of California,*
    361 U.S. 147 (1959) ............................................................................................. 1

*Tavoulareas v. Piro,*
    817 F.2d 762 (D.C. Cir. 1987) ..................................................................... 23, 24

*In re United Press International,*
    106 B.R. 323 (D.D.C. 1989) .............................................................................. 24

*Waldbaum v. Fairchild Publications, Inc.,*
    627 F.2d 1287 (D.C. Cir. 1980) ................................................................... 15, 22

*Walker v. Armco Steel Corp.,*
    446 U.S. 740 (1980) ........................................................................................... 10

*Washington Post Co. v. Keogh,*
    365 F.2d 965 (D.C. Cir. 1966) ....................................................................... 1, 25

*White v. Fraternal Order of Police,*
    909 F.2d 512 (D.C. Cir. 1990) ........................................................................... 24

**Statutes**

D.C. CODE

§ 16-5501 ................................................................................................12, 14, 22

§ 16-5502 ...........................................................................................1, 5, 11, 23, 25

**Other Authorities**

58 D.C. Reg. 17 (Apr. 29, 2011)........................................................................................1

In support of its Special Motion to Dismiss under the District of Columbia Anti-SLAPP Act of 2010, D.C. Code § 16-5502(a), Defendant The Associated Press ("AP") respectfully submits the following memorandum of points and authorities.

## INTRODUCTION

The D.C. Circuit recognized more than a half-century ago that "[t]he threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966). The court cautioned that "[u]nless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors," and that such "self-censorship affecting the whole public is 'hardly less virulent for being privately administered.'" *Id.* (quoting *Smith v. People of State of Cal.*, 361 U.S. 147, 154 (1959)).

Seven years ago, members of the D.C. Council introduced Bill 18-893, the "Anti-SLAPP Act of 2010," to address just this concern. The proposed Act was designed to provide "substantive rights with regard to a defendant's ability to fend off lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view," or as they are often called, "strategic lawsuits against public participation," or SLAPPs. *See* Declaration of Chad R. Bowman, executed July 3, 2017 ("Bowman Decl."), Ex. A at 1, 4. The bill passed, was codified at D.C. Code §§ 16-5501 *et seq.*, and became effective in 2011. *See* 58 D.C. Reg. 17 (Apr. 29, 2011). D.C. thereby joined 28 other jurisdictions in the U.S. in protecting free speech on matters of public concern by shielding defendants from meritless actions in this manner. *See* Bowman Decl., Ex. A at 3.

Over the three following years, courts in this Circuit regularly, if not uniformly, held the D.C. Anti-SLAPP Act to be applicable in diversity cases, construing its protections as

substantive state law.[1]  This aligned with all federal appellate courts that had addressed that

question in considering state anti-SLAPP statutes around the country.[2]  In April 2015, however,

the D.C. Circuit split from its sister circuits.  In the absence of guidance from the D.C. Court of

Appeals, it read the safeguards in the D.C. Anti-SLAPP Act as procedural, rather than

substantive, and declined to apply them as inconsistent with federal procedural rules.  *See Abbas*

*v. Foreign Policy Grp.*, *LLC*, 783 F.3d 1328, 1334-37 (D.C. Cir. 2015).  The court cautioned that

it would be "[a]n interesting issue . . . if a State anti-SLAPP act did in fact exactly mirror" the

federal procedural standards, but considered that possibility "hypothetical."  *Id.* at 1335 n.3.

   *Abbas* would have foreclosed a motion in this Court under the D.C. Anti-SLAPP Act,

except for intervening authority in the D.C. Court of Appeals.  In December 2016, the highest

D.C. court expressly held in *Competitive Enterprise Institute v. Mann* that the Act's "purpose

[was] to create a *substantive* right not to stand trial and to avoid the burdens and costs of pre-trial

procedures," and further clarified that the standard for granting a special motion to dismiss under

the Anti-SLAPP Act *does* "simply mirror the standards imposed by Federal Rule 56."  150 A.3d

1213, 1231, 1238 n.32 (D.C. 2016) (internal marks and citation omitted).  The D.C. court

---

[1] *See, e.g.*, *Forras v. Rauf*, 39 F. Supp. 3d 45, 51-52 (D.D.C. 2014) (applying statute); *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 9-11 (D.D.C. 2013) (same), *aff'd in part on other grounds*, 783 F.3d 1328 (D.C. Cir. 2015); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 254 (D.D.C. 2013) (same); *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 36 n.10 (D.D.C. 2012) (same); *Diwan v. EMP Glob. LLC*, 841 F. Supp. 2d 246, 247 n.1 (D.D.C. 2012) (same); *see also Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012) (finding statute to be substantive but not retroactive), *aff'd*, 720 F.3d 932 (D.C. Cir 2013); *but see 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 96 (D.D.C. 2012) (declining to apply statute in diversity).

[2] *See Liberty Synergistics Inc. v. Microflo LTD*, 718 F.3d 138, 148 (2d Cir. 2013); *Chandok v. Klessig*, 632 F.3d 803, 817-19 (2d Cir. 2011); *Hilton v. Hallmark Cards*, 599 F.3d 894, 901-02 (9th Cir. 2010); *Godin v. Schencks*, 629 F.3d 79, 89 n.16 (1st Cir. 2010); *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010); *Gardner v. Martino*, 563 F.3d 981, 990-91 (9th Cir. 2009); *Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 170 (5th Cir. 2009).  *But cf. Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1359-61 (11th Cir. 2014) (finding Georgia anti-SLAPP law's verification requirement alone to conflict with the Federal Rules of Civil Procedure).

recognized that "[t]he applicability of the Anti-SLAPP statute in federal court is not for [it] to determine," but noted that its "interpretation of the standard applicable to the special motion to dismiss under District of Columbia law will no doubt factor into future analysis of the dicta in *Abbas* concerning the applicability of the Anti-SLAPP Act in litigation brought in federal courts."  *Id.* at 1238 n.32.

As Chief Judge Howell just recently observed, when a decision by the D.C. Court of Appeals "clearly and unmistakably renders inaccurate a prior decision by the D.C. Circuit interpreting D.C. law," then the D.C. court's "more recent expression of the law" should be applied.  *Easaw v. Newport*, 2017 WL 2062851, at *10 (D.D.C. May 12, 2017) (Howell, C.J.). Under the "more recent expression of the law" in *Mann*, AP should be afforded the substantive protections of the D.C. Anti-SLAPP Act in this lawsuit.

To our knowledge, this case squarely presents the first opportunity for this Court to evaluate whether the holding of *Abbas*, construing the D.C. Act as procedural and therefore inapplicable in a federal diversity case, remains good law following the intervening express clarification of the Act by the D.C. Court of Appeals in *Mann*.  It also offers an ideal vehicle for doing so, because this is an archetypal SLAPP action.

As discussed below and in the accompanying memorandum in support of AP's motion to dismiss for failure to state a claim (the "Rule 12(b)(6) Memo"), AP published a news report in March 2017 (the "Report") that shed new light on the past business relationship between Paul Manafort, the former chair of President Donald Trump's 2016 campaign, and Plaintiff Oleg Deripaska, a billionaire Russian industrialist, diplomat, and member of President Vladimir Putin's inner circle.  The Report was published at a time when Russia's attempts to expand its influence – including within this country – could not be a more salient issue to the American

3

public.  Deripaska quickly responded with paid advertisements in two national newspapers –

including a full-page ad in *The Washington Post* – "demand[ing] that any and all further

dissemination of these allegations, by the AP or any other media outlet, must cease

immediately."[3]  He then filed this lawsuit claiming that AP had defamed him through a number

of false implications allegedly conveyed by the Report.

Deripaska's complaint fails to state any claim, for the reasons set out in AP's Rule

12(b)(6) Memo, which is incorporated fully herein.  In particular, the Complaint is fatally

deficient because (a) the alleged implications are not actionable—some are protected statements

of opinion and privileged as a matter of law, others are not "of and concerning" Deripaska, and

none are reasonably capable of conveying the defamatory meanings alleged; and (b) Deripaska is

a public figure who fails to plead facts plausibly alleging publication with "actual malice," the

degree of fault required by the First Amendment.  But a motivated plaintiff—and, especially, a

well-resourced one—can assert such substantively meritless SLAPP claims to impose significant

costs, burdens, and distractions on a publisher.  Often, "the goal of the litigation is not to win the

lawsuit but punish the opponent and intimidate them into silence."  *See* Bowman Decl., Ex. A at

4.  Even if no judgment is entered against the defendant as a result of a SLAPP, a "pall of fear

and timidity [is] imposed upon those who would give voice to public criticism," creating "an

atmosphere in which the First Amendment freedoms cannot survive."  *N.Y. Times Co. v.

Sullivan*, 376 U.S. 254, 278 (1964).

---

[3] Erik Wemple, *Russian billionaire attempts to stifle AP scoop*, Wash. Post (Mar. 28, 2017) https://www.washingtonpost.com/blogs/erik-wemple/wp/2017/03/28/russian-billionaire-attempts-to-stifle-ap-scoop/; Oleg Deripaska - *Initiatives: Open Letter Published in The Washington Post* (Mar. 31, 2017), http://www.deripaska.com/initiative/news/detail.php?ELEMENT_ID=9923#.WVOBU3KGP70.

The D.C. Anti-SLAPP Act mitigates this threat to the First Amendment by providing for the speedy resolution of meritless cases and by shifting the financial burdens of defending them onto plaintiffs.  In light of the *Mann* decision, the availability of these vital—and substantive— protections should no longer turn on whether a publisher is sued in state or federal court.  As demonstrated below, this Court can and should apply the D.C. Anti-SLAPP Act, grant AP's special motion to dismiss, and award AP its fees and costs.

## BACKGROUND

For the relevant facts and procedural history of this matter, AP respectfully directs the Court to its Rule 12(b)(6) Memo, which is incorporated fully herein by reference.  Although Oleg Deripaska is the plaintiff in this action, for the purposes of this special motion to dismiss under the D.C. Anti-SLAPP Act, it bears additional mention that the AP Report is actually focused on his former business partner Paul Manafort.  *Both* of these individuals are public figures who have reached the pinnacle of their high-profile professions, and by the time the challenged Report was published *both* were embroiled in controversies of overwhelming public import.

## ARGUMENT

The D.C. Anti-SLAPP Act empowers defendants to swiftly dispatch defamation claims where the challenged speech arises out of "an act in furtherance of the right of advocacy on issues of public interest," so long as the plaintiff cannot show that "the claim is likely to succeed on the merits."  D.C. Code § 16-5502(a)-(b).  Because AP's Report qualifies for protection under the statute in multiple ways, and because Deripaska cannot carry his burden of demonstrating a likelihood of success, the law requires that this Complaint be dismissed with prejudice.

I.      **THIS COURT CAN ONCE AGAIN APPLY**
        **D.C.'S ANTI-SLAPP ACT IN DIVERSITY CASES**

From the 2011 enactment of the D.C. Anti-SLAPP Act through 2015, courts in this

Circuit found the Anti-SLAPP Act to be generally applicable at least a half-dozen times in cases

where jurisdiction arose out of diversity among the parties.  *See Forras*, 39 F. Supp. 3d at 51-52;

*Abbas*, 975 F. Supp. 2d at 9-11; *Boley*, 950 F. Supp. 2d at 254; *Farah*, 863 F. Supp. 2d at 36

n.10; *Sherrod*, 843 F. Supp. 2d at 84-86 & n.4; and *Diwan*, 841 F. Supp. 2d at 247 n.1.[4]  But on

April 24, 2015, the D.C. Circuit issued its opinion in *Abbas*, affirming the district court's

dismissal of plaintiff's defamation claim under Rule 12(b)(6), but reversing on the question of

whether the Anti-SLAPP Act's protections were available for a defendant in federal court.  783

F.3d at 1333-39.

This conclusion, which diverged from all of the other federal appellate courts to have

addressed that question at the time, rested on two premises.[5]  The first premise was that the D.C.

Anti-SLAPP Act's protections are procedural, rather than substantive, and under *Erie Railroad*

*Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938), federal courts sitting in diversity "are to apply state

substantive law and federal procedural law."  *Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1107

(D.C. Cir. 2012) (citation omitted).  The second premise was that the Act's standards diverged

from those of the Federal Rules, and a federal court exercising diversity jurisdiction "should not

apply a state law or rule if (1) a Federal Rule of Civil Procedure 'answer[s] the same question' as

the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act."  *Abbas*,

783 F.3d at 1333 (quoting *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559

U.S. 393, 398-99 (2010)).

---

[4] By contrast, only once did a district court in this Circuit hold that the Act would not apply
in federal court.  *See 3M*, 842 F. Supp. 2d at 96.

[5] *See supra* note 2.

Starting from these premises, the *Abbas* court held that the Anti-SLAPP Act and Federal Rules of Civil Procedure 12 and 56 "'answer the same question' about the circumstances under which a court must dismiss a case before trial," and that "those Federal Rules answer that question differently" because "[t]hey do not require a plaintiff to show a likelihood of success on the merits." *Id.* at 1333-34.  The court rejected the contention that the Anti-SLAPP Act's "likelihood of success standard is just another way of describing the federal test for summary judgment." *Id.* at 1334.  It reasoned that "the D.C. Court of Appeals has never interpreted the D.C. Anti-SLAPP Act's likelihood of success standard to simply mirror the standards imposed by Federal Rules 12 and 56," and thus held that the "likelihood of success standard is different from and more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56." *Id.* at 1335.

Twenty months later, in the *Mann* decision, the D.C. Court of Appeals rejected both premises of the *Abbas* holding.  Citing a report from the D.C. Council's Committee on Public Safety and the Judiciary, the *Mann* court first noted that "the D.C. Anti-SLAPP Act was designed to protect targets of . . . meritless lawsuits by creating '*substantive* rights with regard to a defendant's ability to fend off' a SLAPP." *Mann*, 150 A.3d at 1226 (emphasis added and citation omitted).  It then addressed the issue of how the Act's "likely to succeed on the merits" standard should be interpreted, characterizing it as an "ambiguous term." *Id.* at 1234-35. Observing that the Act's purpose is "to avoid the toll that meritless litigation imposes on a defendant who has made a prima facie showing that the claim arises from advocacy on issues of public interest," *id.* at 1235, the court held that

> the standard to be employed by the court in evaluating whether a claim is
> likely to succeed may result in dismissal only if the court can conclude
> that the claimant could not prevail *as a matter of law*, that is, after

> allowing for the weighing of evidence and permissible inferences by the jury.

*Id.* at 1236.  The court then took the additional step of clarifying that its interpretation of the "likely to succeed" standard does in fact "simply mirror the standards imposed by Federal Rule 56."  *Id.* at 1238 n.32 (internal marks and citation omitted).  The court predicted that this "interpretation of the standard applicable to the special motion to dismiss under District of Columbia law will no doubt factor into future analysis of the dicta in *Abbas* concerning the applicability of the Anti-SLAPP Act in litigation brought in federal courts."  *Id.*

In short, both state-law premises of the *Abbas* decision have now been squarely rejected by the D.C. Court of Appeals.  *Mann* emphasized that the D.C. Anti-SLAPP Act provides substantive protections for defamation defendants, not just procedural ones.  And as the "final expositor of District of Columbia Law," *see Hicks-Bey v. United States*, 649 A.2d 569, 580 n.7 (D.C. 1994), the D.C. Court of Appeals expressly interpreted the Anti-SLAPP Act's standard of review to be identical to that of Federal Rule 56.

Although the D.C. Circuit "has not squarely addressed the issue of what a district court should do when faced with conflicting authority on D.C. law by the D.C. Circuit and the D.C. COA," Chief Judge Howell just recently concluded that "when the D.C. COA has spoken clearly and unmistakably to the current state of D.C. law, its views must govern."  *Easaw*, 2017 WL 2062851, at *9.  The court provided two main bases for this holding.  First, citing *Salve Regina College v. Russell*, 499 U.S. 225, 238-39 (1991), the decision noted that "in a diversity case, this Court must apply the current substantive law of the District of Columbia, which the D.C. Circuit is no more qualified than this Court to ascertain."  *Easaw*, 2017 WL 2062851, at *9 (citations omitted).  Second, the court recognized that "applying an outdated and incorrect interpretation of D.C. law by the D.C. Circuit would 'subvert the dual aims of *Erie*: discouraging forum shopping

8

and promoting uniformity within any given jurisdiction on matters of local substantive law.'" *Id.*

(quoting *Lee v. Flintkote Co.*, 593 F.2d 1275, 1279 n.14 (D.C. Cir. 1979)).  Instead, "[b]y

following the most recent statement of D.C. law by the D.C. COA, this Court ensures that

litigants in state and federal court are on equal footing." *Id.*  Therefore, "when a decision by the

D.C. COA clearly and unmistakably renders inaccurate a prior decision by the D.C. Circuit

interpreting D.C. law, this Court should apply the D.C. COA's more recent expression of the

law." *Id.* at *10.

In addition to citing numerous authorities from other jurisdictions reaching this same

result, Judge Howell also quoted from *Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119 (D.C.

Cir. 1986), where the D.C. Circuit held that it would generally defer to other circuits'

interpretations of state law, but cautioned that it "will not blind [itself] to state court decisions

handed down *after* the circuit court opinion in question." *Id.* at 126 & n.30; *cf. Nat'l Treasury

Emps. Union v. FLRA*, 30 F.3d 1510, 1516 (D.C. Cir. 1994) (noting that "[t]he doctrine of the

law of the case, which ordinarily would require us to take the same view of the law in our review

. . . on remand as we are taking now, contains an exception when the law itself has changed, or

when an intervening interpretation of the law has been issued by a controlling authority," such as

an "intervening decision of [a] state supreme court on [a] matter of state law").

The *Mann* decision represents an intervening and controlling interpretation of D.C. law to

which this Court must defer.  And running that interpretation through the same analytical

framework that the D.C. Circuit applied in *Abbas* produces the result that the Anti-SLAPP Act is

indeed applicable in federal diversity cases.  For one, this Court can simply follow the D.C.

Court of Appeals in finding the Anti-SLAPP Act to be a source of substantive law that is directly

applicable under *Erie* – the same finding made in *Forras*, 39 F. Supp. 3d at 52, and *Farah*, 863

9

F. Supp. 2d at 36 n.10, even without the benefit of the *Mann* decision's guidance.[6]  For another, this Court can hold the Anti-SLAPP Act's standard of review to be identical to Federal Rule 56, in which case the Anti-SLAPP Act and Rule 56 "'exist side by side, . . . each controlling its own intended sphere of coverage without conflict.'"  *Burke*, 685 F.3d at 1108 (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 752 (1980)).  Given that lack of conflict between the federal rule and state law, the Court must then apply the state law when sitting in diversity "if it is outcome-determinative in the relevant sense," meaning if "the failure to enforce state law 'would disserve the so-called twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.'"  *Id.* (quoting *Hanna v. Plumer*, 380 U.S. 460, 468 (1965)) (internal marks and citation omitted).

It is well recognized that forum-shopping and inequitable administration of the law would result from defendants' inability to avail themselves of an anti-SLAPP statute only in federal court.  *See, e.g.*, *Godin*, 629 F.3d at 92; *Newsham*, 190 F.3d at 973.  Nor is this concern merely theoretical: at least one defamation plaintiff litigating before the D.C. Superior Court sought "to discontinue [his] case and to pursue in the same matter in Federal Court" in light of the *3M* decision – the lone ruling from this district finding the Anti-SLAPP Act inapplicable in federal diversity cases – because "Plaintiffs' counsel did not want to have the Anti-SLAPP issue 'hanging over [his] head.'"  *See* Bowman Decl., Ex. B at 2.  The principles underlying *Erie* do not support giving a libel plaintiff the choice between a forum where he could face a special

---

[6] Certainly, the fee-shifting aspect of the D.C. Anti-SLAPP Act is a substantive remedy.  *See, e.g.*, *Sherrod*, 843 F. Supp. 2d at 85 n.4 ("[W]here a statute provides provisions for attorneys' fees and costs for the prevailing party – as the D.C. Anti-SLAPP provides – other courts have held that such statutory provisions are substantive in nature.") (citing *Godin*, 629 F.3d at 89, and *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 971-72 (9th Cir. 1999)); *see also Northon v. Rule*, 637 F.3d 937, 938-39 (9th Cir. 2011) (awarding attorneys' fees under Oregon statute because "[t]he entitlement to fees and costs enhances the anti-SLAPP law's protection of the state's 'important, substantive' interests") (citation omitted).

motion to dismiss under the Anti-SLAPP Act – and the potential cost-shifting that comes with it – or a forum where that option is simply off the table.  The Court should therefore hold that the D.C. Anti-SLAPP Act once again applies in diversity cases.

## II.    DERIPASKA'S COMPLAINT SHOULD BE DISMISSED UNDER THE D.C. ANTI-SLAPP ACT

The D.C. Anti-SLAPP Act squarely applies to Deripaska's defamation claim based on the AP Report.  Because Deripaska cannot show the likelihood of success necessary to survive AP's special motion to dismiss, the motion should be granted, the Complaint dismissed with prejudice, and AP awarded its reasonable attorneys' fees and costs.

### A.    Deripaska's Complaint Triggers The D.C. Anti-SLAPP Act's Protections

The Anti-SLAPP Act provides that "[a] party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim."  D.C. Code § 16-5502(a).  It further states that

> [i]f a party filing a special motion to dismiss under this section makes a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest, then the motion shall be granted unless the responding party demonstrates that the claim is likely to succeed on the merits, in which case the motion shall be denied.

*Id.* § 16-5502(b).  As *Mann* clarified, this should be interpreted as the Federal Rule 56 summary judgment standard.  150 A.3d at 1238 n.32.  Under the Act, "[i]f the special motion to dismiss is granted, dismissal shall be with prejudice."  D.C. Code § 16-5502(d).

To trigger the Act's protections, AP must make "a prima facie showing" that Deripaska's claim "arises from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(b).  The statute defines "an act in furtherance of the right of advocacy on issues of public interest" in three ways.  First, an "act in furtherance of the right of advocacy on

issues of public interest" includes "[a]ny written or oral statement" made "[i]n connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." D.C. Code § 16-5501(1)(A)(i). Second, an "act in furtherance of the right of advocacy on issues of public interest" includes "[a]ny written or oral statement" made "[i]n a place open to the public or a public forum in connection with an issue of public interest," where an "'[i]ssue of public interest' means an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place." D.C. Code § 16-5501(1)(A)(ii) & (3). Third, an "act in furtherance of the right of advocacy on issues of public interest" includes "[a]ny other expression or expressive conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest." D.C. Code § 16-5501(1)(B). Each of these three is satisfied by the Report.

### 1.    The Report is protected under Section 16-5501(1)(A)(i)

AP's Report directly addresses several issues "under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law," *see* D.C. Code § 16-5501(1)(A)(i). Namely, the Report addresses the issue of how newly-uncovered information about Manafort's efforts to support Putin a decade earlier might affect an ongoing "FBI probe and two congressional investigations" looking into "whether the Trump campaign and its associates coordinated with Moscow to meddle in the 2016 campaign."[7] Since January

---

[7] Report at 3; *see also* Michael S. Schmidt, Mark Mazzetti & Matt Apuzzo, *Trump Campaign Aides Had Repeated Contacts With Russian Intelligence*, N.Y. Times (Feb. 14, 2017), at A22, https://www.nytimes.com/2017/02/14/us/politics/russia-intelligence-communications-trump.html (reporting that U.S. law enforcement had intercepted calls between "Trump associates" and senior Russian intelligence officials, and that "one of the advisers picked up on the calls was Paul Manafort," and further noting that the FBI had begun an investigation of Manafort the previous spring, "as an outgrowth of a criminal investigation into his work for a pro-Russian

2017, various congressional bodies have launched investigations or held hearings relating to allegations of Russian involvement in and interference with the 2016 election.  Those include the Senate Select Committee on Intelligence, which announced its investigation on January 13, the Senate Judiciary Subcommittee on Crime and Terrorism, which announced its effort on February 2, and the House Permanent Select Committee on Intelligence, which announced its inquiry on March 1.[8]  It cannot seriously be disputed that Manafort's past work to support the Putin government through business dealings with a close Putin emissary is currently "under consideration or review" by both legislative and executive bodies.  *See Boley*, 950 F. Supp. 2d at 256 (holding that statements regarding the arrest, investigation, and charging of plaintiff qualify as 'written statements made "[i]n connection with an issue under consideration or review by [an] . . . executive . . . body'") (citing *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.*, 44 Cal. Rptr. 2d 46, 51 (Cal. Ct. App. 1995) (interpreting an identically-worded provision in the California anti-SLAPP statute)).

## 2.     The Report is protected under Section 16-5501(1)(A)(ii)

The Report equally qualifies for protection under the Anti-SLAPP Act because it constitutes a "written . . . statement" made "[i]n a place open to the public or a public forum in

---

political party in Ukraine and for the country's former president," focusing on "why [Manafort] was in such close contact with Russian and Ukrainian intelligence officials").

[8] Press Release, Senator Richard Burr, Chairman, Senate Select Comm. on Intelligence, Joint Statement on Committee Inquiry into Russian Intelligence Activities (Jan. 13, 2017) ("Burr Press Release), https://www.burr.senate.gov/press/releases/joint-statement-on-committee-inquiry-into-russian-intelligence-activities; Press Release, Senators Lindsey Graham and Sheldon Whitehouse, Joint Statement From Senators Graham And Whitehouse On Investigation Into Russian Influence On Democratic Nations' Elections (Feb. 2, 2017), https://www.lgraham.senate.gov/public/index.cfm/2017/2/joint-statement-from-senators-graham-and-whitehouse-on-investigation-into-russian-influence-on-democratic-nations-elections; Press Release, U.S. H. Reps. Permanent Select Committee on Intelligence, Intelligence Committee Chairman, Ranking Member Establish Parameters for Russia Investigation (Mar. 1, 2017) (House Comm. Press Release), https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=767.

connection with an issue of public interest," where an "[i]ssue of public interest" includes any issue related to "community well-being" or any issue related to "a public figure." D.C. Code § 16-5501(1)(A)(ii) & (3). As an initial matter, the Report clearly was "[i]n a place open to the public or a public forum" because it was published online, where "anyone with a working internet connection or access to one can view it." *Abbas*, 975 F. Supp. 2d at 11 (citing *Boley*, 950 F. Supp. 2d at 255, and *Farah*, 863 F. Supp. 2d at 38); *Mann*, 150 A.3d at 1227 (the Act applies "because the lawsuit is based on articles that appeared on [defendants'] websites that concern the debate over the existence and causes of global warming").

The Report also addressed an issue related both to "economic, or community well-being" and to "a public figure." The Report's discussion of Russia's long-standing effort to expand its sphere of influence in Europe and the United States is without question a matter of "community well-being." In announcing the Senate Intelligence Committee's investigation into links between the Russians and the Trump campaign, Senator Mark Warner, the committee's vice chairman, stated that "[t]his issue impacts the foundations of our democratic system, it's that important."[9] Likewise, in announcing the House Intelligence Committee's inquiry, ranking member Rep. Adam Schiff called the investigation "a national security necessity," stating that "anything less than a full accounting of all the facts will be insufficient to protect the country and meet the expectations of the American people."[10]

The Report also concerns two public figures: Deripaska and Manafort. In the absence of a definition of "public figure" in the statute, the D.C. Court of Appeals has interpreted the Anti-SLAPP Act to "import[] the definition of 'public figure' used throughout defamation law." *Doe No. 1 v. Burke*, 91 A.3d 1031, 1041 (D.C. 2014). The D.C. Circuit applies a three-part test to

---

[9] Burr Press Release.

[10] House Comm. Press Release.

determine whether a defamation plaintiff is a public figure: "First, the court must identify the relevant controversy and determine whether it is a public controversy.  Second, the plaintiff must have played a significant role in that controversy.  Third, the defamatory statement must be germane to the plaintiff's participation in the controversy." *Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106, 114 (D.C. Cir. 2017) (quoting *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016)); *accord Moss v. Stockard*, 580 A.2d 1011, 1030-31 (D.C. 1990) (adopting the same test from *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980)).  Deripaska and Manafort are both "public figures" under this definition.

### (a)      Deripaska is a public figure.

As demonstrated in AP's Rule 12(b)(6) Memo, Deripaska is a limited-purpose public figure.[11]  Before the publication of the Report, there existed a public controversy over Russian oligarchs acting as emissaries for the Putin regime and seeking to advance Russia's interests worldwide.  *See* Rule 12(b)(6) Memo at 30-34.  Deripaska injected himself into that controversy through his work as an outspoken international representative for the Russian Federation, his lobbying efforts in the United States, and his access to the media.  *See id.* at 34-37.  The Report is germane to this controversy because it describes how Deripaska's past work with Manafort was part of that effort to expand the Russian sphere of influence.  *See id.* at 37-38.  The Report therefore was connected to a public figure within the meaning of the D.C. Anti-SLAPP Act.

### (b)      Manafort is a public figure.

Manafort also qualifies as a public figure.  His experience in high-level political operations – and equally high-profile public controversies – can hardly be disputed.  From 1975 to 1977, just out of law school, Manafort served as "Associate Director of the Presidential

---

[11] Deripaska may also be a public official based on his status as a Russian Federation diplomat.  *See* Rule 12(b)(6) Memo at 9.

Personnel Office at the White House" and worked "as a delegate-hunt coordinator for eight States for the President Ford Committee."[12]  From 1978 to 1980, Manafort was "southern coordinator, Reagan for President Committee, and deputy political director, Republican National Committee," while also working in private practice at a Washington law firm.  *Id.*  By 1981, when President Reagan nominated him to the Board of Directors of the Overseas Private Investment Corporation, Manafort had become a named partner at Black, Manafort & Stone, "specializing in government relations, public affairs, and political consulting."  *Id.*

The division between Manafort's lobbying and political consulting work eventually formalized into Manafort's roles as partner at both the lobbying firm Black, Manafort, Stone & Kelly and the political consultancy Black, Manafort, Stone & Atwater – an arrangement that *Time* referred to collectively as the "ultimate supermarket of influence peddling."[13]  During a 1989 congressional hearing about lobbying for federal subsidies related to a housing project, Manafort was asked "to describe the involvement of Black Manafort in the project," and he replied: "'I would stipulate that for the purposes of today, you could characterize this as influence peddling.'"[14]  Manafort additionally served as "political director of the Republican National Convention in 1984," worked on the "arrangements committee" of the 1988 GOP convention, and managed the 1996 Republican convention for the Dole campaign.[15]

---

[12] *Nomination of Paul J. Manafort, Jr., To Be a Member of the Board of Directors of the Overseas Private Investment Corporation* (May 13, 1981), The American Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=43806.

[13] Evan Thomas, *The Slickest Shop in Town*, TIME (Mar. 3, 1986), http://content.time.com/time/subscriber/article/0,33009,960803-1,00.html.

[14] Philip Shenon, *Bush Consultant Peddled Influence at H.U.D. He Says*, N.Y. Times (June 21, 1989), at A1,  http://www.nytimes.com/1989/06/21/us/bush-consultant-peddled-influence-at-hud-he-says.html.

[15] Alexander Burns & Maggie Haberman, *Preparing for Floor Fight, Trump Hires Veteran G.O.P. Strategist to Lead Effort to Wrangle Delegates*, N.Y. Times (Mar. 29, 2016), at A14,

Over the same period of time, Manafort's client list grew to include foreign interests.  In 1985, his lobbying firm disclosed pursuant to the Foreign Agents Registration Act ("FARA") that it had signed an agreement with the Chamber of Philippine Manufacturers, Exporters, and Tourism Associations – a "business association closely tied to President Ferdinand E. Marcos" – to "represent [the Chamber] before the United States Congress, administrative agencies and the Executive Branch."[16]  By 1986, according to *The New York Times*, Manafort's firms also represented Saudi Arabia and the Dominican Republic.[17]  A 1992 report from the Center for Public Integrity noted that Manafort's firms had likewise been retained by Kenya and "Angola's UNITA rebel group."[18]  In 1998, Manafort's firms took on Nigeria as a client "at a time when the country's dictator, Gen. Sani Abacha, was engaged in an aggressive public relations and lobbying campaign to persuade Americans that he was the leader of a progressive emerging

---

https://www.nytimes.com/politics/first-draft/2016/03/28/donald-trump-hires-paul-manafort-to-lead-delegate-effort/; Transcript of Press Conference by Paul Manafort, Manager for the Republican National Convention for the Dole for President Campaign (July 31, 1996), The American Presidency Project, http://www.presidency.ucsb.edu/ws/?pid=115329; Martin Tolchin, *Ex-Reagan Aides' Lobbying Leads To Calls For New Rules*, N.Y. Times (April 21, 1986), at A1, http://www.nytimes.com/1986/04/21/us/ex-reagan-aides-lobbying-leads-to-calls-for-new-rules.html; Warren Weaver Jr. & E.J. Dionne Jr., *Campaign Trail*, N.Y. Times (May 12, 1988), at A32,  http://www.nytimes.com/1988/05/12/us/campaign-trail.html.

[16] *Firm Registering As Lobbyist For Group Linked to Marcos*, N.Y. Times (Nov. 22, 1985), at A10, http://www.nytimes.com/1985/11/22/world/firm-registering-as-lobbyist-for-group-linked-to-marcos.html; Lobbyist Registration Statement for Black, Manafort, Stone & Kelly, DOJ (Nov. 1985), at 4, http://www.fara.gov/docs/3600-Exhibit-AB-19851101-D0XCT601.pdf.

[17] Martin Tolchin, *Ex-Reagan Aides' Lobbying Leads To Calls For New Rules*, N.Y. Times (April 21, 1986), at A1, http://www.nytimes.com/1986/04/21/us/ex-reagan-aides-lobbying-leads-to-calls-for-new-rules.html.

[18] Pamela Brogan, *The Torturers' Lobby: How Human Rights-Abusing Nations Are Represented in Washington*, The Center for Public Integrity (1992) at 51-53, https://cloudfront-files-1.publicintegrity.org/legacy_projects/pdf_reports/THETORTURERSLOBBY.pdf.

democracy."[19]   And last year it was reported that Manafort's firms worked for Mobutu Sese

Seko, the long-time dictator of Zaire.[20]

By the mid-2000s, Manafort's practice gained a foothold in Eastern Europe as well.  In

2005, Manafort "beg[a]n working for one of Ukraine's richest men, Rinat Akhmetov, to improve

the image of his companies."[21]   Akhmetov was a "prominent sponsor" of the "Party of Regions,"

the party of Prime Minister Viktor Yanukovych, who had been "declared the winner of a

presidential election in 2004 that was marred by fraud and overturned by the country's highest

court after weeks of protests in favor of his pro-Western rival, Viktor A. Yushchenko."  *Id.*

Manafort worked with the Party of Regions to secure electoral victories in 2006 and 2007,

"returning [Yanukovych] to the post of prime minister."  *Id.*  The U.S. Ambassador to Ukraine

characterized Manafort's work as attempting an "extreme makeover" for the Party of Regions,

with the goal of "chang[ing] its image from that of a haven for mobsters into that of a legitimate

political party."[22]   Through these efforts, "Ukrainian political consultants said that Yanukovych

---

[19] Don Van Natta Jr. & Douglas Frantz, *The 2000 Campaign: Special Interests Money; Lobbyists Are Friends And Foes to McCain*, N.Y. Times (Feb. 10, 2000), at A10, http://www.nytimes.com/2000/02/10/us/2000-campaign-special-interests-money-lobbyists-are-friends-foes-mccain.html.

[20] Steven Mufson & Tom Hamburger, *Inside Trump adviser Manafort's world of politics and global financial dealmaking*, Wash. Post (Apr. 26, 2016)*,* https://www.washingtonpost.com/politics/in-business-as-in-politics-trump-adviser-no-stranger-to-controversial-figures/2016/04/26/970db232-08c7-11e6-b283-e79d81c63c1b_story.html.

[21] Steven Lee Myers & Andrew E. Kramer, *Before Running Trump's Bid, Wielding Influence in Ukraine*, N.Y. Times (Aug. 1, 2016), at A1, https://www.nytimes.com/2016/08/01/us/paul-manafort-ukraine-donald-trump.html.

[22] Tom Hamburger, Dana Priest & Andrew Roth, *How Trump adviser Manafort revived his career – and business fortunes – in Ukraine*, Wash. Post (Aug. 18, 2016), https://www.washingtonpost.com/politics/how-trump-adviser-manafort-revived-his-career--and-business-fortunes--in-ukraine/2016/08/18/8bcfb144-648f-11e6-be4e-23fc4d4d12b4_story.html; Steven Lee Myers & Andrew E. Kramer, *Before Running Trump's Bid, Wielding Influence in Ukraine*, N.Y. Times (Aug. 1, 2016), at A1, https://www.nytimes.com/2016/08/01/us/paul-manafort-ukraine-donald-trump.html.

grew to trust Manafort, and that Yanukovych's victory in the 2010 presidential election was considered proof that Manafort's approach was successful."[23]   Manafort and his team "met with State Department officials and other opinion leaders to convince them that Yanukovych was a pro-Western democrat who supported NATO and was willing to work more closely with Washington" though Manafort did not "register as a foreign agent or as a lobbyist in Washington for his work with Ukraine."  *Id.*  A 2014 *Politico* report stated that "[a]fter Yanukovych's 2010 victory, Manafort stayed on as an adviser to the Russia-friendly president and became involved in other business projects in Eastern Europe."[24]   Manafort later asserted that his "work in Ukraine ceased following the country's parliamentary elections in October 2014."[25]

In March 2016, Donald Trump hired Manafort "to lead his delegate-corralling efforts" in the run-up to that summer's Republican nominating convention.[26]   Reporting at the time noted that Manafort had drawn attention "chiefly for his work as an international political consultant, most notably as a senior adviser to former President Viktor F. Yanukovych of Ukraine, who was driven from power in 2014."  *Id.*  Two months later, Manafort was named the Trump campaign's

---

[23] Tom Hamburger, Dana Priest & Andrew Roth, *How Trump adviser Manafort revived his career – and business fortunes – in Ukraine*, Wash. Post (Aug. 18, 2016), https://www.washingtonpost.com/politics/how-trump-adviser-manafort-revived-his-career--and-business-fortunes--in-ukraine/2016/08/18/8bcfb144-648f-11e6-be4e-23fc4d4d12b4_story.html.

[24] Alexander Burns & Maggie Haberman, *Mystery man: Ukraine's U.S. fixer*, Politico (March 5, 2014), http://www.politico.com/story/2014/03/paul-manafort-ukraine-104263.

[25] Kenneth P. Vogel, *Manafort's man in Kiev*, Politico (Aug. 18, 2016), http://www.politico.com/story/2016/08/paul-manafort-ukraine-kiev-russia-konstantin-kilimnik-227181.

[26] Alexander Burns & Maggie Haberman, *Preparing for Floor Fight, Trump Hires Veteran G.O.P. Strategist to Lead Effort to Wrangle Delegates*, N.Y. Times (Mar. 29, 2016), at A14, https://www.nytimes.com/politics/first-draft/2016/03/28/donald-trump-hires-paul-manafort-to-lead-delegate-effort/.

"chairman and chief strategist," which are titles "generally reserved for a presidential candidate's highest-ranking advisers."[27]

Questions about Manafort's work advancing foreign interests came to the fore as the convention was still underway.  On July 21, 2016, the *Los Angeles Times* reported that members of the Republican party's "foreign policy establishment [were] outraged" after the 2016 GOP platform "eliminated references to arming Ukraine in its fight with Russia, which seized the Crimean Peninsula in 2014 and has supported separatists in eastern Ukraine," specifically noting that "Trump's campaign manager, Paul Manafort, had worked as a consultant for the now-ousted pro-Russian government in Ukraine."[28]  Three days later, when asked by ABC's George Stephanopoulos whether "there are any ties between Mr. Trump, you or your campaign and Putin and his regime," Manafort replied, "No, there are not.  That's absurd."[29]  In another televised interview the following week, Manafort "denied his campaign had any role in changing the language of the Republican Party's platform on Ukraine," telling NBC's Chuck Todd, "It absolutely did not come from the Trump campaign."[30]

---

[27] Maggie Haberman & Ashley Parker, *Trump Aide Paul Manafort Promoted to Campaign Chairman and Chief Strategist*, N.Y. Times (May 20, 2016), https://www.nytimes.com/2016/05/20/us/politics/paul-manafort-trump.html; John Santucci, *Trump Campaign Announces Expanded Role for Paul Manafort*, ABC News (May 19, 2016), http://abcnews.go.com/Politics/trump-campaign-announces-expanded-role-paul-manafort/story?id=39231973.

[28] Tracy Wilkinson, *In a shift, Republican platform doesn't call for arming Ukraine against Russia, spurring outrage*, L.A. Times (July 21, 2016), http://www.latimes.com/world/la-na-pol-ukraine-gop-20160720-snap-story.html.

[29] *'This Week' Transcript: Live from Philadelphia Democratic National Convention*, ABC News (July 24, 2016), http://abcnews.go.com/ThisWeek/week-transcript-live-philadelphia-democratic-national-convention/story?id=40825144.

[30] Sally Bronston, *Trump Chairman Denies Any Role in Platform Change on Ukraine*, NBC News (July 31, 2016), http://www.nbcnews.com/meet-the-press/trump-chairman-denies-any-role-platform-change-ukraine-n620511.

On August 14, 2016, *The New York Times* reported that investigators from "Ukraine's newly formed National Anti-Corruption Bureau" had found "[h]andwritten ledgers show[ing] $12.7 million in undisclosed cash payments designated for Mr. Manafort from Mr. Yanukovych's pro-Russian political party from 2007 to 2012."[31]  Through counsel, Manafort denied receiving any such cash payments.  *Id.*  The same report noted that "criminal prosecutors [were also] investigating a group of offshore shell companies that helped members of Mr. Yanukovych's inner circle finance their lavish lifestyles," and that "[a]mong the hundreds of murky transactions these companies engaged in was an $18 million deal to sell Ukrainian cable television assets to a partnership put together by Mr. Manafort and a Russian oligarch, Oleg Deripaska, a close ally of President Vladimir V. Putin."  *Id.*

Just five days later, on August 19, 2016, Trump announced that Manafort had submitted his resignation.  According to one report, "The [Trump] family was particularly troubled by reports of Manafort's involvement with Russia and felt he hadn't been entirely forthright about his activities overseas," adding that "[f]amily members were also unhappy about changes made to the GOP platform that were seen as beneficial to Russia, which they felt Manafort played a role in."[32]

On November 1, 2016, one week before Election Day, NBC reported that the FBI had been conducting a preliminary inquiry into Manafort's "foreign business connections," though

---

[31] Andrew E. Kramer, Mike McIntire & Barry Meier, *Secret Ledger in Ukraine Lists Cash for Trump Aide*, N.Y. Times (Aug. 17, 2016), at A1, https://www.nytimes.com/2016/08/15/us/politics/paul-manafort-ukraine-donald-trump.html.

[32] Nolan D. McCaskill, Alex Isenstadt & Shane Goldmacher, *Paul Manafort resigns from Trump Campaign*, Politico (Aug. 19, 2016), http://www.politico.com/story/2016/08/paul-manafort-resigns-from-trump-campaign-227197; *see also* Maggie Haberman & Jonathan Martin, *Add Manafort to Casualties of Trump Bid*, N.Y. Times (Aug. 20, 2016), at A1, https://www.nytimes.com/2016/08/20/us/politics/paul-manafort-resigns-donald-trump.html.

Manafort denied having any knowledge of such an investigation.[33]  Manafort stated that allegations of his ties with the Putin regime were "political propaganda, meant to deflect." *Id.*

Given these widely circulated reports, it can hardly be disputed that Manafort qualifies as a public figure under the D.C. test.  First, a controversy existed throughout Manafort's time on the Trump campaign and has continued up to the present over the extent of his long-time ties to the Putin regime, because the "press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Waldbaum*, 627 F.2d at 1297.  Second, Manafort played a significant role in that controversy, "purposely trying to influence the outcome" through multiple interviews with the press addressing that very topic. Indeed, given that questions about Manafort's willingness to represent divisive foreign figures had followed him for decades, his decision to take the reins of the Trump campaign "carried a risk of public scrutiny" to say the least. *Jankovic*, 822 F.3d at 587.  Third, the AP Report on its face is germane to Manafort's participation in this controversy – or put differently, cannot reasonably be described as "wholly unrelated" to the ongoing public debate over links between members of the Trump campaign and the Putin regime.  *See id.* at 589.  The Report therefore addresses two public figures, each of which independently satisfies the requirements for Anti-SLAPP Act protection under D.C. Code § 16-5501(1)(A)(ii).

### 3.     The Report is protected under Section 16-5501(1)(B)

The Report also meets the requirements for Anti-SLAPP Act protection because it amounts to "expressive conduct that involves . . . communicating views to members of the public in connection with an issue of public interest" within the meaning of D.C. Code § 16-5501(1)(B).

---

[33] Ken Dilanian, Robert Windrem, William M. Arkin & Tom Winter, *FBI Making Inquiry Into Ex-Trump Campaign Manager's Foreign Ties*, NBC News (Nov. 1, 2016), http://www.nbcnews.com/news/us-news/fbi-making-inquiry-ex-trump-campaign-manager-s-foreign-ties-n675881.

Plaintiff can hardly dispute that the Report satisfies this criterion because several of the statements in the Report that he specifically cites in his Complaint consist of "communicating views" about Manafort, who is a public figure. *See* Compl. ¶¶ 27 (citing Senator Graham's views on Manafort's work as quoted in the Report), 31 (citing Democratic House Intelligence committee members' views on Manafort's work as included in the Report). The Report thus communicates views to members of the public in connection with an issue of public interest, and qualifies for protection under the Anti-SLAPP Act in this third way as well.

> **B.    Deripaska Cannot Show That His
> Claim Is Likely To Succeed On The Merits**

Because AP has made the necessary showing that Deripaska's claim "arises from an act in furtherance of the right of advocacy on issues of public interest," AP's special motion to dismiss should be granted unless Deripaska "demonstrates that the claim is likely to succeed on the merits." D.C. Code § 16-5502(b). As established in AP's Rule 12(b)(6) Memo, Deripaska cannot possibly make that showing because he fails even to state a claim on which relief can be granted. Specifically:

- The first set of challenged passages – discussing Manafort's failure to register under FARA – is not reasonably capable of conveying the defamatory implication alleged by Deripaska. Raising a question about Manafort's obligation to register under FARA is not an accusation of criminality by Manafort, let alone by Deripaska. *See* Rule 12(b)(6) Memo at 16-18; *see also, e.g.*, *Tavoulareas v. Piro*, 817 F.2d 762, 781 (D.C. Cir. 1987) (en banc); *Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26, 30-34 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996) (per curiam). In other words, the passages are not actionable as a matter of law

because the alleged implication is not reasonably conveyed and is not of-and-concerning Deripaska.

- The second set of challenged passages – consisting of comments from Senator Graham and Democratic House Intelligence Committee members – is not actionable because those statements are all assertions of opinion, too subjective to be proven true or false.  *See White v. Fraternal Order of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990); *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) (en banc). In addition, the publication of comments by elected officials is privileged as a matter of law under the "neutral reportage" doctrine, because AP evenhandedly presented allegations by members of Congress about Manafort, a public figure, in connection with an ongoing congressional investigation.  *See* Rule   D Memo at 18-23; *In re United Press Int'l*, 106 B.R. 323, 328-31 (D.D.C. 1989).  The further allegation that these comments implied an ongoing connection between Deripaska and Manafort is not reasonably conveyed by the Report, because the alleged implication is contradicted by express disclosure that the two were at odds and in litigation by 2014.  *See* Rule 12(b)(6) Memo at 23-24.

- The third set of challenged passages – describing Manafort's work in Ukraine – is not actionable because they do not reasonably convey the allegedly defamatory implication that Deripaska stole Ukrainian assets in 2014.  The text of the Report explains that Deripaska's relationship with Manafort had ended by 2014, directly contradicting the alleged implication.  *See* Rule 12(b)(6) Memo at 24-26; *see also Tavoulareas*, 817 F.2d at 781; *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 601 (D.C. 2000).

- Deripaska's allegations about the Report "as a whole" fail to state a claim, again because the alleged implication of criminal conduct is not reasonably conveyed and the implication of a Deripaska connection to the campaign controversy is contradicted by the express timeline in the Report.  *See* Rule 12(b)(6) Memo at 26-28.

- Further, because Deripaska is a public figure, no claim of defamation by implication can be stated unless the Report on its face indicates that AP intended to convey the implications, and Deripaska must then allege facts that could plausibly establish that AP published those implications with knowledge that they were false or with reckless disregard of whether they were false or not.  *See Jankovic*, 822 F.3d at 589.  Deripaska fails to do so.  *See* Rule 12(b)(6) Memo at 28-44.

For each and all of these reasons, Deripaska cannot carry his burden of demonstrating that he is likely to succeed on the merits of his defamation claim as required by the D.C. Anti-SLAPP Act.  His Complaint accordingly should be dismissed, with prejudice.  *See* D.C. Code § 16-5502(b).

## CONCLUSION

The D.C. Anti-SLAPP Act was intended to provide members of the press and the public alike with a measure of freedom "from the harassment of lawsuits" that troubled the court in *Keogh*, 365 F.2d at 968.  For several years, the Anti-SLAPP Act accomplished that goal in both state and federal court, helping defendants efficiently resolve meritless defamation claims brought against them for speech on issues of public interest.  In light of the D.C. Court of Appeals' recent clarification of the Anti-SLAPP Act's standards, the time has come to restore the

Act's protections to defendants facing baseless defamation actions in this Court.  And this

particular lawsuit, which targets AP's nonactionable reporting about two public figures engaged

in a matter of clear public concern, is exactly the sort of meritless claim that the Anti-SLAPP Act

was designed to address.  AP's special motion to dismiss should be granted, Deripaska's

Complaint should be dismissed expeditiously and with prejudice, and AP should be awarded its

fees and costs.

  Dated:  July 3, 2017

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

/s/ *David A. Schulz*
_____
David A. Schulz (D.C. Bar No. 459197)
Chad R. Bowman (D.C. Bar No. 484150)

*Of Counsel*:

Karen Kaiser
Brian Barrett
The Associated Press
200 Liberty Street
New York, NY 10281
Telephone: (212) 621-7547
Fax: (212) 506-6131
kkaiser@ap.org
bbarrett@ap.org

Mara J. Gassmann (D.C. Bar No. 1014532)
Maxwell S. Mishkin (D.C. Bar No. 1031356)

1899 L Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 508-1136
Fax: (202) 861-9888
dschulz@lskslaw.com
cbowman@lskslaw.com
mgassmann@lskslaw.com
mmishkin@lskslaw.com

*Counsel for Defendant The Associated Press*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I caused defendant Associated Press' Special Motion to Dismiss Pursuant to the D.C. Anti-SLAPP Act, supporting Memorandum, and accompanying Declaration and Exhibits, to be filed and served electronically via the Court's ECF System upon counsel of record.


Dated:  July 3, 2017                    /s/ *David A. Schulz*
                                        David A. Schulz