# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

OLEG V. DERIPASKA,

              Plaintiff,

v.

THE ASSOCIATED PRESS,

              Defendant.

Case No. 1:17-cv-913-ESH

# MEMORANDUM IN OPPOSITION TO
# THE ASSOCIATED PRESS'S MOTION TO DISMISS

BOIES SCHILLER FLEXNER LLP

Jonathan D. Schiller (DC Bar No. 185496)
jschiller@bsfllp.com
575 Lexington Avenue, 7th Floor
New York, NY 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

Jonathan Sherman (DC Bar No. 468539)
jsherman@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. 2

TABLE OF AUTHORITIES ........................................................................................... 3

INTRODUCTION ........................................................................................................... 1

THE COMPLAINT AND PERTINENT ALLEGATIONS ............................................. 8

ARGUMENT ................................................................................................................. 12

    I.      The AP Hides Behind the Wrong Legal Standard to Justify Its Publication of
           Knowing Falsehoods.............................................................................................. 12

    II.     The Article Contains Multiple Verifiably False Statements ............................... 17

          a.    Statement #1 Falsely Asserts That Plaintiff Hired Manafort To Engage
               In a Global Scheme To Advance Pro-Russian Interests............................................ 16

          b.    Statement #2 Falsely Asserts That The Subject Of The Contract Between
               Plaintiff And Manafort Merits Congressional Investigation.................................... 21

          c.    Statement #3 Falsely Asserts That The Contract Between Plaintiff And
               Manafort Is Connected To The Trump Campaign Controversy .............................. 23

    III.    The Article Is Reasonably Capable of Defamatory Meaning ........................... 23

    IV.    Deripaska Need Not Plead Actual Malice ....................................................... 27

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbas v. Foreign Policy Group, LLC,*
    783 F.3d 1328 (D.C. Cir. 2015) ........................................................................ 10, 11

*Afro-Am. Publ'g Co. v. Jaffe,*
    366 F.2d 649 (D.C. Cir. 1966) ................................................................................ 23

*Armenian Assembly of Am., Inc. v. Cafesjian,*
    597 F. Supp. 2d 128 (D.D.C. 2009) ................................................................. 11, 23

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................ 27

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................... 11, 27

*Benz v. Wash. Newspaper Publ'g Co.,*
    Civil Action No 05-1760 (EGS), 2006 WL 2844896 (D.D.C. Sept. 29, 2006) ................. 23, 24

*Brokers' Choice of America, Inc. v. NBC Universal, Inc.,*
    2014 WL 3307834 (10th Cir. 2014) ...................................................................... 14

*Browing v. Clinton,*
    292 F.3d 235 (D.C. Cir. 2002) ............................................................................... 11

*Caudle v. Thomason,*
    942 F. Supp. 635 (D.D.C. 1996) ........................................................................... 24

*Coles v. Washington Free Weekly, Inc.,*
    881 F. Supp. 26 (D.D.C. 1995) .............................................................................. 19

*\*Competitive Enter. Inst. v. Mann,*
    150 A.3d 1213 (D.C. 2016) ....................................................................... 17, 20, 22

*Conley v. Gibson,*
    355 U.S. 41 (1957) .................................................................................................. 11

*Dodds v. ABC,*
    145 F.3d 1053 (9th Cir. 1998) ............................................................................... 21

*\*Farah v. Esquire Magazine,*
    736 F.3d 528 (D.C. Cir. 2014) ................................................................... 11, 12, 27

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ..................................................................................................... 28

*Green v. Cosby*,
  138 F. Supp. 3d 114 (D. Mass. 2015) ........................................................................ 15

*Guilford Transp. Indus., Inc. v. Wilner*,
  760 A.2d 580 (D.C. 2000) .......................................................................................... 16

*Houlahan v. Freeman Wall Aiello*,
  15 F. Supp. 3d 77 (D.D.C. 2014) .......................................................................... 18, 22

*Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*,
  Civil Action No. 04-01161 (HHK), 2006 WL 785326 (D.D.C. Mar. 28, 2006) ...................... 18

*Howard Univ. v. Best*,
  484 A.2d 958 (D.C. 1984) .......................................................................................... 22

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,
  935 F. Supp. 2d 101 (D.D.C. 2013) ............................................................................ 27

*Jankovic v. Int'l Crisis Grp.*,
  494 F.3d 1080 (D.C. Cir. 2007) ................................................................................. 24

*Jankovic v. Int'l Crisis Grp.*,
  593 F.3d 22 (D.C. Cir. 2010) ................................................................................ 16, 20

*\*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) ....................................................................... 26, 27, 28

*Kisser v. Coalition for Religious Freedom*,
  No. 92 C 4508, 1996 WL 98971 (N.D. Ill. Mar. 1, 1996) .......................................... 15

*Klayman v. Segal*,
  783 A.2d 607 (D.C. 2001) .......................................................................................... 23

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
  838 F.2d 1287 (D.C. Cir. 1988) ................................................................................. 22

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991) ................................................................................................... 15

*McBride v. Merrell Dow & Pharm. Inc.*,
  717 F.2d 1460 (D.C. Cir. 1983) ...................................................................... 23, 24, 25

*Memphis Publishing Co. v. Nichols*,
  569 S.W.2d 412 (Tenn. 1978) ............................................................................... 13, 14

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990).................................................................................................... 15, 16

*Moldea v. N.Y. Times Co.*,
  22 F.3d 310 (D.C. Cir. 1994)........................................................................................ 16

*Parnigioni v. St. Columba's Nursery Sch.*,
  681 F. Supp. 2d 1 (D.D.C. 2010)............................................................................. 24, 25

*Southern Air Transport, Inc. v. American Broadcasting Companies, Inc.*,
  877 F.2d 1010 (D.C. Cir. 1989).............................................................................. 25, 26

*Tavoulares v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987)...................................................................................... 23

*Waldbaum v. Fairchild Publ'n, Inc.*,
  627 F.2d 1287 (D.C. Cir. 1980)............................................................................. 27, 28

*Wasserman v. Time, Inc.*,
  424 F.2d 920 (D.C. Cir. 1970)...................................................................................... 26

*Weyrich v. The New Republic, Inc.*,
  235 F.3d 617 (D.C. Cir. 2001)............................................................................ *passim*

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990)............................................................................. 14, 23

*Whitney v. California*,
  274 U.S. 357 (1927)....................................................................................................... 1

**Rules**

Fed. R. Civ. P. 8............................................................................................. 11, 16, 26

Fed. R. Civ. P. 12............................................................................................. 1, 10, 11

**Treatises**

Robert D. Sack, *Sack on Defamation* (4th ed. 2016)................................................ 16

Plaintiff Oleg V. Deripaska ("Deripaska") respectfully submits this memorandum of points and authorities opposing the Motion made by Defendant, Associated Press ("AP"), to Dismiss this action Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion") [Dkt. 6].

## INTRODUCTION AND PROCEDURAL HISTORY

On March 22, 2017, the AP[1] published an article disclosing a theretofore unknown contract between Paul Manafort and Plaintiff Deripaska, a Russian billionaire who "runs one of the world's largest aluminum companies", United Company RUSAL (the "Article").  The gist of the Article, set forth in its first sentence (or, in journalist's parlance, the "lede", *see* note 6 *infra*, is: "**Before signing up with Donald Trump, former campaign manager Paul Manafort secretly worked for a Russian billionaire with a plan to 'greatly benefit the Putin Government, The Associated Press has learned.**'"  The Article identified Mr. Deripaska as the "Russian billionaire."  It stressed that it had obtained (1) certain (unidentified) "newly disclosed business records," and interviewed (2) certain (unnamed) "people with direct knowledge."  They allegedly backed up the core message that Mr. Deripaska and Manafort entered into a contract in 2006, under which Mr. Deripaska would pay Manafort $10 million per year to advance the political interests of the Kremlin in Ukraine, other former Soviet republics in the region, and in Eastern Europe.

---

[1] The AP calls itself "an independent, not-for-profit news cooperative headquartered in New York City."  Its "teams operate in 263 locations" in "over 100 countries".  It distributes new to more than "half the world's population every day."   https://www.ap.org/about/.  Advertising itself as "one of the largest and most trusted sources of independent newsgathering," the AP claims to have "covered every major news event of the past 170 years." https://www.ap.org/tips/.

According to the Article, Deripaska is, variously, a "Russian oligarch," a "close Putin ally", and a "more or less permanent fixture on Putin's trips abroad" who became "one of Russia's wealthiest men under Putin" by having purchased "assets abroad in ways widely perceived to benefit the Kremlin's interests." Citing its own prior report that Manafort had worked in the past "on behalf of Ukraine's ruling pro-Russian political party," and sprinkling throughout the Article references to the unidentified business records and anonymous sources claiming to have seen "money transfers," the Article purports to "link Manafort more directly with Putin's interests in the region" because "at least some of his work in Ukraine was directed by Deripaska, not local political interests there." The Article stressed that the business relationship between the two captured by the contract involved promoting pro-Russian regimes in the region and destabilizing the legitimacy of those opposed to the Kremlin through non-profit front organizations and the media.

The Article is false and defamatory. It is false because, as Mr. Deripaska said in statements in the *Washington Post* and *Wall Street Journal*, published after the Article appeared, he "***never made any commitments or contracts with the obligation or purpose to covertly promote or advance 'Putin's Government' interests anywhere in the world . . . .***" (emphasis added). Specific allegations in the Article are defamatory because they allege, falsely and with constitutional fault as to each, that Deripaska and Manafort conspired to commit alleged acts that would constitute violations of U.S. criminal law, was expected to give rise to congressional investigations, and the like. More generally, the Article as a whole is defamatory because its essential message is that two private emissaries of Presidents Trump and Putin entered into an agreement to undermine governments of elected leaders—precisely the accusation made by the American defense and intelligence communities and major news organizations about President

Putin's interference in the 2016 Presidential election, to whose victor Manafort was a confidante.[2]  The AP, moreover, knew the allegations were false when it published them; it held serious doubts as to the truth of the allegations; at the bare minimum, AP was negligent in publishing them.  The Article so injured Mr. Deripaska that he took the virtually unheard of step of purchasing space in major English-speaking newspapers to correct the record and state the truth—including denying that he had ever been obligated to help 'Putin's government'".  The internal quotation marks are Mr. Deripaska's.

**This Action.**

Two days later, Mr. Deripaska, through counsel, asked for a retraction and correction. He didn't ask for much.  He wanted the AP to state that it was aware of no evidence to support the gist of the Article: that Mr. Deripaska and Manafort had a contractual relationship to advance the interests of the Russian government or Mr. Putin.  The AP refused.  This action followed.

On July 3, 2017, the AP filed two motions.  First, it filed this motion to dismiss pursuant to Fed. R. Civ. 12(b)(6); second it filed a second "Special Motion to Dismiss" pursuant to the District of Columbia anti-SLAPP law.  (We respond to that second motion via a separately-fled memorandum.)

---

[2] "Such allegations and confirmations," *The Washington Post* wrote on March 28, 2017, about the Article, "couldn't possibly have landed in a more responsive news environment. There are two congressional investigations and an FBI probe into whether Trump campaign officials coordinated in any way with Russian officials interested in influencing the outcome of the 2016 presidential campaign."  Erik Wemple, "Russian Billionaire Attempts to Stifle AP Scoop," *The Washington Post* (Mar. 28, 2017), https://www.washingtonpost.com/blogs/erik-wemple/wp/2017/03/28/russian-billionaire-attempts-to-stifle-ap-scoop/?utm_term=.d53c5087af16.

**The Motion to Dismiss.**

The Motion should be denied—and denied out of hand in light of an admission in its Memorandum in Support of its Motion to Dismiss.

First, it contradicts itself on its own understanding of the Article:  sometimes the Article is about Manafort only; at other times, it is about both Deripaska and Manafort.  Perhaps, however, because of the widespread follow-on reporting by dozens of major news organizations that echo the Article's gist that Deripaska agreed to pay Manafort $10 million annually to generate a pro-Russian strategy to benefit Putin, see note 2 *supra*,[3] the AP inadvertently ***admits that the parties entered into and acted bound by the very "contract with Deripaska to implement the [Russian/Putin] strategy***" (emphasis added).  That admission alone requires denial of the Motion because it amounts to an admission that the essential gist of the Article was precisely what Deripaska now claims to be false and defamatory.

--------------------------------------

[3] Bill Chappell, "Former Trump Campaign Head Manafort Was Paid Millions By A Putin Ally, AP Says," npr.org (March 22, 2017) ("A Russian billionaire paid former Trump campaign chairman Paul Manafort millions of dollars to boost the interests of Russian President Vladimir Putin."); Patrick Reevel, "Meet the Russian billionaire who worked with Paul Manafort," ABCNews.com (March 22,2017) ("The AP said it had obtained documents showing Manafort pitched a confidential strategy plan, outlining how he could influence politics, the media and business in the Kremlin's favor in the United States and across Russia's former satellite states, to Deripaska in 2005."); Xeni Jardin, "Russian billionaire Deripaska paid Manafort to 'greatly benefit' Putin before Manafort joined Trump campaign," BoingBoing.com (March 22, 2017) ("Before he worked for the Donald Trump presidential campaign, Paul Manafort worked for a Russian billionaire to help promote Russian president Vladimir Putin's agenda in the United States."); The News-Herald, "AP findings on Trump associate's work for Russian oligarch," (March 22, 2017) ("Manafort secretly worked for Russian billionaire Oleg Deripaska in 2005 and proposed an ambitious plan to promote the interests of "the Putin Government" and undermine anti-Russian opposition across former Soviet republics. The plan was to mirror lobbying and political consulting work that Manafort was already conducting in Ukraine at the time.").

The rest of the Motion is equally without merit.  The Complaint identifies several statements that, in connection with the Article's essential gist, are capable of defamatory meaning.  And while Deripaska need not plead actual malice—both because it is unnecessary to do so at the motion to dismiss stage, and because he is not a public figure within the limited purpose of the Article—he is safely able to do so.  Were the AP's concession that it had made the defamatory statement that Deripaska complains of not enough, the Complaint sufficiently pleads defamation to withstand a motion to dismiss.

## The Public Record Ukranian Issues The AP Ignored.

Despite its highly specific set of accusations in the Article (and its Memorandum), the AP has not yet identified a single act undertaken or proposed *by Mr. Deripaska* for the purpose of assisting Mr. Putin and advancing Russian national interests between 2005 and 2009.  He has been accused of taking part in a covert contractual arrangement with an American political consultant working together for the purpose of benefitting Russia and Putin, and undermining their adversaries—yet no such efforts have ever been reported.

This narrative is false on its face for many reasons.  First, it takes as its guiding factual assumption that Mr. Deripaska engaged Manafort specifically to act on behalf Putin.  But, however close Mr. Deripaska may be to his motherland and however influential he and his job-making and manufacturing capabilities may be, the Article nowhere identifies what Mr. Deripaska has done to be considered a *de facto* agent of Russia's diplomatic corps.  This is important because the AP takes pains to stress its reliance on never-before-seen documents and previously untapped sources so close to the conspiracy that they witnessed payments (of some kind).  The AP's closeness to those documents, indeed, are the primary source of factual credibility enabling the Article to generalize about Mr. Deripaska's role as a senior coordinator

of Vladimir Putin's plans to exercise greater influence in Ukraine and the region.  Particularly given the context in which the Article appeared—what the Complaint refers to the Trump Campaign Controversy, what the Washington Post describes as the same thing, *see* note 2 *supra*—a reasonable reader would have expected to have read quoted details from the "newly disclosed documents," or examples of the work that Mr. Deripaska apparently directed Mr. Manafort to do.  But the Article contains no such details, and this absence raises questions about the Article's credibility.  Or, to an investigative journalist, it should raise such questions.

Indeed, the gist of the Article has the feel of a pre-packaged narrative—with the selected descriptions of the past contractual relationship in Ukraine deployed as a narrative template for Putin's modus operandi in interfering in the domestic politics of other nations.  Consider the temporal structure of the narrative in the Article:  On the one hand, the Article narrates a story of a past arrangement; but it is of relevance only because both Mr. Deripaska and Manafort hold positions close to their country's respective political leaders *today*.  The essential message of the past contract is interspersed with references to current criminal investigations, citations to criminal penalties for lobbying foreign leaders, comments from current U.S. legislators reacting to the gist in light of present-day concerns.

Meanwhile, left buried in the middle of this temporal back-and-forth is the lone statement of Deripaska's spokesperson:  the contract, the person states, involved the provision of investment consulting services to related to Deripaska's business interests.  The Article should be a lot more interested in explaining Deripaska's business interests, and how they fit into the narrative.  But it isn't.

That reinforces the issue the Article seems to go out of its way to avoid: what could Deripaska possibly want Manafort to do for him *in connection with the Ukraine*?  The Article, in

6

fact, elides the entire Ukraine domestic political situation in 2005.   This is a crucial omission that cuts against the Article's credibility.   What about the cover story?

Had the multiple member research team and the two AP reporters looked for that story—and reporters always seem to look for the cover-up—they would have seen that all of the events of the Article took place during one of the most dramatic—and highly publicized—periods in Ukraine's history: the Orange Revolution.   The leaders of the Orange Revolution advocated nationalizing private property in general; and they listed as one of their top priorities nationalizing the ZALK factory owned and operated by Deripaska's publicly-traded aluminum manufacturing firm, RUSAL. (RUSAL does not even rate a mention in the Article.)

The threats to nationalize RUSAL's ZALK plant in the Ukraine continued between 2005 and 2008.   During this period, the nation's President was Viktor Yushchenko, who was not pro-Russian.   His chief rival—also no friend of the Kremlin—was Yulia Tymoshenko, the two-time Prime Minister between 2005 and 2010.   And Manafort's most prominent Ukranian client, Viktor Yanukovych (often described in the press as pro-Russian), lost power in 2004.   Although he did not regain the Presidency until after the events of the narrative had ended, he nevertheless served as Prime Minister during the 2005-6 period and was otherwise among the country's senior leaders.

He, unlike others, did not oppose privatization.   And he trusted and relied on Paul Manafort.   The same Paul Manafort who made a deal with Mr. Deripaska just as his property was under potential assault from the Ukranian left.

The AP knew all of this, of course.   Its reach is too long and its resources too great not to have known it.   At a minimum, why this crucial background did not find its way into an article about Deripaska's political needs in Ukraine from 2005-2009 creates an important fact question,

particularly on actual malice and fault.  It is all publicly available in newspapers, periodicals and books.  It is virtually unimaginable that the team of reporters at the AP was unaware of it.  The threat of nationalism directly affected RUSAL in the Ukraine during the very period that Deripaska and Manafort were engaged in their business relationship.  There is no indication in that material that Putin or pro-Russian forces took part in, or interfered with, the nationalization movement.

It is the intentional decision to not report a single word about Deripaska's well known Ukranian business issues, or even to ask anyone about them, that raises reinforces serious suspicions that not only is the gist of the Article false but that the AP reporters knowingly avoided any discussion of it, which of course is actual malice.

### THE COMPLAINT AND PERTINENT ALLEGATIONS[4]

During the 2016 U.S. Presidential campaign, the AP began reporting on the business dealings of Paul Manafort, the chairman of then-candidate Donald J. Trump's campaign.  *See* Compl. ¶ 5.  Jeff Horwitz and Chad Day, two reporters working for the AP's Washington, D.C.-based news bureau, started to investigate Manafort's relationship with Deripaska.  *See id.*  The reporters purportedly "obtained business records" relevant to the relationship and contacted "people with direct knowledge of Manafort's work for" Deripaska.  *Id.* ¶ 41.  The AP's investigatory effort culminated in the publication of the Article, which the AP distributed to its global readership on March 22, 2017.  *Id.* ¶¶ 3-4.

---

[4] The AP devotes nine pages of its Motion to legally irrelevant biographical detail, which will not be addressed on a line-item basis.  Suffice it to say, there are no material facts in dispute.

Styling the Article an exclusive investigative report, Horwitz and Day painted a picture of misconduct and criminal activity on an international scale.  And in the first sentence alone, they implicated Deripaska, Russian President Vladimir Putin, President Trump, and Manafort: "Before signing up with Donald Trump, former campaign manager Paul Manafort secretly worked for a Russian billionaire"—Deripaska—"with a plan to 'greatly benefit the Putin Government,' The Associated Press has learned." *Id.* ¶ 15.  The reporters described Deripaska as "one of Russia's wealthiest men under Putin" and someone "buying assets abroad in ways widely perceived to benefit the Kremlin's interests." *Id.* ¶ 39.  The reporters focused on a memo that allegedly was written by Manafort in 2005 and laid out plans for advancing the Russian government (the "2005 Manafort Memo"); on alleged conversations between Deripaska and Manafort about the memo; on an alleged "$10 million annual contract" that began in 2006 and related to the memo; and on Manafort's "work in Ukraine," "some" of which allegedly was "directed by" Deripaska.  *Id.* ¶¶ 15-16, 23, 41.

By publishing misrepresentations and making "strange"—and deliberate—editorial choices in structuring the Article, the AP asserted that Deripaska's "private, commercial dealings were—and still may be—deeply intertwined with" the theft of Ukrainian assets, alleged criminal activity and other misconduct related to Russia and President Trump's campaign (hereinafter the "Trump Campaign Controversy"), and Russian President Vladimir Putin's global anti-democratic efforts more generally.  *Id.* ¶¶ 4-5, 7, 44.  The Complaint describes three groups of assertions constituting false and defamatory statements (the "Statements") that collectively bolster the gist of the Article that Deripaska and Manafort were jointly engaged in efforts to advance the Kremlin's anti-democratic agenda.  *See id.* ¶¶ 15-50.

*Statement #1*:

9

- Manafort worked for Deripaska pursuant to a 2005 strategy plan that was to "greatly benefit the Putin Government," see Compl. ¶ 19;

- The federal Foreign Agents Registration Act requires that "people who lobby in the U.S. on behalf of foreign political leaders or political parties must provide detailed reports about their actions to the department," and "[w]illfully failing to register [under FARA] is a felony," see id. ¶ 24; and

- "Manafort did not disclose details about the lobbying work to the Justice Department during the period the contract was in place," see Article at 4

*Statement #2*:

- "Republican Sen. Lindsey Graham of South Carolina, a frequent Trump critic, said of Manafort: 'Clearly, if he's getting millions of dollars from a billionaire close to Putin, to basically undermine democratic movements, that's something I'd want to know about,'" see Report at 3; Compl. ¶¶ 27-29; and

- "Democrats on the House intelligence committee said the new revelations will feature in their investigations," see Report at 3; Compl. ¶¶ 31-32.

*Statement #3*:

- "Deripaska became one of Russia's wealthiest men under Putin, buying assets abroad in ways widely perceived to benefit the Kremlin's interests," see Compl. ¶ 39;

- "Manafort worked as Trump's unpaid campaign chairman last year from March until August, a period that included the Republican National Convention that nominated Trump in July," id. ¶ 40; Report at 3;

- "The newly obtained business records link Manafort more directly to Putin's interests in the region. According to those records and people with direct knowledge of Manafort's work for Deripaska, Manafort made plans to open an office in Moscow, and at least some of his work in Ukraine was directed by Deripaska, not local political interests there," Compl. ¶ 41; and

- "[F]ederal criminal prosecutors became interested in Manafort's activities years ago as part of a broad investigation to recover stolen Ukraine assets after the ouster of pro-Russian President Viktor Yanukovych there in early 2014," id. ¶ 42.

Taken as a whole, the Statements are lies.  Deripaska "has never had any involvement in the Trump Campaign Controversy," and his relationship with Manafort—an ordinary business arrangement lasting from 2005 to 2009—predated all alleged contacts between the Russian government and President Trump's campaign.  *Id.* ¶¶ 5, 8, 45.  Deripaska has never worked with Manafort to "advance the interests of the Russian government" or to implement plans from the 2005 Manafort Memo, and the AP has no evidence suggesting such an effort.  *Id.* ¶¶ 8, 20, 23, 30.  Deripaska has never stolen, or helped Manafort in stealing, assets from Ukraine or elsewhere.  *Id.* ¶¶ 45, 46.

Yet the AP maliciously published the Article despite "kn[owing] that [its] statements were false, or at minimum entertain[ing] doubts about the truth of the defamatory statements."  *Id.* ¶¶ 5, 22-23, 34-35, 46-47.  In fact, Horwitz all but admitted in a separate online video (hereinafter the "Horwitz Video") that the Article was misleading.  *Id.* ¶ 6.  Horwitz stated that Manafort's "relationship with [Deripaska] would've been over by the time [President Trump's] campaign began, long since then."  *Id.*  Horwitz also conceded that "[t]here isn't any sort of question at the moment as to whether [Deripaska] was involved in some way in the Trump campaign."  *Id.*  This video is a tacit admission by the AP that a reasonable reader would conclude from the Article that Deripaska had hired Manafort to subvert democratic movements; if not, there would be no reason to post a video expressly disavowing that implication.

In the days following the Article's publication, numerous print and televised publications, such as The Independent (UK), Bloomberg News, CNN, and MSNBC, repeated the false and defamatory statements.  *Id.* ¶ 10.  On March 31, 2017, Deripaska requested a public correction and retraction, which the AP refused.  *Id.* ¶¶ 8-9.  Deripaska

filed this action on May 15, 2017, *see* Dkt No. 1, and the AP filed a motion to dismiss on

July 3, 2017, *see* Dkt No. 6.

## ARGUMENT

**I.     The AP Hides Behind the Wrong Legal Standard to Justify Its Publication of Knowing Falsehoods**

This is a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Under Rule 12(b)(6), "a plaintiff can overcome a motion to dismiss by simply alleging facts

sufficient to state a claim that is plausible on its face." *Abbas v. Foreign Policy Group, LLC,* 783

F.3d 1328, 1334 (D.C. Cir. 2015).  In assessing plausibility, "[t]he Court is obligated to accept

the plaintiff's factual allegations as true and construe the complaint 'liberally,' 'grant[ing]

plaintiff[] the benefit of all inferences that can be derived from the facts alleged . . . .'" *Browing*

*v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (citations omitted).[5]  Dismissal is improper unless

the "plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Indeed, the Supreme Court's recent jurisprudence

articulating a "plausibility standard" in Rule 8 did not purport to change the longstanding rules of

notice pleading, beyond ensuring that plausibility be established.  Hence, the motion must be

denied "even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell*

*Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007) (quoted in *Abbas*.)  The Court must

"assum[e] that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*,

550 U.S. at 555 (citations omitted).

---

[5] "At the Rule 12(b)(6) stage, we do not assess 'the truth of what is asserted or determin[e] whether a plaintiff has any evidence to back up what is in the complaint.'" *Browning*, 292 F.3d at 242 (citation omitted).

The AP cannot deny that it has published the Article to its global readership, and that the Complaint alleges such publication with sufficient "plausibility".  Compl. ¶¶ 3-4.  The Court also must "assume, as the complaint alleges, the falsity of any express or implied factual sentence[] made" in the article at issue.  *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2014) (quoting *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001)); see *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 137 (D.D.C. 2009) ("On a motion brought under Federal Rule of Civil Procedure 12(b)(6), the Court must assume the falsity of any express or implied factual statements.").  Finally, although we will cover this in more detail in addressing the AP's arguments concerning public figure pleading, at the motion-to-dismiss stage, the Court must "assume that [the defendant] made such [a] statement[] *with the requisite state of mind*."  *Farah*, 736 F.3d at 534 (citing *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001)).

Accordingly, the Court must decide "whether the disputed article (1) contains express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place appellant in an offensive false light."  *Weyrich*, 235 F.3d at 623 (citations omitted); *see also Farah*, 736 F.3d at 214-25 (noting that the communication at issue must be reasonably capable of being "understood as stating or implying actual facts about" plaintiff, "verifiable," and "reasonably capable of defamatory meaning" (citations omitted)).  The Court also must determine whether the Complaint plausibly shows "actual or legal harm." *Farah*, 736 F.3d at 534.

The AP, however, stakes its entire defense to this motion on repeated attempts to characterize the Complaint as alleging "defamation by implication."  The phrase appears throughout the AP's papers (Br. at 1), in different rhetorical guises: the Complaint is a series of

13

"strained implications".  (Br. at 2)  The alleged defamatory statements are "three composite

'statements,'" (Br. at 12), using sarcasm to replace argument by enveloping the words

"statements" with quotation marks.  Deripaska "stitches together various statements" (Br. at 16)

to "convey false implications" or to manipulate "[s]tatement juxtaposed in the" Article "to

convey [a] false implication".  (Br. at 13)  The advocacy tactic here is as transparent  as it is

weak.  The AP does not want to focus on the express statements the Complaint identifies that are

false, and so it re-denominates the sole count by announcing—in the first sentence of its brief:

"This is a lawsuit for defamation by implication" (Br. at 1).  Only "an especially rigiorous

showing" will overcome the motion to dismiss.

But the Complaint alleges **<u>"defamation"</u>**.  It does not allege "defamation by

implication."  To be clear: this is not wordplay.  The claim in this case is predicated on the

Article's very first sentence—in journalistic parlance (and with legal significance)—its lede:[6]

that "Before signing up with Donald Trump, Paul Manafort worked for a Russian billionaire with

a plan to 'to greatly benefit the Putin government," the [AP] has learned."  (Cplt. ¶ 15)  This is

---

[6] A story's "lede" is "'journalism jargon' for the introductory portion of a news story—or what
might be called the lead portion of the news story.  Strictly speaking, the lede is ***the first
sentence or short portion of an article that gives the gist of the story and contains the most
important points readers need to know***." "Lead vs. lede," http://grammarist.com/usage/lead-
lede/ (last visited Aug. 14, 2017) (emphasis added); *accord, e.g.,* Chris L. Keller, "'Lead' versus
'Lede' - A Sunday morning Twitter thread Storified," http://blog.chrislkeller.com/lead-versus-
lede-a-sunday-morning-twitter-thr/ (last visited Aug. 14, 2017) (commenting on NYU media
critic Jay Rosen Twitter thread on "lede" and stating "For me, crafting a well-written lead is all
about ***finding the golden nugget.***  It's that ***little piece of information***, of a fact, or anecdote or
opinion ***that will provide a thread throughout the entire story***.") (emphases added).

the first sentence verbatim; it is, in the context of journalism, the "gist of the story", the "golden nugget", the "thread throughout the entire story."  *See* note 4 above.

Under the theory of defamation by implication, a statement can be defamatory despite not asserting any untrue facts, typically by juxtaposing true facts in a purposeful manner that creates a desired understanding in the reader's mind.  The paradigmatic example of defamation by implication is found in *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978).  In it, defendant newspaper accurately reported that a woman had shot the plaintiff after finding her at home with her husband.  These facts were true—the plaintiff was at her home at the time of the shooting, as was the shooting suspect's husband.  The court found that these facts, "when read and construed in the sense in which a reader would ordinarily understand it, carried a clear implication that the female plaintiff was involved in an adulterous relationship" with the shooter's husband.  *Id.* at 419.  Yet the "undisputed proof showed that not only were [the plaintiff] and [the shooter's husband] at the [plaintiff's] home but so, also, were [the plaintiff's husband] and two neighbors, all of whom were sitting in the living room, talking, when [the shooter] arrived around three o'clock in the afternoon" and the shooting occurred.  *Id.* at 414.  In other words, the publication in *Nichols* amounted to defamation by implication because, while each and every one of the reported facts was indisputably true, the impression those facts created in the reader's mind was false. See also *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 2014 WL 3307834 (10th Cir. 2014) (holding that when considering a defamation by implication claim, the "literally quoted statements are not considered in isolation, but rather the overall impression of the broadcast, quotes included, is considered against the overall impression of the actual statements made by the plaintiff.").

15

That is not the case here. The Article affirmatively claims that "former campaign manager Paul Manafort secretly worked for a Russian billionaire with a plan to 'greatly benefit the Putin Government." This is not an implication; it is an express statement of fact, and it is false. As observed in *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990), a court considering a defamation by implication claim "must first examine what defamatory inferences might reasonably be drawn from a materially true communication." This Court need not guess what inferences might be drawn from the Article, because the AP unequivocally makes a factual statement about Deripaska.  And the gist of that statement is expressly false.

Defendant knows well that this is not a case of defamation by implication.  Indeed, Defendant concedes as much when it admits in its Answer that the Article stated precisely the defamatory statement that Deripaska now complains of—that "a contract with Deripaska to implement the strategy was signed by Manafort in 2006, and bank records revealed millions of dollars transferred to Manafort in a business relationship with Deripaska that continued at least through 2009."  Dkt. 6 at 1.  Deripaska could not summarize the gist of the Article's defamatory meaning any better. The Court should take notice of this judicial admission.  *Ellipso, Inc. v. Mann*, 583 F. Supp. 2d 1, 2 (D.D.C. 2008) ("a party is bound by the admissions in his pleadings.").  The fact that the AP made the defamatory statement is thus not subject to dispute. As discussed more fully below, the AP"s attempt to neutralize the defamatory sting of Statements 1, 2, & 3 misses the mark. But more fundamentally, AP cannot evade the fact that the false and defamatory statements of fact in the first paragraph as elaborated upon by the remainder of the article are false because their "gist" or "sting" is false.  The doctrine of defamatory gist, or substantial truth, has been wielded as a defendants' shield, *cf. Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (relying on the common law of libel to permit

16

New Yorker reporter to intentionally alter quoted material attributed to him: "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'").

It is no less plaintiff's sword.  Under common law, where the "gist" of an entire publication is false, or where the "gist" of a message conveyed in that publication is false, they are, by definition, statements "capable of a defamatory meaning."  *E.g., Green v. Cosby*, 138 F. Supp. 3d 114, 133 (D. Mass. 2015) ("[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether it is a potentially defamatory statement of fact; rather, the determinative question is whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance.") (internal quotations omitted); *Kisser v. Coalition for Religious Freedom,* No. 92 C 4508, 1996 WL 98971 (N.D. Ill. Mar. 1, 1996) (breaking out partially true and partially false statement to identify gists of specific messages and overall gist that plaintiff participated in and encouraged criminal activity, even though those words did not appear in the publication); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990).

Under these circumstances, the Court should deny the Motion out of hand.  The AP has not even tried to argue that the gist of the three statements, let alone the gist of the Article as a whole, are either implausible or insufficiently specific so as to meet the standards under Rule 8.[7]

## II.       The Article Contains Multiple Verifiably False Statements

---

[7] In lecturing the Court and the plaintiff that First Amendment principles compel routine summary disposition (Br. at 14-15), the AP appears to deliberately misread Judge Sack's treatise to say that "courts routinely consider" the legal questions the AP raises here.  This is wrong. Among other things, in evaluating initial motions to dismiss, "courts do not typically invoke constitutional principles. . . . Indeed, it has been said that 'under federal civil procedure, at least, it is generally accepted that the usual standards of notice pleading apply in defamation cases . . . .'"  Robert D. Sack, *Sack on Defamation* § 16:2.1 (4th ed. 2016).

The First Amendment protects only pure statements of opinion, and it "gives no protection to an assertion 'sufficiently factual to be susceptible of being proved true or false,' *even if* the assertion is expressed by implication in 'a statement of "opinion."'" *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 27 (D.C. Cir. 2010) [hereinafter *Jankovic II*] (*en banc*) (emphasis in original) (quoting *Milkovich*, 497 U.S. at 20 ); *see also Moldea v. N.Y. Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994) ("[S]tatements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false.").  An actionable statement is one that "has an explicit or implicit factual foundation and is therefore objectively verifiable." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) (citation omitted).  In determining verifiability, "the court must consider the statement in context" and from the perspective of a "reasonable reader." *Weyrich*, 235 F.3d at 624, 626.

> **a.** Statement #1 Falsely Asserts That Plaintiff Hired Manafort To Engage In a **Global Scheme To Advance Pro-Russian Interests**

The AP made three verifiably false statements in support of the Article's essential gist. *See* Compl. ¶¶ 15-50.  Statement #1 asserts that "Mr. Deripaska paid Mr. Manafort" for the plans set forth in a 2005 memorandum, "in particular to 'greatly benefit the Putin Government.'" *Id.* ¶ 19.  The gist of the Article is that Manafort and Deripaska's dealings involved influencing the United States government, and states that "[w]illfully failing to register" as a person "who lobb[ies] in the U.S. on behalf of foreign political leaders or political parties" is a federal crime. *See id.* ¶ 24.  The Article therefore includes verifiably false allegations: that Deripaska had an arrangement with Manafort to "greatly benefit the Putin Government," that they had entered into a contract to implement the plans in the memo, that Mr. Manafort's dealings pursuant to that contract involved unregistered lobbying the United States on behalf Deripaska, and that

Deripaska is therefore implicated in criminal activity.  The Complaint notes that all of these allegations are false.  *See id.* ¶ 20.  Statement #1, which comprises the allegations, reasonably appears factual because it "lack[s] language normally used to convey an opinion, such as 'in my view,' or 'in my opinion,' or 'I think.'"  *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1245 (D.C. 2016) (because the defamatory article was not couched in the language of opinion, its "assertions about [plaintiff] deception and misconduct are stated objectively, as having been "shown" and "revealed").

In fact, the Article makes clear in its first sentence that the AP endorses this false assertion:  "Before signing up with Donald Trump, former campaign manager Paul Manafort secretly worked for a Russian billionaire with a plan to 'greatly benefit the Putin Government,' The Associated Press has *learned*."  Compl. ¶ 15 (emphasis added).  Words such as "learned" indicate that Statement #1 is "stated objectively."  *See Competitive Enter. Inst.*, 150 A.3d at 1245 (emphasizing the article's use of the words "shown" and "revealed" to establish article's objectivity in a reasonable reader's mind).

Statement #1 is also actionable because a reasonable reader would conclude that the AP "has facts in [its] possession on which [it] bases" the connection between Deripaska, Manafort, and the 2005 memorandum.  See *Houlahan v. Freeman Wall Aiello*, 15 F. Supp. 3d 77, 83-84 (D.D.C. 2014).  For instance, the Article states that"Manafort's plans were laid out in detailed documents obtained by the AP that included strategy memoranda and records showing international wire transfers for millions of dollars."  Compl. ¶ 17.  And the Article "links the purported plans set forth in the [memo] to the '$10 million annual contract' purportedly entered into between Mr. Deripaska and Mr. Manafort."  *Id.*  The Article reasonably suggests that the AP knew facts about the arrangement between Deripaska and Manafort.  *See, e.g., Houlahan v.*

19

*World Wide Ass'n of Specialty Programs & Sch.*, Civil Action No. 04-01161 (HHK), 2006 WL 785326, at *3 (D.D.C. Mar. 28, 2006) (noting that "overall tenor" of the communication suggests that defendant "is in a position where he is aware of facts unavailable to the public at large"). Accordingly, the First Amendment does not shield Statement #1.

In arguing that Statement #1 is not "of and concerning" Deripaska, the AP misapprehends the Statement's defamatory nature. It is not simply that Manafort "failed to fulfill a personal reporting obligation." Dkt No. 6 at 17. It is that, as Defendant puts it, "Manafort may have failed to comply *with all of the regulatory requirements triggered by [the] arrangement*" between Manafort and Deripaska. *Id*. (emphasis added). The arrangement between Manafort and Deripaska would have triggered regulatory requirements under the Foreign Agents Registration Act ("FARA") only if pursuant to their contract Manafort had lobbied within the United States on Deripaska's behalf. Statement #1 therefore asserts that he did. In other words, the Article includes references to purported FARA violations only to substantiate the assertion that a contract triggering FARA requirements exists. This assertion is "of and concerning" Deripaska, and it is false.

This is distinguishable from *Coles v. Washington Free Weekly*. In that case, the court found that the statement "[Farahpour] did the legwork to gather evidence, he researched the law" was not "of and concerning" the plaintiff because "the fact that Farahpour did legal research does not *necessarily imply* that plaintiff did not." *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 33 (D.D.C. 1995) (emphasis added). That Manafort may have failed to disclose his work under his contract with Deripaska to undermine democratic movements necessarily implies that such a contract exists. It does not.

20

**b.   Statement #2 Falsely Asserts That The Subject Of The Contract Between Plaintiff And Manafort Merits Congressional Investigation**

Statement #2 also contains verifiably false allegations.  In particular, improper conduct by Deripaska is established by the AP's juxtaposition of Senator Lindsey Graham's quote ("Clearly, if [Mr. Manafort]'s getting millions of dollars from [Mr. Deripaska,] a billionaire close to Putin, to basically undermine democratic movements, that's something I'd want to know about.") and the statement that "Democrats on the House intelligence committee said the new revelations will feature in their investigations."  Compl. ¶¶ 27, 31.  Through these sentences, the AP conveys that "Mr. Deripaska's contracts with Mr. Manafort had criminal implications and merit a congressional investigation."  Id. ¶ 33.  Put another way, the AP would not have juxtaposed Senator Graham's quote with the reporting from the House Intelligence Committee unless the AP "supposed that 'ordinary, reasonable readers could read the [article]" as asserting that Deripaska's business deals are worth investigating and may involve "undermin[ing] democratic movements." *Competitive Enter. Inst.*, 150 A.3d at 1245 (quoting *Jankovic II*, 593 F.3d at 25); Compl. ¶¶ 27, 31.  The assertion contains numerous verifiably false allegations, such as that Deripaska continues to have an arrangement with Manafort, that the arrangement is illegal or improper in anyway, and that elected officials are indeed investigating Deripaska or his business dealings. See Compl. ¶ 37.  And a reasonable reader would note that the AP included a quotation by a United States Senator—and one who belongs to the Senate Judiciary Committee—to bolster the factual nature of these allegations. *See, e.g.*, *Weyrich*, 235 F.3d at 626 (noting that "the author utilizes quotations . . . to further reinforce the impression that the stories are in fact true").  The First Amendment does not protect these verifiably false allegations. *Id.* ¶ 33.

21

The AP defends Statement #2 by arguing that the quotations contained within it are merely "subjective reactions to AP's reporting."  Dkt No. 6 at 21.  Once again, the AP misses the point.  The defamation arises not solely from the suggestion that Manafort's conduct may or may not merit congressional investigation; it arises from the assertion that Manafort's alleged conduct was undertaken pursuant to a contract he entered into with Deripaska.  This is false.[8]

The AP relies on *Dodds v. ABC*, 145 F.3d 1053 (9th Cir. 1998) to deflect Statement #2's defamatory sting by claiming that it is in fact about Manafort, and therefore does not make Deripaska appear "odious, infamous, or ridiculous."  But *Dodds* is inapposite.  In it, the plaintiff was featured along with two other judges in a television show reporting on the judicial disciplinary process.  The other two featured judges were both accused of sexual misconduct with litigants, while the plaintiff was accused of unprofessionalism.  The plaintiff argued that his depiction alongside the other judges was defamatory because viewers would be lead to believe he too was involved in criminal activity.  Deripaska does not argue that solely being mentioned in the same article as Manafort is defamatory; rather, the defamation arises from the AP's false assertion that he and Manafort had entered into a contractual agreement with the purpose of undermining Western democracies and advancing the Kremlin's agenda.

---

[8] As the AP concedes, the D.C. Circuit does not recognize the neutral reporting privilege.  Dkt No. 6 at 23.  The Court therefore need not consider the AP's assertion that Statement #2 falls within the privilege's ambit.  Even if such a privilege applied, the AP could not benefit from its protection.  The neutral reporting privilege exists to protect disinterested reporting on defamatory statements uttered by others, if the purpose of the reporting is to document that the utterance occurred, rather than to promulgate it as the truth.  That is not what has happened here.  The quotations were not offered by the speakers' own initiative; the AP actively solicited reactions from prominent public figures to its so called "revelations" about the contract between Deripaska and Manafort for the purpose of legitimizing its reporting.  The effect of seeking out and including these quotations in the Article is to lead a reasonable reader to conclude that the AP's reporting is truthful.

### c.   Statement #3 Falsely Asserts That The Contract Between Plaintiff And Manafort Is Connected To The Trump Campaign Controversy

Finally, Statement #3 also asserts verifiably false allegations.  As the Complaint alleges, the Article links Deripaska and Manafort to the Trump Campaign Controversy, Russian President Vladimir Putin, and a congressional investigation about the purported theft Ukrainian assets.  *See* Compl. ¶¶ 39-43.  For instance, the Article juxtaposes the statement that "at least some of [Manafort's] work in Ukraine was directed by Deripaska," with the statement that "federal criminal prosecutors became interested in Manafort's activities years ago as part of a broad investigation to recover stolen Ukraine assets."  *Id.* ¶¶ 41-42.  This purposeful juxtaposition of sentences reasonably suggests, among other things, that Deripaska "is implicated in federal prosecutors' investigation of that theft."  *Id.* ¶ 44; *see Competitive Enter. Inst.*, 150 A.3d at 1245 (emphasizing that a defendant's editorial choices about article structure may indicate that he intends to make verifiable assertions to "ordinary, reasonable readers").

In addition, the AP made a "strange insertion of a paragraph regarding the Trump Campaign Controversy" in the paragraphs discussing Deripaska, Manafort, and Ukraine, conveying to reasonable readers that "the alleged theft of assets from Ukraine is somehow tied to the Trump Campaign Controversy."  Compl. ¶ 42.  These assertions appear to be verifiable because the AP made clear that it had "newly obtained business records" and spoke with "people with direct knowledge of Manafort's work for Deripaska."  *Id.* ¶ 41; *Houlahan*, 15 F. Supp. 3d at 83 (noting that a "reasonable person . . . could believe" the defendant had a factual foundation for its assertions).  These assertions are false and actionable.  *See* Compl. ¶ 45.

### III.   The Article Is Reasonably Capable of Defamatory Meaning

A statement is defamatory if, read in its entire context by a reasonable person, "it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Weyrich*, 235 F.3d at 627 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293-94 (D.C. Cir. 1988)).

The language must make the plaintiff appear "odious, infamous, or ridiculous." *Id.* (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)); *see also Benz v. Wash. Newspaper Publ'g Co.*, Civil Action No 05-1760 (EGS), 2006 WL 2844896, at *3 n.9 (D.D.C. Sept. 29, 2006) (defining "odious" as "arousing or deserving hatred or loathing"; "infamous" as "notorious or in disgrace or dishonor"; and "ridiculous" as deserving to be the "object of scornful laughter by joking and mocking" (quoting *Klayman v. Segal*, 783 A.2d 607, 619 (D.C. 2001))).

At the motion-to-dismiss stage, the Court's "power to hold as a matter of law that a statement is not defamatory is very limited." *McBride v. Merrell Dow & Pharm. Inc.*, 717 F.2d 1460, 1465 (D.C. Cir. 1983). "It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *Armenian Assembly of Am.*, 597 F. Supp. 2d at 141 (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)). The plaintiff must show only that "the publication tends to lower plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community of plaintiff's associates." *McBride*, 717 F.2d at 1465 (quoting *Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 654 n.10 (D.C. Cir. 1966)).

As the Complaint alleges, the AP made three statements "reasonably capable of a defamatory meaning." *Armenian Assembly of Am.*, 597 F. Supp. 2d at 141; see Compl. ¶¶ 15-50. Statement #1 indicates that Deripaska's business dealings implicate criminal activity related to

24

government corruption.  The AP repeatedly endorsed this Statement in the Article, including in the Article's opening sentence.  *Id.* ¶ 15; *see White*, 909 F.2d at 520-21; *cf. Tavoulares v. Piro*, 817 F.2d 762, 780 (D.C. Cir. 1987) (en banc) (noting that the lead sentence is "generally [a] reliable indicator[] of an article's content").  A reasonable reader in the United States may believe that someone involved in potential criminal activity and corrupting United States government is "notorious or in disgrace or dishonor."  *Benz*, 2006 WL 2844896, at *3 n.9; *see* Compl. ¶¶ 24-25.  Moreover, in our current political climate and given the history of the Cold War, many Americans may feel "intense antipathy" toward Russia and President Vladimir Putin, and a reader may reasonably believe that Deripaska is associated with the Russian government. *See, e.g.*, *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (noting that "[m]erely associating somebody with a foreign government would not ordinarily be defamatory," but acknowledging that an allegation that someone "was engaged in dealings with the [apartheid] government of South Africa clearly would have a defamatory meaning because of the intense antipathy felt by a great number of Americans towards South Africa").

Statement #2 also is reasonably capable of defamatory meaning.  The Article indicates that Deripaska's "contracts with Mr. Manafort had criminal implications and merit a congressional investigation."  Compl. ¶ 33.  The AP juxtaposed Senator Graham's quote with statements from the House Intelligence Committee to suggest to reasonable readers that Deripaska's business deals are worth investigating and may involve "undermin[ing] democratic movements."  *Id.* ¶¶ 27, 31.  The AP endorses this allegation by making the juxtaposition.  *See, e.g.*, *McBride*, 717 F.2d at 1462-63, 1465 (inferring defamatory meaning from juxtaposition of statements); *Parnigioni v. St. Columba's Nursery Sch.*, 681 F. Supp. 2d 1, 15 (D.D.C. 2010) (same).  And like Statement #1, Statement #2 indicates that Deripaska's business dealings

25

implicate criminal activity related to government corruption.  Even more so than Statement #1, Statement #2 implies that these business dealings are suspicious enough to warrant a congressional investigation.  Such allegations would make Deripaska appear "notorious or in disgrace or dishonor."  *Benz*, 2006 WL 2844896, at *3 n.9; *see Caudle v. Thomason*, 942 F. Supp. 635, 639 (D.D.C. 1996) (denying motion to dismiss because statement "portrays [plaintiff] as participating in some questionable business activities"); Compl. ¶¶ 36-37.  Statement #2 is therefore also actionable.

Finally, a reasonable reader may interpret Statement #3 as defamatory.  The Article indicates that Deripaska "is implicated in federal prosecutors' investigation of th[e] theft" of Ukrainian assets.  Compl. ¶¶ 41-44.  The AP's "strange" ordering of statements cannot be understood unless the AP's intent was to convey that "the alleged theft of assets from Ukraine is somehow tied to the Trump Campaign Controversy."  Id. ¶ 42; *see, e.g.*, *McBride*, 717 F.2d at 1462-63, 1465; *Parnigioni*, 681 F. Supp. 2d at 15.  Therefore, a reader may reasonably conclude from Statement #3 that Deripaska has become involved with criminal activity of an international scale, arousing the suspicion of a congressional committee; such an implication places Deripaska in an "infamous" light.  *Weyrich*, 235 F.3d at 627.  Statement #3 is therefore reasonably capable of defamatory meaning.

The AP suggests that the Court should dismiss the lawsuit in light of *Southern Air Transport, Inc. v. American Broadcasting Companies*, *Inc.*, 877 F.2d 1010 (D.C. Cir. 1989).  But *Southern Air* is inapposite.  In that case, the plaintiff argued that the defendants' news video segment implied that it had a partnership with the government of South Africa, and reportedly supplied weapons to Nicaraguan contras.  Reviewing a dismissal on summary judgment, the D.C. Circuit noted that allegations of such a partnership would be defamatory, but the panel held

that the segment did not reasonably imply such allegations. *See id.* at 1015-16. The segment "mentioned only briefly" the plaintiff and some of its deals with a third-party company affiliated with the South African government, and "it is nowhere suggested [that the plaintiff] had any involvement in the discussions" between the South African government and the C.I.A.—a clear focus of the segment. *Id.* at 1015. But here, the Article features Deripaska prominently, referring to him numerous times. *See, e.g.*, Compl. ¶¶ 15, 17, 19, 33, 41-42. In fact, the lead sentence emphasizes Deripaska and his alleged business dealings with a former adviser to President Trump. See id. ¶ 15. Unlike the viewers of the segment in Southern Air Transport, no reasonable reader would believe that Deripaska and his business deals were a tangential point in the Article. Indeed, it is difficult to imagine a version of the Article that does not have as its focal point Deripaska's connections with Manafort; without this alleged revelation, such an article would be nothing more than a rehashing of the vast amount of earlier reporting detailing Manafort's Russian connections. Therefore, the Article is reasonably capable of defamatory meaning, and the Court should deny the AP's motion to dismiss.

## IV. Deripaska Need Not Plead Actual Malice

The AP also erroneously asserts that Deripaska must allege facts plausibly showing the AP's actual malice—that is, "knowledge that [the actionable statement] was false or . . . reckless disregard of whether it was false or not," *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) [hereinafter *Jankovic III*]. As long as it alleges facts supporting other elements of the defamation claim, the Complaint need only mention actual malice to satisfy Rule 8 of the Federal Rules of Civil Procedure.

The "proper procedure" for analyzing actual malice is to wait until relevant "pretrial affidavits, depositions or other documentary evidence" emerges from discovery. *Wasserman v.*

27

*Time, Inc.*, 424 F.2d 920, 922 (D.C. Cir. 1970) (Wright, J., concurring).  As the D.C. Circuit has

held, because the Complaint includes assertions of actual malice, *see* Compl. ¶¶ 5, 22-23, 34-35,

46-47, the Court must "assume" at this preliminary stage that the AP made the Statements "with

the requisite state of mind." *Farah*, 736 F.3d at 534; *see also Weyrich*, 235 F.3d at 623 ("We

must also assume that such statements were made by [the defendants] with knowledge of their

falsity or reckless disregard for their truth.").

It is true that "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But a

plaintiff satisfies the *Twombly* standard when he plausibly alleges "speaker, recipient, subject

matter, and defamatory nature of the statements." *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,

935 F. Supp. 2d 101, 118 (D.D.C. 2013); *cf. Farah*, 736 F.3d at 534 (post-*Iqbal* case) (assuming

falsity and intent).  The Complaint has adequately pleaded such facts here. *See generally* Compl.

Therefore, the AP must wait until summary judgment before it can litigate actual malice.  *See,*

*e.g.*, *Jankovic III*, 822 F.3d at 589-90 (summary judgment).

In any event, Deripaska need not satisfy the actual malice standard because he is not a

limited-purpose public figure with respect to the Trump Campaign Controversy, which is the

essential subject matter of the Article.  *Waldbaum v. Fairchild Publ'n, Inc.*, 627 F.2d 1287, 1296

(D.C. Cir. 1980) (when determining whether a plaintiff is a limited-purpose public figure, court

must first identify the relevant controversy).  Deripaska has played no role—let alone a

significant one—in this controversy.  *Id.* at 1297 (to qualify as a limited-purpose public figure,

the plaintiff must have played a significant role in the identified controversy).  Indeed, despite

the litany of biographical highlights that the AP recounts in an effort to demonstrate that

Deripaska linked both to Manafort and pro-Russian causes more generally, the only specific link

28

between Deripaska and the current controversy that the AP can point to is its own false and defamatory reporting.  This is insufficient.  As the Supreme Court cautioned in *Gertz v. Robert Welch, Inc.*, courts should not conclude that an individual is a public figure for all purposes solely because of activity in "community and professional affairs" and should not treat that individual as a public figure for a limited controversy in the absence of evidence that he had "thrust himself into the vortex of" any relevant public issue or "engage[d] the public's attention in an attempt to influence its outcome."  418 U.S. 323, 351–52 (1974).  The AP invites the Court to ignore that warning here.  There is no evidence other than the AP's own misleading reporting that Deripaska has thrust himself into this controversy, nor that he seeks to influence its outcome.  Absent any, Deripaska cannot qualify as a limited-purpose public figure with respect to the Article's essential subject matter.

The AP contends that Deripaska is in fact is a limited-purpose public figure with respect to the Article's central subject matter because "[t]here can be no question that 'persons actually were discussing' the 'specific question' over the role of oligarchs as de facto emissaries of Putin."  *Jankovic*, 822 F.3d at 585 (quoting *Waldbaum*, 627 F.2d at 1297).  This is nothing more than an exercise in goalpost moving.  Whatever role Deripaska has allegedly played in the public controversy over "the role of Russian oligarchs, and their ambitions and influence in furtherance of Russian priorities," no reasonable reader would understand the Article as weighing in on that debate. . The Article plainly is not an inquiry into the proper role of Russian oligarchs in world politics;[9] instead, the "specific question" at the heart of the Article is Russian involvement in the

---

[9] AP's attempt to redefine the Article's specific question as an inquiry into the proper role of oligarchs such as Deripaska in Russian geopolitics is at odds with its simultaneous claim that the

Trump campaign.  Deripaska had no role in this involvement, and he has not voluntarily inserted himself into this debate.  He therefore cannot be a public figure for this limited purpose.

## CONCLUSION

For the foregoing reasons, the AP's Motion to Dismiss for Failure to State a Claim should be denied.

Dated:  August 16, 2017                            Respectfully submitted,

                                        BOIES SCHILLER FLEXNER LLP

                                        /s/ Jonathan Sherman
                                        Jonathan D. Schiller (D.C. Bar No. 184596)
                                        jschiller@bsfllp.com
                                        575 Lexington Ave., 7th Fl.
                                        New York, NY 10022
                                        Telephone:  (212) 446-2300
                                        Fax:  (212) 446-2350

                                        Jonathan Sherman (D.C. Bar No. 468539)
                                        jsherman@bsfllp.com
                                        1401 New York Ave., NW
                                        Washington D.C. 20005
                                        Telephone:  (202) 237-2727
                                        Fax:  (202) 237-6131

                                        *Counsel for Plaintiff Oleg V. Deripaska*

_____

Article is not "of and concerning" Deripaska.  If the Article truly was concerned with oligarch's influence on the Kremlin's affairs, then it is inescapably "of and concerning" Deripaska, as he is the only Russian oligarch mentioned.  The AP's attempt to have their cake and eat it too belies the simple truth that the Article is "of and concerning" Deripaska, and that its specific focus is his participation in efforts to advance the Kremlin's anti-democracy agenda.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 16th day of August 2017, I caused a true and correct copy of the foregoing Memorandum in Opposition to Defendant's Motion to Dismiss to be served via the Court's ECF system upon counsel for the Defendant.

*/s/ Jonathan Sherman*
Jonathan Sherman

31