## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OLEG V. DERIPASKA,

        Plaintiff,

v.

THE ASSOCIATED PRESS,

        Defendant.

Case No. 1:17-cv-00913-ESH

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

*Of Counsel:*

Karen Kaiser
Brian Barrett
THE ASSOCIATED PRESS
200 Liberty Street
New York, NY 10281
Telephone: (212) 621-7547
Fax: (212) 506-6131
kkaiser@ap.org
bbarrett@ap.org

LEVINE SULLIVAN KOCH & SCHULZ, LLP

   David A. Schulz (D.C. Bar No. 459197)
   Chad R. Bowman (D.C. Bar No. 484150)
   Mara J. Gassmann (D.C. Bar No. 1014532)
   Maxwell S. Mishkin (D.C. Bar No. 1031356)

1899 L Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 508-1136
Fax: (202) 861-9888
dschulz@lskslaw.com
cbowman@lskslaw.com
mgassmann@lskslaw.com
mmishkin@lskslaw.com

*Counsel for Defendant The Associated Press*

Date: September 8, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...............................................................................................................................2

I.   DERIPASKA FAILS TO ESTABLISH THAT ANY STATEMENT
     IN THE AP REPORT CAN SUSTAIN HIS CLAIM OF LIBEL ....................................2

     A.    Deripaska's Effort To Recast His Claim Is Unavailing..........................................2

     B.    Deripaska Has No Answer To The Legal Deficiencies In His
           Complaint.................................................................................................................5

           1.    Deripaska fails to show how Statement #1
                 reasonably conveys any actionable defamatory meaning...........................5

           2.    Deripaska fails to show how Statement #2 reasonably conveys
                 any actionable defamatory meaning ............................................................7

           3.    Deripaska fails to show how Statement #3 reasonably conveys
                 any actionable defamatory meaning ..........................................................10

           4.    Deripaska fails to show how the Report "as a whole"
                 reasonably conveys any actionable defamatory meaning..........................11

II.  DERIPASKA ALLEGES NO FACTS PLAUSIBLY ESTABLISHING
     ACTUAL MALICE, AND WRONGLY SEEKS TO AVOID DOING SO ....................12

     A.    Deripaska's Effort To Shed His Public Figure Status By
           Artificially Narrowing The Public Controversy Is Unavailing..............................13

     B.    Deripaska Is Plainly Incorrect In Denying Any Obligation
           To Plead Facts Plausibly Alleging The Existence Of Actual Malice ....................17

     C.    The Opposition Confirms That Deripaska
           Has Not And Cannot Plausibly Allege Actual Malice...........................................20

III. DERIPASKA MAY NOT PROCEED TO DISCOVERY
     WITHOUT ALLEGING A VIABLE CLAIM FOR LIBEL .............................................23

CONCLUSION..........................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ............................................................................6

*\*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................17, 18, 19, 24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................17, 18, 19

*Boley v. Atl. Monthly Grp.*,
    950 F. Supp. 2d 249 (D.D.C. 2013) .................................................................19

*Bose Corp. v. Consumers Union of U.S.*,
    466 U.S. 485 (1984) ..................................................................................21, 22

*CACI Premier Tech., Inc. v. Rhodes*,
    536 F.3d 280 (4th Cir. 2008) ...............................................................................11

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ..............................................................................6

*Clyburn v. News World Commc'ns, Inc.*,
    903 F.2d 29 (D.C. Cir. 1990) ..............................................................................17

*Coles v. Wash. Free Weekly, Inc.*,
    881 F. Supp. 26 (D.D.C.1995) ..............................................................................6

*Conley v. Gibson*,
    355 U.S. 41 (1957) ...............................................................................................17

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ............................................................................19

*Felder v. WMATA*,
    105 F. Supp. 3d 52 (D.D.C. 2015) ......................................................................24

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) .............................................................................................13

*Guilford Transp. Indus., Inc v. Wilner*,
    760 A.2d 580 (D.C. 2000) .....................................................................................8

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ................................................................................20

*Hourani v. Psybersolutions LLC*,
    164 F. Supp. 3d 128 (D.D.C. 2016) ......................................................17

*Howard Univ. v. Best*,
    484 A.2d 958 (D.C. 1984) .......................................................................4

*Janklow v. Newsweek, Inc.*,
    788 F.2d 1300 (8th Cir. 1986) ..............................................................21

*Jankovic v. International Crisis Group*,
    494 F.3d 1080 (D.C. Cir. 2007) ...............................................................7

*Jankovic v. International Crisis Group*,
    72 F. Supp. 3d 284 (D.D.C. 2014) ........................................................15

*\*Jankovic v. International Crisis Group*,
    822 F.3d 576 (D.C. Cir. 2016) ...........................................15, 17, 21, 22, 23

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
    856 F.3d 106 (D.C. Cir. 2017) ..............................................................15

*LaPointe v. Van Note*,
    2006 WL 3734166 (D.D.C. Dec. 15, 2006) ...........................................22

*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003) .............................................................22

*Mar-Jac Poultry, Inc. v. Katz*,
    773 F. Supp. 2d 103 (D.D.C. 2011) ......................................................11

*Masson v. New Yorker Magazine*,
    501 U.S. 496 (1991) ...............................................................................20

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ..............................................................18

*N.Y. Times v. Sullivan*,
    376 U.S. 254 (1964) .........................................................................21, 23

*Newton v. National Broadcasting Co.*,
    930 F.2d 662 (9th Cir. 1990) ................................................................21

*OAO Alfa Bank v. Ctr. for Pub. Integrity*,
    387 F. Supp. 2d 20 (D.D.C. 2005) ...........................................13, 15, 17

*Ollman v. Evans,*
   750 F. 2d 970 (D.C. Cir. 1984) ....................................................................................7, 8

*Palin v. N.Y. Times Co.,*
   --- F. Supp. 3d ---, 2017 WL 3712177 (S.D.N.Y. Aug. 29, 2017) ...................................18, 23

*Parisi v. Sinclair,*
   845 F. Supp. 2d 215 (D.D.C. 2012) ..........................................................................19, 20, 21

*People for Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.,*
   60 F. Supp. 3d 14 (D.D.C. 2014) ..........................................................................................24

*Provisional Gov't of Republic of New Afrika v. ABC,*
   609 F. Supp. 104 (D.D.C. 1985) .............................................................................................6

*Rebozo v. Wash. Post Co.,*
   637 F.2d 375 (5th Cir. 1981) .................................................................................................17

*Rubin v. U.S. News & World Report, Inc.,*
   271 F.3d 1305 (11th Cir. 2001) .......................................................................................10, 11

*S. Air Transp., Inc. v. ABC,*
   877 F.2d 1010 (D.C. Cir. 1989) ..............................................................................................7

*Secord v. Cockburn,*
   747 F. Supp. 779 (D.D.C. 1990) ...........................................................................................22

*St. Amant v. Thompson,*
   390 U.S. 727 (1968) ..............................................................................................................20

*Stepanov v. Dow Jones & Co.,*
   120 A.D.3d 28 (N.Y. App. Div. 2014) ..................................................................................11

*Tavoulareas v. Piro,*
   817 F.2d 762 (D.C. Cir. 1987) .................................................................12, 13, 15, 21, 23

*Thomas v. News World Commc'ns, Inc.,*
   681 F. Supp. 55 (D.D.C. 1988) .............................................................................................20

*Tucker v. Fischbein,*
   237 F.3d 275 (3d Cir. 2001)...................................................................................................21

*Waldbaum v. Fairchild Publ'ns, Inc.,*
   627 F.2d 1287 (D.C. Cir. 1980) ................................................................................13, 14, 16

*Wannall v. Honeywell, Inc.,*
   775 F.3d 425 (D.C. Cir. 2014) .........................................................................................11, 16

*Wash. Post Co. v. Keogh*,
   365 F.2d 965 (D.C. Cir. 1966) ................................................................................................22

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) .........................................................................................8, 19

**Rules**

Fed R. Civ. P. 8.........................................................................................................17, 18, 24

Fed R. Civ. P. 12(b)(6)....................................................................................................1, 19

## PRELIMINARY STATEMENT

Plaintiff's opposition[1] confirms that this libel lawsuit should be dismissed.  It repeatedly objects that the AP Report is wrong because Deripaska never agreed to Paul Manafort's 2005 plan "to benefit the Putin Government," but fully accepting that allegation to be true (as required on a motion to dismiss) the Complaint still fails to state a claim.  According to the Complaint, this alleged mistake implicitly defamed Deripaska in three ways—falsely suggesting that he abetted Manafort's failure to register in 2006, stole assets from Ukraine after 2014, and participated in the "Trump Campaign Controversy" in 2016.  None of these implications are reasonably conveyed by the Report and none are actionable for reasons fully laid out in AP's initial motion papers.

Having no meaningful response, the Opposition attempts to recast Deripaska's claim.  It argues that this case is for "direct" libel only, *not* for any "implication," despite the Complaint's allegations to the contrary.  It then contends for the first time that the direct defamatory meaning of the allegedly false statement is that Deripaska worked to undermine democratic governments, but like each of the implications alleged in the Complaint, this new defamatory meaning is not reasonably conveyed by the Report.  It simply quotes a question posed by Senator Graham, and raising a question is not making an accusation.  And if any such implication were reasonably conveyed by the Report, it would be nonactionable opinion or otherwise privileged.

The Opposition equally has no answer to the Complaint's failure to allege facts that could plausibly establish that AP published with "actual malice" fault.  Instead, it wrongly contends that no such allegations are needed—either because Deripaska is supposedly a "private figure"

---

[1] Mem. in Opp. to The Associated Press's Mot. to Dismiss, dated August 16, 2017, Dkt. No. 10 (hereafter cited as "Opp. __.").  AP's initial memorandum in support of the Rule 12(b)(6) motion, dated July 3, 2017, Dkt. No. 6, will be cited as "AP Mem. __."

despite his prominent public stature on issues raised by the Report, or because the *Iqbal/Twombly* pleading rule does not apply.  These claims are wrong as a matter of law, and Deripaska's failure plausibly to allege actual malice independently requires dismissal.

The Opposition's obfuscation of the claims alleged, irrelevant factual detours (like its extended discussion of the Orange Revolution), and pointless attack on AP's "strange" editorial choices do nothing to address the clear legal deficiencies in the Complaint.  Its repeated taunting of AP for reliance on "unnamed" sources and failure to quote from "newly disclosed records," suggests that the true objective of this lawsuit is to find a source, not to redress a libel.  But the doors to costly and intrusive discovery may not be unlocked to a plaintiff who has not plausibly alleged a viable claim.  Deripaska emphatically has not.

## ARGUMENT

## I.     DERIPASKA FAILS TO ESTABLISH THAT ANY STATEMENT IN THE AP REPORT CAN SUSTAIN HIS CLAIM OF LIBEL

### A.     Deripaska's Effort To Recast His Claim Is Unavailing

The Opposition makes plain that Deripaska has alleged only one key factual error in the AP Report:  Its allegedly false assertion that he agreed to Paul Manafort's 2005 proposal to take steps to "benefit the Putin Government."  This objection to the Report leads nowhere.  The Complaint never alleges that it is defamatory to state—even falsely—that Deripaska acted to benefit the Putin Government.  The absence of any such allegation was plainly not an oversight, given Deripaska's resume and well-documented public role in advancing Russian interests.  Yet, the defamatory implications that the Complaint does allege—that Deripaska abetted and engaged in criminal activity and was connected to the 2016 Trump campaign—are not reasonably conveyed by the Report.  *See* AP Mem. 23-26.

2

The Opposition attempts to sidestep the legal insufficiency of these alleged implications by characterizing the Report as *directly* false and insisting that "this is not a case for defamation by implication." *E.g.,* Opp. 16. It describes the "gist" of the AP Report as its disclosure that "former campaign manager Paul Manafort secretly worked for a Russian billionaire with a plan to 'greatly benefit the Putin Government,'" and contends that this is untrue. *Id.*; *see also id.* at 3, 11.[2] Deripaska now asserts that this alleged falsity is the basis of his claim for direct libel.

This belated effort to recast Deripaska's claim as *solely* for direct libel cannot be squared with the Complaint. *See* Compl. ¶ 1 ("This is an action for defamation by direct statements *and by implication*;") (emphasis added); *see also id.* ¶¶ 5, 7, 24, 28, 33, 35, 44, 47, 54, 57, 58, 61, 62 (alleging defamatory implications, "themes," "inferences," or assertions "in substance"). The Complaint points to three sections of the Report and alleges specific defamatory innuendo that it contends (however unreasonably) to have been conveyed by each. *See, e.g.*, Compl. ¶¶ 18, 32-33, 43-44. This is the very essence of libel by implication.

Deripaska presumably advances his "direct libel only" argument to evade the rigorous standard imposed on defamation by implication claims. To state a claim for implied libel, as the Complaint plainly attempts to do, Deripaska must demonstrate not only that the implication is reasonably conveyed, but also that the Report evidences an intent by AP to convey the implication. *See* AP Mem. 24-26. Deripaska can do neither.

Moreover, the misguided effort to recast this case as one for direct libel begs the central question: What is the direct defamatory meaning of the allegedly false statement? The

---

[2] The Opposition argues that the "Answer" by AP "inadvertently admits that the parties entered into and acted bound by" the contract whose existence he denies. Opp. 4. Of course, AP has not filed an Answer, and its motion to dismiss says what the Report itself says—that Manafort "secretly worked for a Russian billionaire with a plan to 'greatly benefit the Putin Government.'" Report at 1.

Complaint never asserts that the alleged error in reporting that Deripaska paid for work to benefit the Putin Government—or for that matter *any* error allegedly made in the Report—is itself defamatory.  To be sure, the Complaint contains the conclusory allegation that the Report contained "overtly false and defamatory statements," Compl. ¶ 5, but it nowhere identifies any specific statement that is alleged to be *both* false and directly defamatory.

Recognizing this shortcoming, the Opposition claims that the Report is automatically "capable of a defamatory meaning" because its "gist" is false, that is, no contractual agreement supposedly was reached with Manafort.  Opp. 17.  This misstates the law.  It is a libel plaintiff's burden plausibly to allege a defamatory meaning flowing from an allegedly false statement.[3] *E.g.*, *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984).  Deripaska's Complaint does not do so.  All of the defamatory meanings alleged require inferential steps and locate a defamatory implication buried within a combination of sentences "[t]aken together."  Compl. ¶ 18.

The Opposition alternatively suggests a new defamatory meaning supposedly flowing directly from the Report—that Deripaska worked to undermine democratic governments.  However, that meaning is not reasonably conveyed at any point in the AP Report, including by the quoted *question* posed by Senator Graham and cited in the Opposition.  Report at 3 ("if" Manafort was paid "to basically undermine democratic movements, that's something I'd want to know about").  Raising a question is not reasonably understood as making an accusation.  AP Mem. 16.  And even if this defamatory meaning suggested for the first time in the Opposition

---

[3] This requirement of both falsity and defamatory meaning, by way of example, would foreclose a defamation claim by former New England Patriots tight end Aaron Hernandez arising from a news article accurately reporting his murder conviction, but mistakenly identifying his team as the New York Giants.  A plaintiff cannot seize on an alleged error of *non-defamatory* fact as somehow making other statements actionable.

were reasonably conveyed, it would be nonactionable as an expression of the Senator's opinion, or otherwise privileged.  *Id.* at 20-21.

**B.      Deripaska Has No Answer To The Legal Deficiencies In His Complaint**

The Opposition provides no real answer to AP's demonstration that each of the implied defamatory meanings advanced in the Complaint fails to state a claim.  AP Mem. 15-26.  The Opposition argues at length, Opp. 17-23, that the implied meanings allegedly conveyed are each "verifiably" false (a point not even raised by AP as to most of the alleged implications), but fails to rebut any of the dispositive legal deficiencies identified in AP's motion.

**1.      Deripaska fails to show how Statement #1 reasonably conveys any actionable defamatory meaning.**

The Opposition argues that the paragraphs in the Report collectively defined as Statement #1 imply two purportedly defamatory meanings—"that Deripaska's business dealings implicate criminal activity related to government corruption," and "that Deripaska is associated with the Russian government."  Opp. 24-25.  Neither theory can withstand scrutiny.

As to the first alleged meaning, the Opposition offers no support beyond *ipse dixit* for Deripaska's contention that the Report implicitly accuses him of involvement in criminal activity.  The Report does raise a question about whether *Manafort* should have registered as a foreign agent but does not reach any conclusion on this point, even presenting Sean Spicer's view that no crime was committed.  Report at 2 ("[t]here's no suggestion [Manafort] did anything improper"); *see also id.* at 4 ("'I don't know if [Manafort] violated the Foreign Agent Registration Act,' Sen. Graham said . . . .").  The Opposition does not even attempt to rebut the constitutionally grounded principle that raising such questions, even ones deeply unpleasant and embarrassing to a subject, does not constitute an accusation of wrongdoing that can sustain a

claim for defamation.  *See, e.g.*, *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338-39

(D.C. Cir. 2015); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1098 (4th Cir. 1993).

Furthermore, even if Statement #1 could be construed as a defamatory accusation that

Manafort violated federal law, Deripaska has no claim for libel because the statement does not

convey anything defamatory *about Deripaska*.  *See* AP Mem. 17-18.  To say that Deripaska

retained Manafort, who failed to satisfy a registration obligation, is no more defamatory of

Deripaska than saying that a lawyer was ticketed for speeding on the way to court is defamatory

of the lawyer's client.  The false implication the Complaint alleges to flow from Statement #1

says nothing "odious, infamous or ridiculous" about Deripaska.  *See, e.g.*, *Coles v. Wash. Free*

*Weekly, Inc.*, 881 F. Supp. 26, 33-34 (D.D.C. 1995) (citation omitted), *aff'd*, 88 F.3d 1278 (D.C.

Cir. 1996); *see also Provisional Gov't of Republic of New Afrika v. ABC*, 609 F. Supp. 104, 108

(D.D.C. 1985) ("[d]efamation is personal," so to be actionable, "the publication must contain

'statements that are reasonably susceptible of application' to the [plaintiff]." (citations omitted)).

Unable to deny this bar to the claim under Statement #1, the Opposition abandons the

defamatory implication alleged in his Complaint and instead asserts that Statement #1 simply

conveys in another way the allegedly false meaning that he had an agreement with Deripaska:

> [T]he Article includes references to purported FARA violations
> only to substantiate the assertion that a contract triggering FARA
> requirements *exists*. This assertion is 'of and concerning'
> Deripaska, and it is false.

Opp. at 20 (emphasis added).  But, as discussed in Point I.A above, this new meaning now

attributed to Statement #1 is itself non-actionable.

A second defamatory meaning first proffered in the Opposition is equally off base.

Deripaska now argues that Statement #1 implies he "is associated with the Russian government,"

and contends this is defamatory by seemingly analogizing to the antipathy directed toward a

plaintiff-corporation reported to have been partnering with 1980's apartheid South Africa.  Opp.

24-26 (citing *S. Air Transp., Inc. v. ABC*, 877 F.2d 1010, 1015 (D.C. Cir. 1989)); *see also*

*Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) (describing someone as a

"crony" of Slobodan Milosevic, reviled for war crimes and ethnic cleansing, was sufficient to

establish a prima facie case of defamation).  But as Deripaska acknowledges, "[m]erely

associating somebody with a foreign government would not ordinarily be defamatory," Opp. 25,

and whatever criticisms may legitimately be directed at Vladimir Putin or the Russian

Federation, Deripaska offers no legal support for allowing a Russian citizen with a diplomatic

visa to maintain a libel claim based on a statement associating him with his home country.[4]

### 2. Deripaska fails to show how Statement #2 reasonably conveys any actionable defamatory meaning.

The Opposition attempts to defend two defamatory implications allegedly conveyed by

the statements of a U.S. Senator and members of the U.S. House (collectively labeled Statement

#2), specifically, that Deripaska's involvement with Manafort (1) was "nefarious" and warranted

investigation, and (2) was ongoing and tied to the "Trump Campaign Controversy."  Neither

implication is reasonably conveyed by the AP Report, and the defense of both alleged meanings

falls far short.

As already demonstrated, even if Statement #2 could reasonably be construed to accuse

Deripaska of "nefarious" conduct that deserved to be investigated, the implication would be non-

actionable as constitutionally protected opinion under *Ollman v. Evans*, 750 F. 2d 970 (D.C. Cir.

1984).  *See* AP Mem. 19-23.  This is true, among other reasons, because Senator Graham's quote

---

[4] Had Deripaska alleged this meaning in his Complaint, such a claim would readily be dismissed as substantially true based on ample public records subject to judicial notice.  *See* AP. Mem. at 37 & n.65 (sworn affidavits asserting diplomatic status), 8-9 (FARA filings), 32 n.50, 34-35 (interviews expressing support for Putin), 4 & n.7 (website touting patriotism).

("basically undermin[ing] democratic movements") and the views of the House Democrats (Manafort's past actions should "feature in their investigation"), are understood in the context of the Report as subjective assessments that are not capable of being proven true or false. *Ollman*, 750 F.2d at 987 (protecting "interpretable statement of opinion made inextricably in the contest of political, social or philosophical debate" (internal marks and citation omitted)); *Guilford Transp. Indus., Inc v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) ("a subjective view, an interpretation, a theory, conjecture, or surmise" is not actionable (citation omitted)).  Both the Graham quote and House Democrats' views were presented in a context that reinforced their subjective nature—among a collection of reactions from diverse political leaders to a topic with long-standing interest and passionate feelings.  *See* AP Mem. 21-22.

The Opposition miscites *Weyrich v. New Republic, Inc.* as supporting the proposition that "a quotation by a United States Senator" somehow "bolster[s] the factual nature of these allegations."  Opp. 21.  *Weyrich* says no such thing—the quotations at issue in that case were fabricated, but presented as true quotes.  The question addressed by the *Weyrich* court was whether, in context, the fake quotes were parodic and thus deserving protection.  235 F.3d 617, 626 (D.C. Cir. 2001).  Nothing in that decision supports Deripaska's suggestion that the subjective view of an elected official is less deserving of protection as opinion if it appears within quotation marks.

Nor does Deripaska explain how the "juxtaposition" of the Graham quote and the view of the House Democrats turns otherwise protected opinion into actionable defamation.  Opp. 25. While true facts might be presented in such a way as to imply some defamatory meaning not otherwise present in the words themselves, none of the inapposite cases cited in the Opposition supports Deripaska's argument that an unverifiable and subjective reaction of one member of

Congress becomes actionable in defamation if it is placed alongside the unverifiable and subjective reactions of other members of Congress.  The argument itself is nonsensical.

Deripaska provides no case support at all for his further contention that accurately and neutrally reporting the statements of elected officials on a public controversy is exempt from the neutral reportage privilege because the statements were delivered in response to a reporter's queries.  Opp. 22 n.8.  The alleged meaning of Statement #2 as an accusation by elected officials of nefarious conduct by Deripaska is both nonactionable and privileged.  AP Mem. 18-24.

The Opposition similarly misfires in arguing that Statement #2 implies that Deripaska "'still may be . . . deeply intertwined with'" Manafort.  Opp. 9 (purporting to describe the Report but instead quoting the Complaint's mischaracterization of it).  As AP has demonstrated, the Report cannot reasonably be read to imply that Deripaska has either an ongoing relationship with Manafort or any connection to the Trump Campaign Controversy—the Report itself *contradicts* any such implication.  *See* AP Mem. 19-24.  The Report describes actions proposed by Manafort in 2005 that continued through "at least 2009," and makes clear that this relationship with Deripaska was in tatters and the two were fighting in court before 2014.  Report at 2, 4.

Nothing in the Report implies any ongoing relationship when Manafort began working for the Trump campaign.  It quotes Sean Spicer belittling any concern about who Manafort's clients were "from 10 years ago," and quotes Deripaska's spokesman that Manafort's past work for him "now is subject to legal claims."  *Id.* at 2.  Even the AP headline and lead make plain that Manafort's proposal to act for the benefit of the Putin Government was "before" he ever worked for Trump.  It is unreasonable as a matter of law to read the Report to convey an implication that the Report itself directly contradicts.  *See* AP Mem. 23-24 (collecting cases).

### 3. Deripaska fails to show how Statement #3 reasonably conveys any actionable defamatory meaning.

The Opposition makes no serious effort to clarify how the facts reported by AP that collectively make up Statement #3 *reasonably* give rise to the implication that Deripaska stole Ukrainian assets in 2014 and is implicated in both a federal investigation of that theft and the Trump Campaign Controversy. As AP already has shown, they do not. *See* AP Mem. 24-26.

Nor does the Opposition even contend that the facts reported in Statement #3 are *false*. Opp. 23. The Opposition finds the alleged defamatory meaning in part by juxtaposing two statements in the Report that it does not deny to be true—that "at least some of [Manafort's] work in Ukraine was directed by Deripaska," and that "federal criminal prosecutors became interested in Manafort's activities years ago as part of a broad investigation to recover stolen Ukraine assets *after the ouster of pro-Russian President Viktor Yanukovych there in early 2014*." Report at 3 (emphasis added). In another example of misleadingly quoting the Report to support a meaning contrary to its actual text, the Opposition omits the italicized portion of the statement. The Report itself makes clear that the "broad investigation" into the theft of assets (of which Manafort does not even appear to be a central focus, let alone Deripaska), concerns conduct nearly 10 years after Manafort's proposal to work for Deripaska and at a time when the two were already embattled in litigation.

Furthermore, none of this reasonably conveys wrongdoing by Deripaska or implies that Deripaska "is implicated in federal prosecutors' investigation." Opp. 23. Again, the alleged implication is particularly unreasonable given that the Report includes facts that indicate the opposite. *See* AP Mem. 25. Courts confronting similar allegations have repeatedly rejected defamation-by-association theories like Deripaska's because no claim for defamation arises simply from an accurate report of a plaintiff's association with a person accused of wrongdoing.

*See, e.g.*, *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1308 (11th Cir. 2001) (rejecting gold refiner's defamation claim based on article "detail[ing] the process by which smugglers commit tax fraud"); *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 302-03 (4th Cir. 2008) (rejecting contractor's defamation claim based on statements referring to his employees and associates ); *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 123 (D.D.C. 2011) (rejecting implication that plaintiff knowingly laundered money to assist terrorists); *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37-38 (N.Y. App. Div. 2014) (rejecting corporate registration agent's defamation claim based on report of wrongdoing by clients).

The Opposition fares no better in contending that Statement #3 ties him to the current Trump Campaign Controversy.  As already discussed, the Report itself negates any such implication.  *See* AP Mem. 24-26; *supra* at 9.  Nor does Deripaska have any response to the authority cited by AP holding that dismissal is required in the absence of any showing that AP intended or endorsed Deripaska's strained defamatory inferences.  *See* AP Mem. 24-26.

### 4. Deripaska fails to show how the Report "as a whole" reasonably conveys any actionable defamatory meaning.

The Opposition equally fails to respond to AP's demonstration that a plaintiff cannot state a free-floating claim for defamation unmoored to specific false, defamatory statements.[5] *See* AP Mem. 26-28.  Without providing any legal authority, and again contradicting its insistence that Deripaska's claim is for direct libel only, the Opposition simply states that "the Article as a whole is defamatory because its essential message is that two private emissaries of Presidents Trump and Putin entered into an agreement to undermine governments of elected

---

[5] By failing to respond, Deripaska has conceded the point.  *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded" (citations omitted)).

leaders." Opp. 2.  This deeply strained implication is untenable as a matter of law, for the reasons already set forth.  *See* AP Mem. 26-28; *supra* at 4.  Moreover, the Opposition's disingenuous attempt to depict Paul Manafort as the "emissary" of a U.S. President when he worked for Deripaska a decade ago is not anything remotely conveyed by the Report.

Plaintiff's last-ditch effort to rewrite his Complaint and introduce such far-fetched implications only underscores why courts properly require libel plaintiffs to "allege specific defamatory comments," lest vague innuendos untethered to the publication be used as a vehicle to chill speech.  *Tavoulareas v. Piro*, 817 F.2d 762, 781 (D.C. Cir. 1987).  Because none of the specific defamatory meanings of the three "Statements" alleged in the Complaint are actionable, Deripaska's claim for libel should be dismissed.

## II.     DERIPASKA ALLEGES NO FACTS PLAUSIBLY ESTABLISHING ACTUAL MALICE, AND WRONGLY SEEKS TO AVOID DOING SO

Apparently recognizing that the Complaint fails to plausibly allege actual malice, the Opposition makes the remarkable claim that Deripaska is not obligated to do so.  Opp. 27-29.  It first argues that he is not a public figure "with respect to the . . . essential subject matter of the Article," *id*. at 28, and then contends that the existence of actual malice must be assumed at this stage, even if Deripaska is a public figure, *id.* at 27-28.  Both arguments are demonstrably wrong and Deripaska's failure to plausibly allege actual malice independently requires dismissal. While the Opposition blithely asserts that Deripaska "is safely able to" plead actual malice, *id.* at 5, it is telling that he both fails to do so in his Complaint *and* fails to respond at all to AP's demonstration of the Complaint's deficiency.  *See* AP Mem. 40-44 (detailing inadequacy of plaintiff's actual malice allegations).

A.    **Deripaska's Effort To Shed His Public Figure Status By Artificially Narrowing The Public Controversy Is Unavailing**

Deripaska argues that he is not a limited-purpose public figure because his prominent and undisputed role in public life and the ongoing "public controversy over 'the role of Russian oligarchs, and their ambitions and influences in furtherance of Russian priorities,'" were not "the Article's essential subject matter."[6] Opp. 29. This attempt to recast the preexisting public controversy, which by definition must predate the challenged publication, as limited to the four corners of the challenged Report, is contrary to the settled law of this Circuit.

In determining whether a controversy existed before publication of the challenged statements, the Court "must examine whether persons actually were discussing some specific question," and should consider "if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment. . . . If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980); *see also OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 46-47 (D.D.C. 2005) ("To qualify as a public controversy, the law requires only that the issue be discussed publicly, and that the resolution of the issue affect others besides the immediate participants in the debate."). Put another way, the existence of the public controversy is

---

[6] Deripaska does not dispute that he is someone who "has 'assumed a role of especial prominence in the affairs of society'" that "'invites attention and comment.'" *Tavoulareas,* 817 F.2d at 773 (internal marks omitted) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)). And he offers no response to AP's observation that his status as a Russian Federation diplomat, which he has employed to defeat jurisdiction over him by U.S. tribunals, also qualifies him as a public official subject to the actual malice standard. AP Mem. 4, 9, 30 n.43; *see also* Brett Forrest, *Paul Manafort's Overseas Political Work Had a Notable Patron: A Russian Oligarch*, Wall. St. J. (Aug. 17, 2017), https://www.wsj.com/articles/paul-manaforts-overseas-political-work-had-a-notable-patron-a-russian-oligarch-1504131910 (reporting on Deripaska's 2007 media statement, "'I don't separate myself from the state'").

determined by viewing the content of the challenged publication in a larger context and assessing how the words on the page relate to the public discussion.

This point is clearly illustrated by *Waldbaum*, where the publication at issue was a five-sentence report concerning plaintiff's termination as president of a supermarket cooperative. Waldbaum challenged a statement in the report that the co-op had been "losing money the last year and was retrenching."  627 F.2d at 1290.[7]  In identifying the preexisting public controversy, the *Waldbaum* court looked beyond the specific publication at issue to an ongoing "public debate within the supermarket industry and beyond" about innovation and business strategy and found it to be "the viability of cooperatives as a form of commercial enterprise and over the wisdom of various policies that Greenbelt in particular was pioneering."  *Id.* at 1299.  The *Waldbaum* analysis makes clear that a "controversy" for the public figure analysis is determined by viewing the challenged publication in a wider context and considering how the publication relates to the pre-existing debate.

Earlier this year the D.C. Circuit applied this same approach, where a libel plaintiff challenged a newsletter's summary of his petition for *certiorari* in a criminal prosecution.  In deciding plaintiff's public figure status, the court looked beyond the narrow focus of the newsletter to the underlying "public controversy concerning the 1983 shootout" that had been the basis for the petitioner's conviction, and also considered "the underlying issues of taxation and

---

[7] The challenged statement read, in full:

> GREENBELT OUSTS ERIC WALDBAUM
>
> Eric Waldbaum has been replaced as president of Greenbelt Consumer Services. Rowland Burnstan will serve as acting chief executive office(r) until a new president is named.  Burnstan, an independent management consultant and economist, has worked for various Government agencies and businesses.  Greenbelt said part of his interim job will be to locate a new president for the co-op, which has been losing money the past year and retrenching.  Waldbaum had served as president since 1971.  His plans are not known.

*Id.* at 1290 n.5.

federal government power" explored in prior press coverage of petitioner's association "with anti-tax and anti-government movements, as well as explorations and discussions of the political and religious ideologies underlying those movements."  *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 114 (D.C. Cir. 2017).  The premise of Deripaska's argument—that the controversy itself must be defined by the challenged publication alone—is clearly wrong.

Indeed, Deripaska's very argument was recently rejected in *Jankovic v. International Crisis Group*.  There, a Serbian businessman plaintiff argued that the scope of the public controversy must be defined by the challenged report, and was thus limited to the "Serbian government's lack of progress in implementing political and economic reform" after the assassination of its prime minister and "what that meant for Serbia's integration into the international community."  72 F. Supp. 3d 284, 301 (D.D.C. 2014) (citation omitted), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016).  The court rejected the argument, noting that the topics explored in the challenged report were "part of the 'larger debate'" concerning broader economic and political reforms, which was the relevant public controversy for assessing plaintiff's public figure status.  *Id.* at 302, *aff'd* 822 F.3d at 586 (rejecting plaintiff's view that "narrowing the definition of the controversy is required in order to relate it to the publication containing the defamation" and observing that the court itself had previously "defined controversies as being broader than the narrower discussion contained in the defamatory document" (citations omitted)); *see also Tavoulareas*, 817 F.2d at 774 (article focused on nepotism by Mobil executive while controversy was nation's "[p]ublic policy toward the oil industry"); *OAO Alfa Bank*, 387 F. Supp. 2d at 43 (D.D.C. 2005) (article focused on U.S. corporate influence-peddling while controversy was identified as "corruption in post-Soviet Russia and the future of Western aid and investment in the country").

Deripaska fails to cite any legal authority for his premise that the appropriate public controversy is set by the metes and bounds of the challenged publication for a simple reason:  It is clearly wrong.  Because Deripaska's entire public figure argument rests upon this faulty premise, it must be rejected.

Even were the argument not wrong as a matter of law, it fails as a matter of fact.  The Report touches upon a long-standing concern over Russian oligarchs who act as *de facto* emissaries for the Russian government to expand their own influence along with Russia's.  For example, the Report introduces Deripaska as a businessman whose foreign transactions were good business for the Kremlin and whose presence at international diplomatic events had drawn attention from the U.S. State Department.  Report at 3.  The "Trump Campaign Controversy" can only be appreciated as the kind of "sub[-]controversy" often generated by larger public debates.  *E.g.*, *Waldbaum*, 627 F.2d at 1297 n.27.  There can be no serious doubt that the role of *de facto* Russian emissaries like Deripaska is "a real dispute" that "has received public attention" and "affects the general public."  *Id.* at 1296; *see, e.g.*, AP Mem. 3 n.4, 4 nn.6-9, and 6-9 (citing voluminous pre-publication public records, news coverage, and public debate over the influence of Russian leaders, tycoons, and agents on U.S. government and policy).

The Opposition has no answer with respect to AP's demonstration that the other prongs of the *Waldbaum* analysis are satisfied.[8]  Deripaska does not dispute that he voluntarily injected himself into the controversy over Russian oligarchs acting as emissaries of the Russian government and cannot evade the bedrock principle that by seizing the spotlight for his public achievements and opinions, including accepting diplomatic status from the Russian government, and "hobnob[bing]" with President Putin and other world leaders, he was "engaged in conduct

---

[8] The Opposition fails even to mention the second and third prongs of the *Waldbaum* analysis and thus concedes they are met.  *Wannall*, 775 F.3d at 428.

that he knew markedly raised the chances that he would become embroiled in a public controversy."[9]  *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990); *see also, e.g.*, *Rebozo v. Wash. Post Co.*, 637 F.2d 375, 378-80 (5th Cir. 1981) (President Nixon's confidant voluntarily assumed the risk of being a public figure); *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 132-33, 142-44 (D.D.C. 2016) (same for Kazakhstani businessman who acted to benefit the ruling family).

Deripaska is undeniably a public figure for purposes of this libel claim.

### B.   Deripaska Is Plainly Incorrect In Denying Any Obligation To Plead Facts Plausibly Alleging The Existence Of Actual Malice

Deripaska is equally incorrect in arguing that he is not required at this stage to plead actual malice because publication with fault may simply be assumed.[10]  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court interpreted Rule 8 of the Federal Rules of Civil Procedure to require a federal complaint to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), reinforced that a complaint must plead

---

[9] Other plaintiffs have easily been deemed public figures on analogous facts.  *Compare, e.g.*, *Jankovic*, 822 F.3d at 587 (hiring of U.S. lobbyist "eliminates the risk that [plaintiff] was merely an ordinary civic participant . . . mischaracterized as a limited-purpose public figure"), *with* AP Mem. 8-9 (U.S. lobbyists hired to aid Deripaska and Russian Federation); *OAO Alfa Bank*, 387 F. Supp. 2d at 43-45 (Russian businessmen, "catapulted" into the "elite" during "the fall of the Soviet Union" and with close ties to the Kremlin, had "been the repeated target[s] of allegations of collusion and illegality," which supported finding they played a non-trivial and non-tangential role in the public controversy), *with* AP Mem. 2-9, 34-37 & n.64 (Russian businessman Deripaska, likewise made rich in the aftermath of the Soviet Union and close to the Kremlin, had "[f]or years" been subject of allegations of ties to organized crime).

[10] The Opposition even misstates the threshold question of the pleading standard by which the Complaint is to be judged, contending that "[d]ismissal is improper unless the 'plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Opp. 12 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  The Supreme Court expressly rejected the "no set of facts" standard in *Twombly*, 550 U.S. at 562-63 ("[that] language has been questioned, criticized, and explained away long enough"); *see also Iqbal*, 556 U.S. at 670.  In its place, the Court required a claimant to allege facts that "raise the right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." While Rule 8 "marks a notable and generous departure from the hyper[-]technical, code-pleading regime of a prior era," it does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678-79.

To survive a motion to dismiss, a litigant must allege facts plausibly establishing each element of its claim before it may impose the substantial burdens of litigation on a defendant. *Id*. This includes the pleading of actual malice. As recently observed in another public figure libel case,

> if political journalism is to achieve its constitutionally endorsed role of challenging the powerful, legal redress by a public figure must be limited to those cases where the public figure has a plausible factual basis for complaining that the mistake was made maliciously, that is, with knowledge it was false or with reckless disregard of its falsity.

*Palin v. N.Y. Times Co.*, --- F. Supp. 3d ---, 2017 WL 3712177, at *1 (S.D.N.Y. Aug. 29, 2017).

Notwithstanding this clear rule, Deripaska remarkably urges that the *Iqbal/Twombly* standard should *not* apply to the pleading of actual malice. He posits that "[a]s long as it alleges facts supporting *other* elements of the defamation claim, the Complaint *need only mention* actual malice to satisfy Rule 8." Opp. 27 (emphases added). Yet again, his position is flatly incorrect as a matter of law.

As previously noted (AP Mem. 39 & n.66), every Court of Appeals to have considered this question has concluded that the *Iqbal/Twombly* standard applies to pleading actual malice; a public figure libel plaintiff must plead facts "giving rise to a reasonable inference that the defendants published the story knowing that it was false or with reckless disregard for whether it was false or not." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016); AP Mem. 39 n.66 (collecting decisions of the First, Second, Fourth, Seventh, and Eleventh Circuits).

Seeking to avoid not only controlling Supreme Court authority but also uniform rulings across the Circuits, Deripaska relies upon stray language from *Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013), a case that does not address pleading standards at all, much less the standard for pleading actual malice. In *Farah*, the author of a book questioning President Obama's birth place and eligibility for the presidency sued Esquire magazine over a satire. The author alleged defamation and related claims, and Esquire moved to dismiss on the grounds that the piece was constitutionally protected opinion—in other words, non-actionable as a matter of law on the basis that it was incapable of being proven true or false. In a brief paragraph preceding the court's affirmance of dismissal on that basis, it stated that "[t]he court must also assume" for purposes of considering a dismissal under Rule 12(b)(6), "that Esquire made such statements with the requisite state of mind." *Id.* at 534 (citing *Weyrich*, 235 F.3d at 623).[11] Neither the adequacy of pleading nor the existence of actual malice (*i.e.*, knowledge of *falsity*) are addressed at all in *Farah*. In short, this passing reference to actual malice in a case that did not decide actual malice does not bear the heavy weight Deripaska places on it.

Tellingly, in several cases in this Circuit that *have* given recent occasion to consider the adequacy of actual malice pleadings, judges have applied the *Iqbal/Twombly* standard and have not viewed *Farah* or *Weyrich* to be any bar. *See* AP Mem. 39-40; *see also, e.g.*, *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218 (D.D.C. 2012) (the pleading standard requires plaintiff to plausibly allege that "the defendant must have acted with actual malice, i.e., 'with knowledge that it was false or with reckless disregard of whether it was false or not'" (citation omitted)); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262-63 (D.D.C. 2013) ("with respect both to

---

[11] *Weyrich* was decided in 2001, before *Iqbal/Twombly*. It is a case also involving questions of pure opinion rather than fault pleading standards, and is the sole precedent on which *Farah* relied for the proposition quoted by Deripaska.

falsity and actual malice, [plaintiff] must 'demonstrate that [his] complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" (citation omitted)); *Thomas v. News World Commc'ns, Inc.*, 681 F. Supp. 55, 65 (D.D.C. 1988) (granting motion to dismiss where complaint lacked "any colorable claim" that defendant published statements with actual malice).

### C. The Opposition Confirms That Deripaska Has Not And Cannot Plausibly Allege Actual Malice

A public figure like Deripaska must allege facts—and not simply conclusions—that if proven would plausibly establish publication by AP with "actual malice" in order to state a claim.  He has not done so.  Nothing in the Complaint plausibly alleges facts establishing that AP intended to convey the implications alleged by Deripaska, much less that those implications were knowingly false.  The new criticisms of AP's editing of the Report in the Opposition do not demonstrate actual malice as a matter of law, only confirming that Deripaska has not and cannot state a viable claim for defamation.

The Opposition contends that the Report should have explored in deeper detail both Deripaska's business ventures and the political history of Ukraine, and theorizes that a failure to do so demonstrates actual malice.  It does not.  Actual malice is "a term of art denoting deliberate or reckless falsification." *Masson v. New Yorker Magazine*, 501 U.S. 496, 499 (1991).  A defendant acts recklessly when, at the time of publication, it "in fact entertained serious doubts as to the truth of his publication" or acted "with a high degree of awareness of . . . probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (citation omitted).  Whether an allegation of actual malice "is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989); *see also Parisi*, 845 F. Supp. 2d at 219 (dismissing public figure's allegations that defendant "fabricated the

story, that the story was so improbable that only a reckless person would have circulated [it], or that he acted wholly on an unverified anonymous telephone call" as legally insufficient).

Deripaska's critique of AP's supposedly "strange" editorial choices utterly fails as evidence of actual malice.  As in *Newton v. National Broadcasting Co.*, that material omitted from or included in AP's report "does not portray [plaintiff] in the most flattering light" is "irrelevant to the actual-malice inquiry."  930 F.2d 662, 686 (9th Cir. 1990); *see also, e.g., Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986) ("First Amendment cautions courts against intruding too closely into questions of editorial judgment").  Deripaska describes the Report as "a pre-packaged narrative," Opp. 6, but even if that were true (and it is not), "concoct[ing] a pre-conceived storyline" similarly fails to demonstrate actual malice.  *Jankovic*, 822 F.3d at 597 (citing *Tavoulareas*, 817 F.2d at 795 ("adopt[ing] an adversarial stance" is not "antithetical to the truthful presentation of facts")); *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (actual malice theories "grounded on allegations of poor journalistic practices—*e.g.*, that [defendant] had a preconceived story-line . . . are without support in the case law").

Nor does AP's decision not to delve further into Deripaska's "Ukrainian business issues"—specifically, that Deripaska may have perceived his businesses to be under threat of nationalization in the Orange Revolution—amount to purposeful avoidance of the truth as Deripaska argues.  Opp. at 8.[12]  It is hornbook law that even wholesale failure to investigate,

---

[12] The Opposition's background section presents information about Ukraine's political climate during the Orange Revolution that plaintiff suggests should have led AP to question whether Deripaska's motivation was to protect Russian interests or to protect his interests as a private property owner facing state confiscation.  Deripaska's portrayal of his motivation, even if accepted as true, does not make the Report false and does not establish actual malice.  The mere existence of facts that contradict a challenged publication does not plausibly establish actual malice.  *See, e.g.*, *N.Y. Times v. Sullivan*, 376 U.S. 254, 287-88 (1964); *Jankovic*, 822 F.3d at 595-97 (alleged "inherent improbability" of publisher's knowledge of country's political situation is not actual malice); *see also Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485,

without more, is not "purposeful avoidance" constituting actual malice.  Simply put, "reliance on insufficient investigation [as evidence of actual malice] is a non-starter.  Only if 'a defendant has reason to doubt the veracity of its source' is its 'failure to examine evidence within easy reach or to make obvious contacts' evidence of its reckless disregard."  *Jankovic*, 822 F.3d at 594 (citation omitted).  Or as the Court of Appeals explained in *Lohrenz v. Donnelly*, "[e]ven where doubt-inducing evidence could be discovered, a publisher may still opt not to seek out such evidence and may rely on an informed source, so long as there is no 'obvious reason to doubt' that source." 350 F.3d 1272, 1285 (D.C. Cir. 2003) (citation omitted)); *see also, e.g., LaPointe v. Van Note*, 2006 WL 3734166, at *12 (D.D.C. Dec. 15, 2006) (acting on "incomplete information" does not amount to actual malice).[13]

The newly added allegation that "AP knew" that the political context in Ukraine refuted its reporting because its "reach is too long and its resources too great not to have known it," Opp. at 7, is both a logical fallacy and legally insufficient.  Logically, Deripaska seems to urge that because he had "business issues" in Ukraine, he could not have been advancing Russian governmental interests, but the two are not mutually exclusive.  To the contrary, almost by definition a Russian oligarch's business interests are intertwined with the interests of the Russian state, and efforts to promote Russian policies abroad are not erased simply because they also made business sense.

---

511 (1984) (falsity is not evidence of actual malice); *Wash. Post Co. v. Keogh*, 365 F.2d 965, 970 (D.C. Cir. 1966) (same).

[13] Deripaska faults AP for supposedly not "ask[ing] about" Deripaska's Ukrainian business, but "plaintiff cannot rely on the defendant's failure to consult with him prior to the publication . . . as evidence of actual malice." *Secord v. Cockburn*, 747 F. Supp. 779, 789 (D.D.C. 1990). Moreover, AP *did* contact Deripaska.  Although he declined to answer AP's questions, Report at 3, the Report includes his representative's written response:  "'There was an agreement between Mr. Deripaska and Mr. Manafort to provide investment consulting services related to business interests of Mr Deripaska which now is a subject to legal claims.'"  *Id.* at 4.

Legally, these allegations provide plaintiff no help here because "it is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant *in fact* harbored subjective doubt." *Jankovic*, 822 F.3d at 589 (emphasis added and citation omitted).  Moreover, an allegation of actual malice must be weighed against the information actually known to the author of a publication, not against the institutional knowledge of an organization as a whole.  *See, e.g.*, *Sullivan*, 376 U.S. at 287-88 (no actual malice on part of defendant in publishing advertisement containing false information without first checking its accuracy against the information contained in the newspaper's own files).  As recently explained in dismissing another public figure's defamation claim for failure to plausibly allege actual malice, "it is not the [news organization's] collective knowledge and intent that is relevant but rather" the individual author's.  *Palin*, 2017 WL 3712177, at *8; *see also Tavoulareas*, 817 F.2d at 794 ("defamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement").

Deripaska is equally off-base in contending that a video published by AP and featuring reporter Jeff Horwitz shows that AP was aware of some falsity in its Report.  It does no such thing.  The very quotes Deripaska points to repeat information that is conveyed in the Report itself.  *Compare* Opp. 11, *with* AP Mem. 43-44.  And, even if they did not, a clarification is evidence of a *lack* of actual malice.  *Palin*, 2017 WL 3712177, at *8.

In short, none of the strained theories of actual malice offered up for the first time in Deripaska's briefing, individually or collectively, are sufficient as a matter of law.

## III.    DERIPASKA MAY NOT PROCEED TO DISCOVERY WITHOUT ALLEGING A VIABLE CLAIM FOR LIBEL

The Opposition reveals an intense interest by Deripaska in knowing AP's confidential sources, which at the end of the day may well be his true motive in advancing the far-fetched

defamatory implications alleged in the Complaint and argued in the Opposition.  The Opposition

repeatedly questions AP's reference to "newly disclosed business records" and its interviews of

"(unnamed) people with direct knowledge."  Opp. 1; *see also id.* at 5 (noting AP's reliance on

"never-before-seen documents").  It even taunts AP for not identifying any of its sources on this

motion and provocatively suggests "AP has no evidence."  *Id.* at 11.  But this is a motion to

dismiss and no such evidence is required.  Nor is Deripaska entitled to seek disclosure of AP's

work product unless and until he can plausibly allege the existence of a viable claim.  *Iqbal*, 556

U.S. at 678-79.  He has not done so.

As explained by the Supreme Court, litigants must allege facts plausibly establishing

*each element* of their claim before they may impose the substantial burdens of discovery on

adversaries.  *Id.*  This pleading burden is imposed to prevent plaintiffs from "unlock[ing] the

doors of discovery . . . armed with nothing more than conclusions."  *Id.* at 679.  Courts in this

Circuit repeatedly have emphasized that plaintiffs cannot defeat a motion to dismiss by

suggesting that discovery will reveal the information necessary to meet the Rule 8 pleading

standard.  *See, e.g.*, *Felder v. WMATA*, 105 F. Supp. 3d 52, 59 (D.D.C. 2015) (plaintiff not

entitled to use discovery to establish a claim that is plausible on its face "even when those facts

are only within the head or hands of the defendant" (internal marks and citation omitted));

*People for Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 60 F. Supp. 3d 14, 20

(D.D.C. 2014) (same).

## CONCLUSION

For these reasons, and those set out in the Memorandum in Support of AP's Motion to Dismiss, AP respectfully requests this Court to enter an order dismissing the Complaint, with prejudice, and enter such other and further relief as the Court deems just and proper.

Dated:  September 8, 2017

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP

*Of Counsel*:

Karen Kaiser
Brian Barrett
THE ASSOCIATED PRESS
200 Liberty Street
New York, NY 10281
Telephone: (212) 621-7547
kkaiser@ap.org
bbarrett@ap.org

/s/ *David A. Schulz*
    David A. Schulz (D.C. Bar No. 459197)
    Chad R. Bowman (D.C. Bar No. 484150)
    Mara J. Gassmann (D.C. Bar No. 1014532)
    Maxwell S. Mishkin (D.C. Bar No. 1031356)

1899 L Street, N.W., Suite 200
Washington, D.C. 20036
Telephone: (202) 508-1136
dschulz@lskslaw.com

*Counsel for Defendant The Associated Press*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I caused defendant Associated Press' Reply

Memorandum in Support of its Motion to Dismiss for Failure to State a Claim to be filed and

served electronically via the Court's ECF System upon counsel of record.


Dated: September 8, 2017                    /s/ *David A. Schulz*
                                            David A. Schulz